# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DARRIN LEAF,

     Plaintiff,

                                  Case No. 1:03 CV 0226

v                                    Hon. Robert Holmes Bell

SHERIFF STEPHEN DeBOER, individually
and in his official capacity, and BARRY
COUNTY,

     Defendants.

_____/

Katherine Smith Kennedy               Patrick A. Aseltyne (P23293)
Pinsky, Smith, Fayette & Hulswit       Johnson, Rosati, LaBarge,
146 Monroe Center St. NW #1515         Aseltyne & Field, P.C.
Grand Rapids, MI 49503               Attorney for Defendants
(616) 451-8496                      303 S. Waverly Road
                                     Lansing, MI 48917
                                     (517) 886-3800

_____/

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Index of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

    A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.    There Is No Genuine Issue of Material Fact That Plaintiff Has
Failed to Satisfy the Three Elements for Stating a First
Amendment Retaliation Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            a.    Plaintiff did not engage in protected activity. . . . . . . . . . . . . . . 7

            b.    Plaintiff has not suffered a materially adverse job consequence.   8

            c.    Nor is the Plaintiff able to show that there was a
causal relationship between his alleged protected activity
and the transfer of positions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        2.    There Is No Genuine Issue of Material Fact That the
Reason Plaintiff Did Not Receive the Court Officer Assignment
Was Because the Judges Preferred Another Officer. . . . . . . . . . . . . . . . . . 12

        3.    The Sheriff is Entitled to Qualified Immunity. . . . . . . . . . . . . . . . . . . . . 13

        4.    There Is No Basis to Continue the County as a Named Defendant . . . . . 17

    E.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# INDEX OF AUTHORITIES

**Cases**

Anderson v Liberty Lobby, Inc.,
477 US 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Barrett v Lucent Techs,
No. 00-4458, 2002 WL 1272116 (6th Cir June 6, 2002) (per curiam) . . . . . . . . . . . . . . 10

Betkerur v Aultman Hospital Association,
78 F3d 1079 (6th Cir 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Board of Directors of Int'l Rotary v Rotary Club of Duarte,
481 U.S. 537; 107 S. Ct. 1940 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Celotex Corp. v Catrett,
477 US 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Clark County School Dist. v Breeden,
532 U.S. 268; 121 S.Ct. 1508 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Cooper v City of North Olmsted,
795 F.2d 1265 (6th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Garner v. Memphis Police Dep't,
8 F.3d 358 (6th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Hafford v Seidner,
183 F3d 505(6th Cir 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Harlow v Fitzgerald,
475 US 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Hollins v Atlantic Co.,
188 F3d 652 (6th Cir 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Kentucky v. Graham,
473 U.S. 159;105 S.Ct. 3099; 87 L.Ed.2d 114 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Kocsis v Multi-Dare Management Inc.,
97 F3d 876 (6th Cir 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Matsushita Elec. Indus. Co. v Zenith Radio Corp.,
     475 US 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Mitchell v Forsyth,
     472 US 511(1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Moon v. Transport Drivers, Inc.,
     836 F.2d 226(6th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Neague v Cynkar,
     258 F3d 504 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Phelps v Yale Security, Inc.,
     986 F2d 1020(6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Saucier v Katz,
     533 US 194; 121 S Ct 2151 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Street v J.C. Bradford & Co.,
     866 F2d 1472 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Strouss v Michigan Dept of Corrections,
     250 F3d 336(6th Cir 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Thaddeus X v Blatter,
     175 F3d 378 (6th Cir 1999) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

Wrzesinski v Danielson,
     231 F Supp2d 611 (WD MI, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Zanders v National RR Passenger Corp.,
     898 F.2d 1127(6th Cir 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**State Statutes**
MCL 15.405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

MCL 28.421 et seq. (2000 PA 381) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Federal Statute**
42 USC 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

42 USC1988 . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Federal Court Rule**
Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## A.     INTRODUCTION

Plaintiff is a road patrol deputy with the Barry County Sheriff's Department.  He has been a deputy for 14 years.  In 1998, at his request,  he was assigned to the newly-created position of school liaison officer by Defendant Sheriff Stephen DeBoer.  This was a day shift position.  It paid the same and had the same benefit level as the traditional road deputy position the Plaintiff had been doing.  He served as the school liaison officer until August 2001, when he was removed in favor of another employee.

The Plaintiff claims that he was "demoted" back to a road patrol position because he signed a petition in favor of legislation that would have liberalized the concealed weapons licensing statute in Michigan and the Sheriff was an opponent of that legislation.  See 2000 PA 381; MCL 28.421 <u>et</u> <u>seq</u>.  He also claims that the Sheriff demoted him because he taught gun safety classes with the head of the local NRA. ( ¶ 9, Plaintiff's Complaint)

Plaintiff goes on in his Complaint to claim that in late 2001 he sought appointment by the Sheriff to a new court officer position and that this job had traditionally been assigned to the applicant with the highest seniority among the deputies.  He alleges that he was not chosen because of his above association and the stance he took on the concealed weapons legislation.

In this case brought under 42 USC 1983, Plaintiff is suing the Sheriff in his individual and official capacities and also sues the County "because it funds the Barry County Sheriff's Department."  (¶ 6, Plaintiff's Complaint)  Plaintiff claims that his constitutional rights under the First and Fourteenth Amendments have been abridged.  He seeks alleged lost wages for the failure to assign him to either the school liaison or court officer positions and  punitive damages.  He further seeks reinstatement to the school liaison, court officer or comparable position, as well as attorney fees under 42 USC1988.

## B.    STATEMENT OF FACTS [1]

The Plaintiff h**as** been employed as a deputy sheriff with the Barry County Sheriff's Department since 1989. (¶ 7, Plaintiff's Complaint)  The terms and conditions of his employment are set forth in a collective bargaining agreement that was entered into between the union that represents the deputies, the County and the Sheriff.  (Exhibit 3)  In 1998 the Plaintiff saw a posting for a new position that had just received grant funding.  The position was for a school liaison officer. It meant that he would no longer be working his midnight shift and that his job duties would change from the traditional ones performed by a road patrol deputy to an officer who worked primarily during the day with teachers and students from the various school districts in and about Barry County.  He would receive the same rate of pay and other benefits in the new position.  (Exhibit 1, pp. 91-92)  Plaintiff applied for the position and was selected by the Sheriff.

He testified that the Sheriff's wife, who was not a Department employee or his supervisor, but who had volunteered to write the grant request for the position, told him she thought he would serve as the school liaison officer for the length of the grant.  (Exhibit 1, pp. 29-31) However, the CBA recognizes that the Sheriff alone retains "the right to direct, . . . transfer, assign and retain employees in positions within the Sheriff's Department. . . ."  (Exhibit 3, p.3; also referenced on page 3 of Arbitrator Kruger's Opinion, Exhibit 4) And neither the Sheriff nor the undersheriff had told Plaintiff that he would stay in the school liaison position for any set period of time.  (Exhibit 1, p. 75)

Plaintiff testified that he did not think he did anything to warrant removal from the school liaison position and was surprised when he was removed by the Sheriff just before the start of the

---

[1] References to deposition testimony will be to Deputy Dar Leaf's deposition, Exhibit 1, and to Sheriff Stephen DeBoer's deposition, Exhibit 2, followed by the page reference.  Also, all exhibits to this brief are filed in paper form pursuant to Local Rule 5.7(d)(vii).

2001-2002 school year. He had not received, in his opinion, any significant criticism from the Sheriff before the meeting to remove him.

The Rules and Regulations of the Department require that officers who wish to work outside the Department on their own time must obtain permission from the administration to do so. The Plaintiff was allowed to teach numerous classes on gun safety and martial arts throughout the time that he has worked at the Department by permission of the Sheriff. (Exhibit 1, pp. 47-48, 64-65) In fact, he was never once denied that privilege by the Sheriff. (Exhibit 1, p. 48)

Mr. Leaf explained that he solicited persons to help him teach a class on gun safety and one of the persons who responded was a Mr. Stevens, a county resident and president of the local NRA. However, when he taught the class, Stevens began discussing political issues with the attendees, both children and adults, and Leaf did not think it was appropriate. (Exhibit 1, pp. 94-95) In fact, Leaf did not invite Stevens to return as an instructor for this reason. Ibid.

Plaintiff was asked by Stevens in the summer of 1999 to circulate a petition for signatures in support of the CCW legislation that was designed to relax the standards for carrying a concealed weapon in Michigan. (Exhibit 1, pp. 98-100) Leaf circulated the petition among his fellow officers while he was on duty and the Sheriff asked him not to do that, so he ceased. Ibid. Meanwhile, Mr. Stevens had an ongoing disagreement with the Sheriff and the local gun board over being denied a CCW permit and in fact he sued the Sheriff and the County Gun Board for $5 million over the denial. (Exhibit 1, pp. 132-33)

In the same 1999 meeting that the Sheriff asked Plaintiff not to circulate petitions while on duty, he also told him that maybe he had gotten some bad advice in doing so from the people he was hanging around. (Exhibit 2, p. 35) The Sheriff admitted that he was referring to Mr. Stevens, but said that he made the comment because he thought the advice was wrong, not because it was Mr.

Stevens who gave it. (Exhibit 2, pp. 36, 39) Plaintiff admits that this comment by the Sheriff was probably after the incident when Plaintiff himself found Mr. Stevens' comments while teaching the gun safety class to have been inappropriate enough that he decided not to invite Stevens back to teach the class. (Exhibit 1, p. 95)

According to Leaf, about two years later in March 2001, the Sheriff again spoke with him and expressed concern that he may be exposing the county to liability by teaching the gun safety and concealed weapons classes while a deputy sheriff, even though he was teaching the classes through his private business, a d/b/a called The Right Fight. Again, the Sheriff supposedly questioned the Plaintiff about whom he was hanging out with. (Exhibit 1, pp. 132-33) This was immediately after Stevens filed a $5 million dollar lawsuit against the Sheriff. (Exhibit 5)

Leaf admits that the Sheriff never told him not to associate with Stevens, or that he did not approve of Mr. Stevens, or what there was about Mr. Stevens that supposedly caused the Sheriff to question Leaf about him. (Exhibit 1, pp. 68, 108) Leaf cannot remember if he ever asked the Sheriff why he may have been concerned about Stevens. Ibid Ironically, Leaf admits that he did not hang out with Mr. Stevens in any event. (Exhibit 1, pp. 103-04)

In response to the Sheriff's concern about increased liability to the County caused by Plaintiff teaching these gun safety classes through The Right Fight, Leaf went to the County Prosecutor and asked him if there was a potential for increased liability by teaching gun safety classes. Apparently the Prosecutor later called the Sheriff, complaining that Leaf was seeking legal advice on a matter that essentially concerned a private business that Leaf was operating and the Prosecutor did not think it was appropriate for a county employee to seek his legal advise for such matters. (Exhibit 2, pp. 45-47) The Sheriff relayed this message to Leaf and expressed his displeasure with Leaf going to the Prosecutor. However, he did accept Leaf's proof of having insurance for teaching the classes

under his private company's name and did allow him to continue teaching the classes. (Exhibit 1, p. 63)

Leaf stated that he applied for a vacant court officer position in January 2002 and did not get it despite having the most seniority of all applicants and that seniority in the past had been the only criteria for appointment to the position. (Exhibit 1, pp. 110-11)

This issue has been the subject matter of an arbitration between the parties. Arbitrator Dan Kruger ruled in favor of the County, finding that the primary reason Plaintiff was not selected was because the county judges decided to pick one of the other two candidates for the position. (Exhibit 4, p. 13) The Sheriff had consulted with the chief judge in the past about judicial preferences for court officers and he had acceded to the judges' wishes since the assigned deputy reported to the judges. (Exhibit 2, pp. 56-59, 62)

In November 2002 Plaintiff successfully bid for an opening on the road assigned to the day shift and he has held that shift ever since. The shifts are assigned according to seniority under the CBA. Court officer and road patrol positions pay the same amount of money and have the same benefits, but the court officer receives more overtime hours per year, according to Plaintiff. (Exhibit 1, pp. 112-114)

### C. STANDARD OF REVIEW

A motion for summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate where no genuine issues of material fact remain to be decided and the moving party is entitled to judgment as a matter of law. Street v J.C. Bradford & Co., 866 F2d 1472 (6th Cir. 1989). The Sixth Circuit has noted that the federal courts have entered into a "new era" in summary judgment practice. Street, supra. The 1986 Supreme Court trilogy — Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 US 574 (1986); Anderson v Liberty Lobby, Inc., 477 US 242 (1986); and Celotex Corp. v Catrett,

477 US 317 (1986) — ushered in this era on the standard of review for summary judgment. These cases, in the aggregate, have lowered the movant's burden on a summary judgment motion.

In <u>Betkerur</u> v <u>Aultman Hospital Association</u>, 78 F3d 1079, 1087-88 (6th Cir 1996) the Court made the following assessment regarding the standard of review and respective burdens of proof when considering 56(c) motions:

> After reviewing the above trilogy, this Court endorsed a set of principles to be applied to motions for summary judgment:
> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.
> * This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."
> See also <u>Street</u> v. <u>J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-80 (6th Cir.1989)

(summary judgment should be granted where an opposing party is unable to produce sufficient evidence to demonstrate that it could withstand a directed verdict motion at trial) (footnotes with citations omitted) and <u>Anderson</u> v <u>Liberty Lobby Inc.</u>, <u>supra</u>, at 2510 ("The mere existence of some alleged factual dispute is not enough; a party must show a genuine issue of material fact.")

### D.    ARGUMENTS

### 1.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT PLAINTIFF HAS FAILED TO SATISFY THE THREE ELEMENTS FOR STATING A FIRST AMENDMENT RETALIATION CLAIM

In order to state a cause of action for First Amendment retaliation, the general rule requires that a plaintiff show (1) that he engaged in protected conduct, (2) that an adverse action was taken against him, and (3) that there is a causal link between elements one and two–such that the adverse action was motivated at least in part by the plaintiff's protected conduct. Thaddeus X v Blatter, 175 F3d 378, 394 (6th Cir 1999) (en banc).

### a.    Plaintiff did not engage in protected activity.

In the present case the threshold issue is: what was the protected activity the Plaintiff engaged in to trigger the protection of the First Amendment?  He alleges that he did three things:  He taught a CCW class; he taught a CCW class with the head of the local NRA and he signed a petition in support of amending the concealed weapons statute. (¶ 9, Plaintiff's Complaint)  Only one of these activities arguably implicates the First Amendment.

First, there is no constitutional right to teach a gun safety class.  Further, the Plaintiff was allowed to teach all the classes that he asked the Sheriff for permission to teach, according to his own testimony.  (Exhibit 1, p. 48)

Second, he was not denied his freedom to associate with Mr. Stevens.  In fact the Plaintiff himself decided that he did not want to associate with Mr. Stevens because Stevens had acted inappropriately, in the estimation of the Plaintiff, when they team taught the first class in 1999, so he did not invite Stevens to return.  The Sheriff had nothing to do with this disassociation.  (Exhibit 1, pp. 94-95)

Third, the Plaintiff was not prohibited from signing any petition in favor of amending the CCW statute. The Plaintiff admitted that he was soliciting signatures from co-workers while on duty at the Sheriff's Department. He was merely told by the Sheriff that he should not do so, and he complied. He was not disciplined or threatened with discipline. There is no constitutional right for a public employee to solicit signatures for a legislative petition from co-workers while on duty. By statute, public employees are not to coerce others into contributing anything of value for the purpose of furthering or defeating a ballot question in Michigan. MCL 15.405 Moreover, this is not something that Plaintiff gets paid to do on County time, so he quite appropriately should not be allowed to do it by his boss.

     **b.**      **Plaintiff has not suffered a materially adverse job consequence.**

The general rule announced in Thaddeus X, supra concerning First Amendment retaliation cases has a slight variation in the context of an employment claim, like the present one, where the requirement is that the plaintiff must identify a "materially adverse" change in the terms and conditions of his employment to satisfy the second element of the test for retaliation. Hollins v Atlantic Co., 188 F3d 652, 662 (6th Cir 1999) provides:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation**.** (Quoting Crady v Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir. 1993)).

Plaintiff is not able to satisfy this second element of the test because he has not suffered a materially adverse change in the terms and conditions of his job by returning to his previous midnight duties as a road deputy from the job of a school liaison officer.

As noted, he suffered no loss of pay or benefits with the change. According to the attached Affidavit of County Clerk Smith (Exhibit 6), the payroll records show Plaintiff has actually made more in overtime pay as a road patrol deputy in one year (2003) than he did in all the prior years combined, when he was working full time as a school liaison officer. Job transfers alone do no qualify as an adverse action unless the conditions of the transfer would lead a reasonable person to find them objectively intolerable. Strouss v Michigan Dept of Corrections, 250 F3d 336, 342-43 (6th Cir 2001) It would be difficult to characterize this as an intolerable working condition when Plaintiff is performing the same job that he did for the first 9 years of his career, which is the same job that he hired on to perform originally, and is making more money. The fact that he was transferred does not itself satisfy the test. "Materially adverse" for purposes of meeting the test means,

> termination of employment, a demotion evidenced by a decrease in wage or a salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. Kocsis v Multi-Dare Management Inc., 97 F3d 876, 886 (6th Cir 1996) (quoting Crady v Liberty Nat'l Bank and Trust Co., 993 F2d 132, 136 [1993]) See also Darnell v Campbell County Fiscal Court, 731 F. Supp 1309 (ED Ky, 1990) aff'd 924 F2d 1057 (6th Cir, 1991) (holding that transfer requiring plaintiff to drive 20 minutes more to new job site did not meet test where salary, benefits and duties remained the same)

**c.      Nor is the Plaintiff able to show that there was a causal relationship between his alleged protected activity and the transfer of positions.**

The timing of the protected activity and the actual transfer are too remote by themselves to create a genuine issue of material fact on the causation issue. Plaintiff testified that he circulated the petition and spoke with the Sheriff about it in 1999. (Exhibit 1, pp. 97-101) According to the Plaintiff, they next spoke about his associating with Mr. Stevens in March 2001, after Stevens filed the suit, but there is no indication that Plaintiff had been associating with him since he refused to let Stevens teach the class again in 2000. In fact, Plaintiff admitted that he really did not hang around Dave Stevens. (Exhibit 1, pp. 103-04)

The Sixth Circuit has held that to show a casual connection, a plaintiff must produce evidence from which an inference can be drawn that his protected activity was the likely reason for the adverse action. See <u>Zanders</u> v <u>National RR Passenger Corp.</u>, 898 F.2d 1127, 1135 (6th Cir 1990); <u>Cooper</u> v <u>City of North Olmsted</u>, 795 F.2d 1265, 1272 (6th Cir.1986). Proximity in time between protected activity and an adverse employment action alone may not support an inference of retaliation. See <u>Moon</u> v. <u>Transport Drivers, Inc.</u>, 836 F.2d 226, 229 (6th Cir.1987), <u>Clark County School Dist.</u> v <u>Breeden</u>, 532U.S. 268, 273; 121 S.Ct. 1508, 1511 (2001) (citing with approval a Tenth Circuit case in which the court found that absent further evidence, three months is insufficient to create a triable issue of causation) See also <u>Barrett</u> v <u>Lucent Techs</u>, No. 00-4458, 2002 WL 1272116, at *6 (6th Cir June 6, 2002) (per curiam) *(*finding that without additional evidence, two and one-half months is insufficient to create a triable issue of causation) and <u>Hafford</u> v <u>Seidner</u>, 183 F3d 505, 515 (6th Cir 1999) (finding that absent additional evidence, 2–5 months is insufficient to create a triable issue of causation).

In the present case, there is no proximity at all between when the Plaintiff allegedly engaged in his protected activity and when he was transferred. There was a period of about two years between when he first taught the class with Stevens and circulated the petition at work and the transfer back to the road patrol, and 5 months between the last, and apparently only other, time association with Mr. Stevens was mentioned by the Sheriff and transfer to the road. Significantly, there is no other additional evidence of retaliatory conduct to support Plaintiff's theory of causation.

There was no direct statement from the Sheriff, or any other supervisor, indicating that Plaintiff was being transferred because of his alleged protected activities. There were two statements that were made by the Sheriff concerning Mr. Stevens and one concerning the petition. The two concerning Stevens were ambiguous at best and not close in time to the transfer. These factors

militate against their use by Plaintiff in support of his prima facie case. See Phelps v Yale Security, Inc., 986 F2d 1020, 1025-26 (6th Cir. 1993) The statement that Plaintiff was not to circulate the petition on duty is hardly evidence of retaliation.

Once the Sheriff asked the Plaintiff to be careful about who he was associating with, referring to Mr. Stevens, not because of any position Stevens took on concealed weapons, but because Stevens had apparently told the Plaintiff that he should circulate a petition while working. (Exhibit 2, p. 41) Another time about two years later in March 2001, according to the Plaintiff, the Sheriff made a similar statement about Stevens. This was just a few days after Stevens had sued the County Gun Board and the Sheriff for $5 million dollars (see Stevens v DeBoer, Barry County Circuit Court No. 01-133-AZ, (Exhibit 5)). There is nothing in either one of these exchanges that would create a genuine issue of fact in the mind of a reasonable juror as to there being a causal link between the Plaintiff's alleged protected activity (teaching a gun safety class, teaching a gun safety class with Mr. Stevens and signing a petition) and being removed from the school liaison position in August 2001.

The Sheriff testified that he removed Plaintiff from the school liaison position because he was not satisfied with his handling of the summer programs for the schools. He talked with the Plaintiff for two of the three summers the program was operating under his charge, and when things did not change, the Sheriff decided to make a switch and assign another officer. (Exhibit 2, pp. 18-23) The Plaintiff has the burden of demonstrating that the reason given by the Sheriff is a pretext.

The Court in Kocsis v Multi-Dare Management Inc., 97 F3d 876, 883 (6th Cir 1996) noted that a plaintiff had three options to meet his burden of refuting the proffered reason for the management decision as a pretext:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a

preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action. (Citations omitted) At all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place. <u>Burdine</u>, 450 U.S. at 253, 101 S.Ct. at 1093-94.

Defendants' position is that the Plaintiff fails to meet his burden of showing a pretext in this situation and summary judgment on the first aspect of the Plaintiff's retaliation claim, dealing with the school liaison position, should be granted.

> 2. **THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT THE REASON PLAINTIFF DID NOT RECEIVE THE COURT OFFICER ASSIGNMENT WAS BECAUSE THE JUDGES PREFERRED ANOTHER OFFICER**

The Plaintiff's apparent theory is that because he engaged in protected activity as described above, the Sheriff retaliated against him by not appointing him to the court officer position in 2002. Plaintiff acknowledges that the Sheriff did not tell him that he retaliated against him for exercising a First Amendment right, nor is there any witness to the Sheriff, or any other County official, making such a threat. Moreover, as was the case with the transfer from the school liaison position, there is insufficient temporal proximity to support the notion that the position was awarded to another as a means of retaliating against the Plaintiff for his opposition to the Sheriff's view on the subject of CCW regulation.

Nonetheless, the biggest reason to grant summary judgment to the Defendants on this aspect of the Plaintiff's claim is the failure of the Plaintiff to shoulder his burden of showing that the reason given by the Sheriff for awarding the position to officer DeMaagd was a pretext. The Chief Judge of the Barry County Circuit Court advised the Sheriff that an additional court officer was needed. The Sheriff posted an opening in his Department, obtained a list of interested persons from the employees and, as had been his practice with past appointees, sought the judge's input on the appointment.

Judge Fisher indicated that the judges preferred Officer DeMaagd. The Sheriff did not lobby the judges or make any suggestions for or against Plaintiff, according to the record. (Exhibit 2, pp. 61-62)

The decision of the Arbitrator clearly spelled out what he found to be the reason for selecting DeMaagd over the Plaintiff. It was caused by the judicial preference. Judge Fisher testified at the arbitration that he expressed such a preference to the Sheriff. (Exhibit 4) His attached Affidavit confirms that testimony. (Exhibit 7)

There is nothing improper about selecting an applicant on this basis. As Arbitrator Kruger noted, it was probably a common sense thing for the Sheriff to have done so since the officer works directly for the judge. In any event, the Plaintiff cannot meets his burden of showing that the proffered reason was a pretext and thus summary judgment should be granted to the Defendants.

**3.       THE SHERIFF IS ENTITLED TO QUALIFIED IMMUNITY IN HIS INDIVIDUAL CAPACITY AND DISMISSAL OF THE OFFICIAL CAPACITY CLAIM**

Suits against a public official in his official capacity are really suits against the municipality. Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (noting that official capacity suits are treated as suits against the governmental entity and that a municipality's " 'policy or custom' must have played a part in the violation of federal law"). To establish a claim against a municipal official in his official capacity under Monell, the plaintiff must: (1) identify a municipal policy or custom; (2) connect that policy or custom to the municipality; and (3) show that the execution of the policy or custom caused a constitutional injury. See Garner v. Memphis Police Dep't, 8 F.3d 358, 364 (6th Cir.1993)

There is no evidence in this case, nor does it even appear to be alleged (see Argument 5, below), that Barry County had adopted a policy or had a custom or practice that produced the alleged injury. Therefore the claim against Sheriff DeBoer in his official capacity should be dismissed.

Besides all of the other reasons to grant summary judgment in this case, there is yet another: qualified immunity. In the context of suits brought pursuant to 42 USC § 1983, the doctrine of qualified immunity shields governmental officials sued in their individual capacity "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v Fitzgerald, 475 US 800, 818 (1982). Qualified immunity is not a mere defense to liability, but rather an absolute immunity from suit saving governmental officials from the burdens of having to stand trial. Mitchell v Forsyth, 472 US 511, 526 (1985).

In Saucier v Katz, 533 US 194, 121 S Ct 2151 (2001), the Supreme Court delineated a two-part test for determining whether a governmental official should be protected by qualified immunity. The initial inquiry is whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. 121 S Ct at 2156. "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Ibid. With regard to the second part of the qualified immunity analysis, the Saucier Court has stated that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Ibid.

Under the first prong of the qualified immunity test, there is no basis for this Court to find that the conduct of Defendant DeBoer violated Plaintiff's constitutional rights. As set forth in the preceding section of this Brief, it simply cannot be said that the Sheriff retaliated against Plaintiff,

contrary to his First Amendment rights.  In another case involving an alleged violation of First

Amendment associational rights, the Court stated,

> Seitz [defendant] asserts a claim of qualified immunity with respect to Cindy's
> claims. Seitz is entitled to qualified immunity in the performance of official
> discretionary functions to the extent that his conduct did not violate clearly
> established statutory or constitutional rights. Flatford v. City of Monroe, 17 F.3d
> 162, 166 (6th Cir.1994). Cameron v Seitz, 38 F3d 264, 272 (6th Cir 1994)

However, there is no constitutional right to the type of associational right that present Plaintiff

seems to suggest.

> More recent precedent from the Sixth Circuit further undercuts Plaintiff's assertion
> that intimate friendships are entitled to constitutional protection. In Marcum v.
> McWhorter, 308 F.3d 635 (6th Cir.2002), a deputy sheriff was cohabitating with a
> married woman that he was in a romantic relationship with. See id. at 638-39.
> While the Sixth Circuit held that this relationship exhibited some of the traits of a
> constitutionally protected relationship that were identified in Roberts, the Sixth
> Circuit ultimately held that this relationship was not constitutionally protected
> because of its adulterous nature. See id. at 640-41, 104 S.Ct. 3244. Consequently,
> the Sixth Circuit has yet to extend the right of intimate association beyond familial
> relationships.
> &ast; &ast; &ast;
> In light of this precedent, the Court finds that a relationship between close
> friends, even one with a sexual component to the relationship, is not the type of
> relationship that has played a critical role is shaping our Nation's culture.
> Consequently, Plaintiff's argument that she was deprived of her right to intimate
> association fails.  Flaskamp v Dearborn Public Schools, 232 F Supp 2d 730, 741-
> 42 (ED MI, 2002) (Judge Zatkoff)

The Supreme Court's decision in Board of Directors of Int'l Rotary v Rotary Club of Duarte,

481 U.S. 537, 107 S. Ct. 1940 (1987) declined to extend First Amendment associational protections

to rotary club memberships.  The Court listed those relationships that it had by that time accorded

constitutional protection.

> The intimate relationships to which we have accorded constitutional
> protection include marriage,  the begetting and bearing of children, child
> rearing and education and cohabitation with relatives.  Of course, we have
> not held that constitutional protection is restricted to relationships among

family members. We have emphasized that the First Amendment protects those relationships, including family relationships, that presuppose "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." Rotary Club, supra 481 U.S. at 545 *(quoting* Roberts v. United States Jaycees, 468 U.S., at 619-620, 104 S.Ct., at 3250) (Citations omitted).

Then the Court set forth the following factors that future courts should review when considering the parameters of an associational right.

In determining whether a particular association is sufficiently personal or private to warrant constitutional protection, we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship. 107 S.Ct. at 1946

The present alleged relationship between Stevens and Leaf does not come close to having constitutional protection. In the Plaintiff's own words, he had no relationship with Mr. Stevens, other than he allowed him once to teach a class with him and assisted Stevens by circulating a petition at work. As he stated, he did not "hang around with Stevens." (Exhibit 1, pp. 103-04) This is not the type of relationship to which courts have extended First Amendment associational protections. Consequently, this Court should find that the Defendant is entitled to qualified immunity.

Even assuming, for the sake of argument only, that the Defendant's actions did constitute a violation of Plaintiff's rights of association and speech, the second part of the qualified immunity analysis requires that this Court determine whether the right was clearly established. Saucier, 121 S Ct at 2156. To be clearly established, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Ibid. (quoting Anderson v Creighton, 483 US 635, 640 (1987)).

The second inquiry of the qualified immunity analysis must "be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, at 2156. Thus, "[t]he

relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Ibid. In other words, the right "'must have been "clearly established" in a more particularized, and hence more relevant, sense.'" Ibid.

In evaluating the contours of the right, this Court must look first to decisions of the Supreme Court, then to the decisions of the Sixth Circuit and other courts within this circuit, and finally to the decisions of the other circuits. Neague v Cynkar, 258 F3d 504, 507 (6th Cir. 2001). In this case, the Plaintiff will be unable to identify any state or federal case that would clearly dictate to the Defendant Sheriff that his conduct was unlawful. Certainly, there is no existing precedent from the Supreme Court, the Sixth Circuit, or any other circuit for that matter that would clearly establish the parameters of such a constitutional right so that Sheriff DeBoer should have known he was violating the Plaintiff's associational rights when he allegedly transferred Plaintiff or denied him another transfer because he hung around with Mr. Stevens on a couple of occasions. Thus, summary judgment is appropriate on the basis of qualified immunity.

## 4.    THERE IS NO BASIS TO CONTINUE THE COUNTY AS A NAMED DEFENDANT

In the recent case of Wrzesinski v Danielson, 231 F Supp2d 611 (WD MI, 2002) Judge Quist dismissed a county defendant under circumstances similar to those presented in the present case. Coincidentally, it was the same Plaintiff's firm bringing that case under the same theory of recovery against that county, namely, that it would be responsible for the payment of any judgment. Judge Quist ruled that since the individual defendant had been found immune, there was no independent basis to hold the county in as a defendant. Id at 623 Similarly, this Court should dismiss Barry County.

### E.    CONCLUSION

There is no genuine issue of material fact that Plaintiff did not suffer an adverse job consequence when he went from the school liaison position back to the road patrol so as to trigger any claim for retaliation under the First Amendment.  Further, in regard to this aspect of his Complaint, there is no causal link between the alleged exercise of First Amendment rights and the return to road duties.

Concerning the court officer position, Plaintiff has not shown that the proffered reason was a pretext.  Thus, Plaintiff has failed to meet his burden of proof on both aspects of Plaintiff's retaliation claims and Defendants are entitled to summary judgment as a matter of law.

Finally, the individual Defendant Sheriff is entitled to qualified immunity because Plaintiff has not shown that the Sheriff violated a clearly established constitutional right by taking the action that he is alleged to have taken in this case.

> Respectfully Submitted,
>
> JOHNSON, ROSATI, LaBARGE
> ASELTYNE & FIELD, P.C.
>
>
> BY:    /s/ Patrick A. Aseltyne
>            Patrick Aseltyne (P23293)
>            Attorneys for Defendants
>            303 S. Waverly Road
>            Lansing, Michigan 48917
>            (517) 886-3800

Dated: January 29, 2004