**1**

1   Q.   And what did she say to you at the time as best as you
2        can recall?

3   A.   I don't really remember.

4   Q.   And did you have an understanding as to why she was
5        telling you you received the job?

6   A.   Well, my understanding was she was the grant writer,
7        and my feeling was that she was going to be in charge
8        of it, I think.  I am not sure how to say it.

9   Q.   Did she tell you anything about -- I don't get the
10       impression that she told you anything about how long
11       you are going to be in the position or -- well, let's
12       just stick with that for a minute.

13            She didn't tell you you were going to have
14       this job for six years, ten years?

15  A.   Five years.

16  Q.   Five years she told you?

17  A.   Yes.

18  Q.   And tell me exactly the best you can recall what she
19       said about that.

20  A.   Best I can recall, I believe she said it was -- be
21       ready for a five-year commitment.

22  Q.   That was the length of the grant?

23  A.   My understanding is the grant was for four years, and
24       then the fifth year the schools had to take over the
25       payments or something like that.  It was 90/10, 90

1       paid by the government and 10 percent paid by the

2       schools all pitched in together the first year, and

3       then I think it went 75 the next year, the government,

4       and 25, and then it kind of worked its way down, and

5       the fifth year I believe they were supposed to pay for

6       it all, the schools.

7   Q.  And this would be the end of that fifth year right now

8       where we are now?

9   A.  It started in '98.  No, this would be -- is it sixth

10      year now?

11  Q.  If you don't know, just tell me.

12  A.  I am not really sure.  I would have to go back and

13      count.

14  Q.  To whom did you report in that position?

15  A.  Report about what?

16  Q.  Well, let's say you had to submit the reports.  To

17      whom did you submit the reports?

18  A.  Well, like the quarterly report you mean?

19  Q.  Well, any report.

20  A.  Well, daily report went in to the sergeant.  Quarterly

21      report went in to the sheriff's secretary, Alice.

22  Q.  Any other reports that you submitted to other people?

23  A.  Year-end report went in to Alice.

24  Q.  Sheriff's secretary?

25  A.  Yes.

1   Q.   Did you get your pay then continued from the

2        Barry County Sheriff's Department, is that correct?

3   A.   I don't understand.

4   Q.   You kept getting paid as a deputy?

5   A.   Yes.

6   Q.   You weren't paid by the school districts directly?

7   A.   No, not directly.

8   Q.   To your knowledge did Ms. DeBoer have any supervisory

9        authority over you?

10  A.   I believe she was the grant overseer.  I don't know

11       that for sure.

12  Q.   But, I mean, she couldn't hire and fire and discipline

13       and that kind of stuff with respect to you?

14  A.   No, I don't think so.

15  Q.   So you wouldn't characterize her as your supervisor?

16  A.   No.  Supervisor I would characterize as Bob Abendroth.

17  Q.   Your supervisor?

18            MS. KENNEDY:  You do need to keep your voice

19       up a little bit I think, because we are in a small

20       room with a high ceiling.  I am having a hard time

21       hearing you, so I imagine she might too.

22            THE WITNESS:  All right.

23  Q.   (BY MR. ASELTYNE)  You mentioned a moment ago that you

24       submitted various reports, some would be to your

25       sergeant, some to the sheriff.  Did you have a report

1   A.    Sheriff?

2   Q.    Right about this.

3   A.    No.  Usually what I do is type this up, put it in

4         their box.

5   Q.    You got it back?

6   A.    Yes.

7   Q.    And it says okay on it?

8   A.    Yes.

9   Q.    How long did you, if you can recall, how long did you

10       teach this particular class?  It actually says

11       classes.  How long did you do that?

12  A.    I don't know if this is the first one or not.  I am

13       not sure if this is the first year or not.

14  Q.    You knew that the rules and regs -- as a matter of

15       fact, as we go through one of these actually cites the

16       rules and regs.  You knew that the rules and regs of

17       the department required you to get permission?  I

18       think you already told us that.

19  A.    For secondary employment?

20  Q.    Correct.

21  A.    Uh-huh.

22  Q.    Is that yes?

23  A.    Yes.  I am sorry, yes.

24  Q.    In looking through the documents that I have supplied

25       to you, do you see on any of those documents the

1          sheriff denied you permission for secondary

2          employment?

3     A.   No.

4     Q.   Are there any requests for secondary employment that

5          you submitted that aren't in there, in that packet

6          that you have in front of you, and we are going to go

7          through those, but as you look through there are there

8          any that are not included in your requests?

9     A.   There is only one with the martial arts.  This one.

10    Q.   Exhibit 3?

11    A.   Yes.

12    Q.   So there may be some other exhibits --

13    A.   Yes.

14    Q.   -- exhibits regarding martial arts?  I shouldn't say

15         exhibit, but letters regarding martial arts?

16    A.   Yes.

17    Q.   Did he ever deny you permission?

18    A.   No.

19    Q.   And do you have any estimate as to how many times you

20         requested, besides what you have in front of you as

21         Exhibit 3, for martial arts?

22    A.   I don't know if I would be able to give an estimate or

23         not.

24    Q.   Do you know how many years you taught martial arts?

25    A.   '96 through, pretty much '96 through 2000, but after

1   A.    It's in the law itself.

2   Q.    Where did you find that? Did you go to a book and

3        look it up?

4   A.    It's in a CCW law, the new concealed pistol law.

5   Q.    That's right from the statute?

6   A.    Yes. I told him I would give him the information on

7        the insurance. I also told him the classes were split

8        in two because of the weather and asked if I could

9        fulfill my obligations to do these, and he agreed, but

10       he wanted to see the insurance.

11  Q.    And then you subsequently gave him the insurance, is

12       that correct?

13  A.    I gave him the insurance and d/b/a both together.

14       Should have that.

15  Q.    When I say subsequent, I mean after the meeting of

16       March 9th.

17  A.    I would have to look at the date, but yes.

18  Q.    Okay. Did you tape record these meetings or this

19       meeting of March 9?

20  A.    No.

21  Q.    And when did you put the note together that you have

22       just reviewed?

23  A.    I am not sure exactly on this one. It was, it wasn't

24       right afterwards.

25  Q.    Well, give me an estimate of when.

1    A.    I really couldn't give you an estimate.  I don't know.

2    Q.    Was it that month?

3    A.    Yes.

4    Q.    So sometime in March of 2001 you wrote the note that

5          you just referred to?

6    A.    Yes, I believe it might have been on the 19th that I

7          wrote the note.

8    Q.    Referencing the meeting --

9    A.    Another meeting.

10   Q.    Referencing the meeting that took place March the 9th?

11   A.    Yes.

12   Q.    Why was it that you wrote the note referencing a

13         meeting on March 9th?

14   A.    I started getting a little concerned about my future

15         there, being able to teach classes, being able to --

16   Q.    Teach the CCW classes?

17   A.    Yes.

18   Q.    Okay.  Was there ever a period of time that the

19         sheriff said you could not teach the CCW classes?

20   A.    No, I don't think so.

21   Q.    And are you currently teaching CCW classes?

22   A.    Yes, I still have the d/b/a and the insurance, yes,

23         and I taught one, I think it was the 25th of October,

24         so, yes.

25   Q.    And how many CCW classes roughly would you say you

1          have taught between March 9th, 2001 and October 25th,

2          2003?

3     A.   I wouldn't know right now.  I would have to go back

4          and look.  Started out maybe one a month, and then it

5          really got sparse after that.  The 25th is the first

6          one I taught in quite a while.

7     Q.   Do you have any estimate?

8     A.   It would be a guess, but I am not really sure.

9     Q.   Well, more than 20, more than 30?

10    A.   I don't think it was quite 20, I don't think.

11    Q.   So somewhere between 10 and 20?

12    A.   That would be just a guess, but yes.

13    Q.   And did you receive income for teaching those classes?

14    A.   Some of them, yes.

15    Q.   And would that all be run through your d/b/a?

16    A.   Yes.

17    Q.   And to your knowledge was a 1099 issued for you from

18         the d/b/a, if you know?

19    A.   I am not sure what a 1099 is.

20    Q.   Any other sources of income for the d/b/a other than

21         teaching the CCW classes?  You mentioned --

22    A.   I mean, are you talking about the martial arts?

23    Q.   Sure.

24    A.   That would be the only other one, yes.

25    Q.   How much would it cost for somebody to take your CCW

1   Q.   What does Mr. Stevens do?

2   A.   He is also an instructor for the concealed pistol

3       certified through the National Rifle Association.

4   Q.   And did you ask the sheriff why he was concerned about

5       who you were hanging out with?

6   A.   I don't remember if I did or not.

7   Q.   At any of your meetings?

8   A.   I don't remember.

9   Q.   Did the sheriff ever tell you that you weren't to hang

10      out with Mr. Stevens?

11  A.   He never come right out and said it, no.

12  Q.   Did the sheriff ever tell you that he didn't approve

13      of Mr. Stevens?

14  A.   No, very careful on what he told me.

15  Q.   Did the sheriff ever tell you anything about your

16      teaching of CCW classes other than he was concerned

17      about the issue of liability?

18  A.   Yeah, and whom I was hanging out with and whom I was

19      teaching with.

20  Q.   And did you teach with Mr. Stevens?

21  A.   For a brief time.

22  Q.   And why don't you teach with Mr. Stevens anymore?

23  A.   He, rather than focusing on the concealed pistol class

24      itself, he made a lot of comments that were getting

25      too political, and I wanted to get my focus on just

1    A.    Yes.

2    Q.    This meeting was not tape recorded, was it?

3    A.    No.

4    Q.    At least not by you?

5    A.    No.

6              MS. KENNEDY:  Is there a second side to that

7         page?

8              THE WITNESS:  Yes.

9              MS. KENNEDY:  Okay.

10   Q.    (BY MR. ASELTYNE)  Had you ever been told by the

11        sheriff that you would stay in the position of school

12        liaison officer for a particular length of time?

13   A.    Not the sheriff, by his wife.

14   Q.    The answer is no?

15   A.    The answer is no.

16   Q.    How about the undersheriff?

17   A.    No.

18   Q.    Were the assignments, to the best of your knowledge,

19        to positions of liaison officer and the SWET team and

20        the court officer, were those assignments generally

21        ones that were made by management at the department?

22   A.    What do you mean?

23   Q.    You told us before that when you applied for the

24        position of school liaison officer it was in response

25        to a posting, correct?

1          could you, if you were the most senior person, take

2          that position?

3    A.    Yes.

4    Q.    Okay.  And that was true for all officers in the

5          department?

6    A.    Yes.

7    Q.    Okay.  Now, in terms of your position as the road

8          patrol, after you left your position as the school

9          liaison officer you were assigned then back to the

10         road patrol, is that correct?

11   A.    Yes, midnight shift.

12   Q.    And your wage rate that you received as the school

13         liaison officer, was that the same wage rate that you

14         received as the road patrol working the midnight

15         shift?

16   A.    Same hourly wage.

17   Q.    And there is no shift premium, is that correct?

18   A.    No.

19   Q.    That is correct?

20   A.    I am sorry, yes, there is no shift premium, you are

21         correct, yes.

22   Q.    And you got the same health insurance benefits?

23   A.    Yes.

24   Q.    Same sick, vacation, correct?

25   A.    Yes.

1   Q.   And the same other benefits provided for in Exhibit 1,

2       which was the contract at the time, is that correct?

3   A.   The comp time, I got a lot more of that when I was at

4       school.

5   Q.   But other than the comp time, the other times worked

6       out to be about the same in terms of -- strike that.

7           The other benefits were identical between the

8       road patrol and the school liaison officer, is that

9       fair to say?

10  A.   Yes, it was the same contract.

11  Q.   And there is no distinction between the positions

12      under that contract, is that fair to say?

13  A.   No, there is nothing -- no, I am sorry, yes, that's --

14      you are correct.

15  Q.   Before we go on to the court officer position, let me

16      show you what I am going to have marked as Exhibit 13

17      and maybe you can tell me.

18           (Deposition Exhibit Numbers 13 and 14 marked

19             for identification.)

20  Q.   (BY MR. ASELTYNE)  Do you recognize that, first of

21      all?

22          MS. KENNEDY:  Can I see that, please?

23  Q.   (BY MR. ASELTYNE)   Is that a document that you

24      submitted to the sheriff for --

25  A.   Yes.

1          granted you permission in response to Exhibits 13 or

2          14?

3    A.    No.

4    Q.    Is the only discussion that you had with the sheriff

5          about people who you hang around with, would that have

6          been the discussion that you referenced as having

7          taken place on either March 9th or March the 19th of

8          2001?

9    A.    Say that again.

10   Q.    Would the only time that you discussed with the

11         sheriff who you hung around with or the issue of who

12         you hung around with have been in the March 9th or

13         March 19th meeting of 2001?

14   A.    I don't know.

15   Q.    Is it fair to say that that subject only came up at

16         one meeting?

17   A.    No.

18   Q.    And I don't see any notes at all that you took

19         referencing that subject.

20   A.    I didn't start taking notes right away, then I started

21         getting a little concerned about where he was getting

22         at with it, because when I started teaching that rifle

23         and shotgun safety first fun shoot for the kids, I put

24         out an ad in the paper asking for people who wanted to

25         volunteer.  That's when I got that Dave Stevens, and

1      what we did is we all met in the classroom at the

2      sheriff's department.  We continued with the rifle and

3      shotgun safety first one shoot, we did that through

4      the summer, and what I ended up doing is I asked him

5      not to come back, because he wanted to talk politics

6      in front of the kids, and we had either two or three

7      discussions about it, I think two discussions, and the

8      second one I said, If you are going to do this, you

9      can't come back, I don't want any hard feelings, and

10     he said, Oh, yeah, I understand.  He left.

11  Q.   Why did you do that?

12  A.   I didn't -- it wasn't the place to be talking

13     politics, in front of high school children.

14  Q.   You thought that was inappropriate for Mr. Stevens to

15     do that?

16  A.   Yeah, and it was distracting from what we wanted to

17     accomplish in the class.

18  Q.   Had the sheriff -- I don't know when this class was,

19     so it's hard for me to put a time frame on it.  Had

20     the sheriff had a discussion with you before this

21     meeting with Mr. Stevens and the kids in the sheriff

22     department about Mr. Stevens?

23  A.   I don't think so.

24  Q.   So sometime after that time that Mr. Stevens starts

25     telling the kids about some political things?

1    five years old some of it.  I didn't know that he and

2    the sheriff were, I don't know if you want to call it

3    locking horns over concealed pistol issue.

4  Q.   Who is he?

5  A.   Dave Stevens.  Because back when we were doing that

6    safety shoot he was basically talking about the

7    federal and state politics, and I didn't want that

8    there.  I wanted to focus on let's go teach these kids

9    gun safety.

10 Q.   When was that?

11 A.   I would say the summer of 2000.

12 Q.   You thought that was sometime back in 2000 --

13 A.   The summer of 2000, yes.  There was me, helping out me

14   Tom Stockwell, Ron Miles and Dave Stevens, and when we

15   started that program, and, like I say, I didn't know

16   the two of them had been arguing about a concealed

17   pistol issue at that time, what had happened before I

18   asked him to leave, he asked me if I would sign a

19   specific petition.  It wasn't a legal petition.  It

20   was a petition to give to, I don't know if they were

21   giving it to a senator, state rep in the state here to

22   show the interest of getting private citizens to carry

23   a concealed pistol.

24       Well, I went and signed the petition, and I

25   kind of chuckled, said I am not really worried about

1    being shot at by a private citizen, and then he asked

2    me, he said, Hey, would you ask some of the guys

3    around the department to sign the petition?

4  Q.   This is Mr. Stevens?

5  A.   Yes.  And so I said, Sure, I will give it a shot.

6         So I don't remember if it was the next day or

7    two days or a week later in between shifts I had it

8    and caught some of the guys in the midshift.

9  Q.   Where?

10 A.   In the locker room.

11 Q.   At the sheriff's department?  You were in the

12   sheriff's department locker room?

13 A.   Between shifts.

14 Q.   Circulating petitions?

15 A.   Yes.  And I handed it to one of the guys to sign it,

16   and he said, Absolutely.  He made a comment, quote,

17   shit already has it concealed, so why not give the law

18   abiding citizens a chance, and then I remember you

19   called me in the office on that.

20 Q.   Unfortunately when you point and say you -- the

21   sheriff?

22 A.   The sheriff called me in the office and asked me if I

23   was circulating that petition, and I said yeah.  He

24   asked me not to do it again, so I didn't.  In fact, I

25   don't even know if I turned that one in to him.

1   Q.   Did the sheriff in that meeting tell you that he

2        didn't want you to do that because you were at the

3        sheriff's department and some of those people were on

4        duty?

5   A.   I don't remember the full conversation. I think he

6        said, You probably shouldn't do that when you are on

7        duty. But that's stretching my memory.

8   Q.   Okay.

9   A.   And I didn't. I didn't think it was any big deal.

10       Later on Dave Stevens called me up and he said, How

11       did you do? I said, Well, jeez, I bet you 95 percent

12       of our deputies signed it, and, Hey, thanks for

13       circulating that. That was about the end of the

14       conversation.

15            And then next thing I know it made the

16       newspaper, and then he called me in his office again.

17            MS. KENNEDY:  He?

18            THE WITNESS:  I am sorry. The sheriff called

19       me in the office again, asked me how he got that

20       information, and I told him.

21  Q.   (BY MR. ASELTYNE)  How?

22  A.   How Dave Stevens got the information to put in the

23       newspaper, and I told him. I didn't think it was any

24       big deal.

25  Q.   This is in the summer of 2000?

1    A.    No, it had to have been '99, because the law was

2          signed in 2000, so it had to have been the summer of

3          '99.

4    Q.    When you said Mr. Stevens was talking to the kids and

5          you didn't think that was appropriate, that would have

6          been the summer of '99?

7    A.    I am not sure.

8    Q.    Well, it kind of stands to --

9    A.    No, I am not sure.

10   Q.    Let me word it this way.  If the law was passed and

11         went into effect in 2000, you told me that this was a

12         summer class that --

13   A.    We did it two summers in a row.

14   Q.    But it wouldn't make any sense for him to be

15         circulating petitions on a law that's already passed?

16   A.    It was '99, because 2000 we wouldn't let him come back

17         in.  In fact, he didn't even try.

18   Q.    So 1999 is when he spoke with the children and then

19         you objected to that?

20   A.    It wasn't speaking to the children.  He was talking to

21         adults and the kids were present.

22   Q.    I understand.  I am just trying to summarize here, and

23         you told him you didn't think that was appropriate,

24         and then he gave you this petition to sign, so that

25         would have been 1999?

1    A.    Yes, but I think he gave me the petition first before

2          all this went on.

3    Q.    And then the meeting with the sheriff, when he called

4          you in about the newspaper article, that too would

5          have been 1999?

6    A.    Yes, I believe so.

7    Q.    And I am sorry to interrupt you.  Go ahead.

8    A.    That's okay.  Where was I?

9    Q.    You were talking about your having -- the law was

10         passed in 2000, and you said something about Stevens

11         getting back with you in response to the deputies --

12         why don't we go in a new area.

13   A.    When it hit the paper, called me back in the office,

14         asked me if --

15              MS. KENNEDY:  Who called you back in?

16              THE WITNESS:  I am sorry, the sheriff called

17         me back into his office, asked me how Dave Stevens got

18         the information, and I told him he called me up and I

19         told him.  And that was about the end of that

20         conversation.  He was kind of, I could see he got a

21         little flushed in the face on that, but I pretty much

22         left it alone.

23              I am not sure how many more months went by,

24         but I went through an NRA class so I could be a range

25         safety officer and give some basics on like the

1       website and him locking horns with Mr. Stevens, that's

2       all something that took place prior to the legislation

3       being enacted in 2000, is that correct?

4   A.  I believe, I think you are correct.

5   Q.  Now, during the period of time that you were going to

6       see the sheriff about your being able to teach these

7       classes, and we have gone through a number of

8       permissions that you have received from him, did he

9       ever tell you in any of those meetings that he was

10      going to remove you from the school liaison officer

11      because of your teaching these classes?

12  A.  Oh, no.

13  Q.  Did he ever tell you that he was going to remove you

14      from the school liaison officer position because of

15      your association with Dave Stevens or anybody else?

16  A.  No, he wouldn't do that.

17  Q.  Did he ever tell you that he was going to remove you

18      from the school liaison officer position because you

19      had circulated a petition in the department for

20      approval of this legislation?

21  A.  No.

22  Q.  Now, at any point in time after the legislation was

23      passed, again we have established it's 2000, did you

24      ever discuss with him your meeting with or hanging out

25      with Dave Stevens?

1   A.    I never really hung out with Dave Stevens.

2   Q.    Listen to my question.

3           MS. KENNEDY:  You have to listen to his

4      question and answer his question.

5   Q.    (BY MR. ASELTYNE)  Did you ever discuss with the

6      sheriff your hanging out with Dave Stevens after the

7      2000 legislation was passed?

8   A.    No.

9           (Deposition Exhibit Number 15 marked for

10          identification.)

11  Q.    (BY MR. ASELTYNE)  Now, let me show you Exhibit 15.

12  A.    Hold on a minute.  Say that again.  Ask that question

13      again, did I ever discuss.

14  Q.    Did you ever discuss -- did you not understand my

15      question?

16  A.    No, I did not.  Go ahead.

17  Q.    Did you ever discuss with the sheriff your hanging out

18      with Dave Stevens after the 2000 legislation was

19      passed?

20  A.    Oh, yes, and that's what a lot of these notes are for.

21  Q.    The notes don't reference Mr. Stevens though, do they?

22      Do any of those notes?

23  A.    They don't say his name in there, but it was very much

24      inferred, a lot of like --

25  Q.    By whom?  By you?

1    know that he shouldn't be in this class anymore is

2    that he says things that he shouldn't be saying in

3    these types of environment?

4    A.   I don't remember what I said.

5    Q.   Okay.  If you don't remember, that's fine.

6              Isn't it fair for me to conclude that what

7    the sheriff was referring to when he allegedly told

8    you that he had a concern with who you were hanging

9    out with, specifically you believed he was referring

10   to Mr. Stevens, you don't know exactly what it was

11   about Mr. Stevens the sheriff was referring to?

12   A.   I think that's pretty accurate.  It depends on what

13   meeting too, because as things started getting closer

14   I started getting more nervous.  That's why I started

15   writing things down, what we said in the meetings.

16   Q.   But what the sheriff was referring to about

17   Mr. Stevens, you don't know, isn't that true?

18   A.   Yes.

19             MR. ASELTYNE:  I have marked -- I think I can

20   get done in the next couple of minutes here if we

21   could move along.

22             Let me see if I can find another copy of

23   this.  It's the 11-18-01 letter that was written by

24   Mr. Leaf to the sheriff.  We have already marked that

25   as 5.  Good.

1    Q.    And how many examples of that do you know of?

2    A.    Four.

3    Q.    And in terms of your letter, was what you said in your

4          letter correct?

5    A.    Which letter?  This one?

6    Q.    Exhibit 5, the one we are looking at here.

7    A.    What do you mean correct?  Yes.

8    Q.    I mean is it accurate?

9    A.    Yes.

10   Q.    Now, you didn't mention in your letter that you had

11         the most seniority of anybody who applied, did you?

12   A.    No.

13   Q.    And did you have the most seniority?

14   A.    Yes.

15   Q.    And did you know that?

16   A.    Yes, it was discussed between us and our, some of our

17         guys in our union.

18   Q.    Isn't it true in this letter you conclude the letter

19         by saying, I would appreciate being considered for the

20         position?  Aren't those your words?

21   A.    Sure, yes.

22   Q.    Isn't it true, sir, that you knew that it wasn't

23         automatic that you would get this position?

24   A.    No, that's not true.

25   Q.    You thought you would get the position simply because

1          you were the most senior person?

2     A.   Yeah, yes.

3     Q.   And the basis for that conclusion is Article IV,

4          Section 3 of the contract?

5     A.   No, past practice.

6     Q.   And the past practice would be the prior four examples

7          that you just mentioned?

8     A.   Yes, yes, go with seniority, yes.

9     Q.   And it's also true, is it not, that the arbitrator

10         when he addressed this particular issue ruled against

11         you?

12    A.   Yes.  I am sorry, okay.

13    Q.   Have you ever held the position of court officer if

14         only on an interim basis?

15    A.   No, not this position referred to, no.

16    Q.   As a court officer do you have the -- if you know.  If

17         you don't know, just let me know, but as a court

18         officer would the particular deputy who is serving in

19         that capacity, would he or she have the ability to

20         work overtime that's posted?

21    A.   Yes.

22    Q.   And that would be depending upon whether they were

23         working the court officer position at that time or

24         not, is that fair to say?

25    A.   If they are a court officer and overtime was posted

1       for regular road patrol, they have an opportunity to

2       do that, but we don't have that the other way.

3  Q.   Correct.

4  A.   Yes.

5  Q.   Do you know, let's say, for the people who were court

6       officers in the year 2002, who would that have been,

7       for example, the two people who were court officers in

8       2002?

9  A.   Prior to this or --

10  Q.   No, this letter was written in '01, so we are talking

11      about the people who took the position in 2002 or who

12      served in that position in 2002.  I think that's

13      Mr. Funk and Mr. DeMaagd.

14  A.   DeMaagd.  Who are currently doing it.

15  Q.   Correct.  Do you know how much overtime either one of

16      them earned in the position of court officer?  I am

17      not talking about in the position of a deputy who can

18      work on the posted overtime slots.  You understand the

19      distinction we have been making here?

20  A.   Repeat that one more time just to make sure.

21  Q.   Sure.  Do you know how much overtime either one of

22      those folks earned as a court officer?

23  A.   About five hours per week per -- like Deputy Funk

24      might get five hours, Dave DeMaagd five hours.

25  Q.   Five hours each or five hours either one?

1    A.    Depending on the court schedule, but about five hours

2          per week.

3    Q.    For each person?

4    A.    I think so, yes.

5    Q.    And, again, just so we are crystal clear on this, this

6          would be overtime as a court officer, not overtime

7          that DeMaagd or Funk may sign up because they are

8          wanting to work a road patrol midnight shift?

9    A.    Yes.

10   Q.    And what's the basis for that information?

11   A.    What do you mean?

12   Q.    That they each get five hours a week.

13   A.    Court usually doesn't let out till five, and it

14         varies, because sometimes if they don't have court

15         that day they are not going to get the overtime

16         obviously, and drug court times can go 6:30, 7:00, and

17         it's really on what the court schedule is.

18   Q.    So that's just kind of an anecdotal -- I mean, you

19         haven't looked at their W-2's I assume?

20   A.    No, I haven't.

21   Q.    Has either one of them told you what they get in

22         overtime per year for 2002?

23   A.    Well, they kind of make jokes about it in the locker

24         room that they are getting some more overtime, and we

25         pick on them all the time about they get all this

1     extra overtime and we don't.

2  Q.  How much overtime would you say that in 2002 you

3      earned as a road patrol deputy?

4  A.  2002?

5  Q.  Right.

6  A.  I am note sure, but I think I have it all written down

7      somewhere.

8  Q.  Is that another record that you can provide to your

9      counsel and she can provide to me?

10         MS. KENNEDY:  We disclosed it in our

11     26(a)(1), the differences.

12         THE WITNESS:  Yes.

13 Q.  (BY MR. ASELTYNE)  You disclosed gross numbers, but I

14     am specifically interested in what you earned in

15     overtime.  You didn't disclose that.

16 A.  I did, didn't I?

17         MS. KENNEDY:  Can we go off the record.

18         MR. ASELTYNE:  Sure.

19         (Discussion held off the record.)

20 Q.  (BY MR. ASELTYNE)  Let me ask you this:  Do you have

21     an indication, because you have gone through and run

22     your overtime for 2002, do you know what you earned?

23 A.  I would have to look.

24 Q.  But you can pull that number?

25 A.  I think I gave it to her on how many hours.  I didn't