# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

DARRIN LEAF,

      Plaintiff,

v.

SHERIFF STEPHEN DeBOER, individually
and in his official capacity, and BARRY
COUNTY,

      Defendants.

Case No. 1:03 CV 0226

Hon. Robert Holmes Bell

| | |
|---|---|
| Katherine Smith Kennedy (P54881) | Patrick A. Aseltyne (P23293) |
| Pinsky, Smith, Fayette & Hulswit | Johnson, Rosati, LaBarge, Aseltyne |
| Attorneys for Plaintiff | & Field |
| 146 Monroe Center St NW, #1515 | Attorneys for Defendants |
| Grand Rapids, MI 49503 | 303 S. Waverly Road |
| 616-451-8496 | Lansing, MI 8917 |
| | 517-886-3800 |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### ORAL ARGUMENT REQUESTED

## I. INTRODUCTION

_____Plaintiff Dar Leaf filed his Complaint alleging violations of his First Amendment rights by his employers Defendants DeBoer and Barry County on April 4, 2003. Generally, Officer Leaf alleges that he suffered adverse employment actions due to his participation in NRA related activity and support of the Carrying Concealed Weapons Law (CCW), of which Defendant DeBoer was vigorously opposed. Discovery in this matter has closed and Defendants' filed this motion for Summary Judgment. A hearing on this matter is scheduled for June 29, 2003.

## II. <u>FACTS</u>

<u>The Parties</u>

Plaintiff Dar Leaf is a 15-year employee of the Barry County Sheriff's Department. He is and was at all relevant times a deputy in the department. Defendant Sheriff Stephen DeBoer is and was at all relevant times the Sheriff of Defendant Barry County. Previous to the events in question, Leaf had been working the midnight shift on road patrol. Officer Leaf had a very good work record since the beginning of his employment.

<u>The School Liaison (DISTANCE officer) Position</u>

The School Liaison (DISTANCE officer) position was one that was created by a state grant and its purpose was to make middle and high school student's first experience with police officers a good one. The officer would work in the schools and perform home visits to deal with such issues as truancy and drug use, to offer counseling to students in need and to offer classes and events for the benefit of area students. (See DISTANCE Report, Exhibit A). The School Liaison position was a favored position in that the schools provided a pleasant environment to work in with teachers and students and fun programs, as opposed to a patrol assignment where the officer often sits in his patrol car for hours on end and works with drunks and drug addicts and hardened criminals and morale is poor among officers. (See Leaf Affidavit, attached as Exhibit B).

Quarterly and year-end reports were to be submitted by the School Liaison officer in order to update on progress and continue the funding through the grant. The

original grant was written by Sheriff DeBoer's wife and she played a part in overseeing the grant. (DeBoer 7, 8 - transcripts attached as Exhibit C).

The School Liaison position was able to accumulate significantly more overtime hours than the midnight patrol position. (See Leaf Affidavit, attached as Exhibit B). The School Liaison required overtime hours to be worked but the position was not allowed to take cash payments for the overtime - instead, the position had to take 'comp time.' (DeBoer 23). The only practical time for the School Liaison officer to take the comp time was during summers. (DeBoer 24). Oftentimes the School Liaison was able to have significant time off in the summer because of this accumulated.

Plaintiff as School Liaison Officer

When the position of School Liaison Officer was originally posted, Dar Leaf applied for and received the position. Mrs. DeBoer informed Leaf that he received the position and told him that it would be a 5-year assignment per the terms of the grant. (Leaf 29).

Leaf was the School Liaison officer for the 1998-99; 1999-2000; and 2000-01 school years. Leaf thrived in the position and was much appreciated by those he worked with. (See letters of appreciation, Exhibit D). Every year that he was the School Liaison officer, the grant was renewed. (DeBoer 17). Sheriff DeBoer testified that he received good feedback from principals and superintendents regarding Leaf's good performance. (DeBoer 21). Ron Clevenger, the person from the State in charge of the grant told him that he was doing a great job. (Leaf 141). DeBoer testified that if there was a problem or 'deficiency' with an officer or his performance, his supervisor

would address it.  If an officer was not told by his supervisor that there was a deficiency, he could assume he was doing a good job.[1]  (DeBoer 13, 14).  Sgt. Abendroth was Leaf's supervisor.  (Leaf 40).   Leaf was never disciplined while a School Liaison Officer, nor is there any indication from his personnel file or otherwise that there was any negatives in his work in the position.  During Leaf's 3-year tenure as School Liaison officer, he was never told there were any deficiencies with his job by Abendroth or DeBoer or anyone else.  He only received positive feedback and accolades.


Plaintiff's Associations with the NRA and NRA Members, Leaf's Support for the CCW Law and Sheriff DeBoer's Opposition

        Plaintiff was a member of the NRA became acquainted with a man named Dave Stevens who was the president of the Barry County NRA chapter.  In 1999, a law for Carrying Concealed Weapons (CCW) was proposed.  Sheriff DeBoer was vehemently opposed to the law and was on several committees to fight the passage of the CCW laws. (DeBoer 31,33).  Specifically he did work with a group called "People Who Care About Kids," whose sole purpose was to block the passage of the CCW law. (DeBoer 30).  DeBoer held several  meetings with police agencies and other organizations to discuss the opposition to the law.  (DeBoer 33).  Officer Leaf was in favor of the law.

        At the request of Mr. Stevens, Leaf took a petition regarding the law to work with him and asked his co-workers if they wanted to sign the petition between shifts. (Leaf 98).  Sheriff DeBoer called Leaf into his office the next day and told him he could not circulate the petition at work again.  (DeBoer 35; Leaf 98).  He made a comment that he

---

[1]  There was no evaluation process at the Barry County Sheriff's Department.

got bad advice from Mr. Stevens.[2]  Leaf never circulated a petition at work again.

The Sheriff called Leaf into his office again soon after due to a newspaper article that was published containing information regarding the deputies of the department signing the petition. (Leaf 99).  The Sheriff questioned Leaf as to how the paper got the information.  Leaf explained that it must have been from a casual  conversation he had with Stevens after the petition was signed. (Leaf 99).

The law was passed in the fall of 1999.  Leaf began teaching gun safety classes for concealed pistols in the summer of 2000.  (Leaf 67).  According to policy, officers had to request permission for outside work.  Leaf requested to teach the CCW classes and the Sheriff granted permission.

The Sheriff later found out that Leaf was teaching these classes with Stevens as he read it on an advertisement that was sitting on the front desk.  (DeBoer 44).  DeBoer then called Leaf into his office on March 9, 2001.  DeBoer said he was concerned with him teaching the CCW classes, and concerned with the company he kept outside of work, referring to Mr. Stevens[3].  (Leaf 62, 67).  He also stated he was concerned with the liability of the County for Leaf teaching these classes and Leaf told him that he would get information for him on the insurance.  (Leaf 62).  Leaf testified that he became concerned about his future. (Leaf 64).

_____DeBoer again called Leaf into his office ten days later regarding his teaching the

---

[2]DeBoer testified he had a problem with Stevens as he had asked Leaf to have other officers sign the petition; had filed a lawsuit against him as he was refused several times for a CCW license before the passage of the law, and Stevens had also told DeBoer that he would either attempt to have the Sheriff recalled or go after him in the next election.  (DeBoer 39- 40).

[3]Leaf had separated himself from Stevens by this time as he did not agree with Mr. Stevens' political comments while teaching the classes.

CCW classes.  This time he was furious[4].  He began yelling and screaming at Leaf supposedly because Leaf had called the prosecutor to seek information regarding liability information for the County.  Dar explained that he was just trying to find out if the prosecutor knew if the county was covered under the law.  The Sheriff told him he was undermining his authority.  (Leaf 73)  The Sheriff then began to talk to Dar about a program that his wife wanted Leaf to get started in all of the schools.

Prior to the beginning of that summer, Leaf asked the Sheriff if he could have the "Safety First Kid's Shoot" program that he had put on the past two summers.  The Sheriff got red faced and adamantly said "No" and did not give any further explanation. (Leaf 38, 39).[5]

_____In July of 2001, Dar Leaf was approached to apply for a position on the Gun Board of Barry County.  The Sheriff was also on the Gun Board.  The prosecutor was stepping down from his position leaving one open.  One of the commissioners who was opposed to the Sheriff's position on guns, asked Dar to apply but he told him he feared retaliation from the Sheriff.  Eventually he was encouraged enough to do so and applied for the position in late July.  (Leaf 120). The Sheriff testified that he became aware at that time that Dar Leaf was applying for the Gun Board and that he did not want him on the Board.  (DeBoer 49).  The decision was made to fill the position on August 10. (DeBoer 51).  Dar Leaf was not selected.

---

[4]Though Leaf requested Union representation, Sheriff refused to allow it.  See Exhibit E .

[5]Barry County has a large hunting community and several organizations including Ducks Unlimited, Turkey Federation, White Tail Federation and Pheasants Forever have youth groups.

<u>Removal from the School Liaison Position</u>

On August 16th, 2001, just a week before the school year began, Leaf was called into DeBoer's office again and informed Leaf he was putting him back on midnight patrol. Leaf was very upset and asked why. Sheriff replied that he had been on it long enough and it was time for someone else to do it. Leaf asked him to "do better than that" for an explanation. Sheriff yelled, "Because I said so!" Leaf continued to question the Sheriff why he was being pulled from the position. Sheriff then answered, "Because your always late." Leaf questioned when he was ever late. The Sheriff never answered and the meeting ended. (Leaf notes from 8-16-01 meeting, Exhibit F).

During his testimony, Sheriff DeBoer attempted to give a reason why Leaf was pulled off the School Liaison position claiming it was because he wasn't happy with the summer programs he had been doing. (DeBoer 22). Leaf testified that the Sheriff had never spoken to him about a problem with his summer programs while he was School Liaison. It is undisputed there was no discipline issued for such a thing and there is no documentation whatsoever that this was an issue.[6]

Leaf was replaced by Officer Gary Pearson.[7] Pearson had been on the SWET (drug enforcement) team for the department but because of an incident that occurred on the job with his Lieutenant and friction between them, was forced off the team and

---

[6]Sheriff also attempted to make a claim during deposition that there was a complaint against Dar Leaf as a picnic was cancelled by him though the food was already ordered. However, there is no documentation of the complaint nor was Leaf ever told about any such complaint. (DeBoer 18).

[7]The position, for unexplained reasons, was not posted.

relegated to road patrol for some time before he replaced Leaf.  (DeBoer 52)[8]


### Reaction from the School District

When word got out on August 21, 2001, that Dar Leaf was being replaced as School Liaison, superintendents, principals, teachers, students and parents were all upset.  Several wrote letters to the Barry County administrators and to Sheriff DeBoer. (See several example letters, Exhibit G).  Even local newspapers covered Leaf's removal.  (See articles, Exhibit G).  Sheriff DeBoer testified in deposition that he received many letters regarding Dar Leaf but did not take them into consideration "because he had made his decision."  (DeBoer 29). (See response letters from Brown and DeBoer. Exhibit H).

When DeBoer introduced Officer Pearson at a meeting, more complaints and questions were raised by the school district members about why Dar Leaf was taken off the position. (See Memorandum, Exhibit I).  DeBoer answered that he didn't want to bring up any "skeletons out of closets." (Leaf 135).  DeBoer could not deny he said this. (DeBoer 28).


### The Court Officer Position

The Court Officer position maintains security for the Barry County Courthouse and is responsible for various tasks in security.   The Court Officer escorts prisoners into the courtroom, has some bailiff duties, deals with unruly people, develops policies

---

[8]. The Sheriff testified in deposition that he could not remember what the problem was between Pearson and his Lieutenant on the SWET team.

and procedures for the courtroom, screens for weapons, keeps and eye on the audience, is trained in dealing with bomb threats and hostage situations.  Yet, the Court Officer position is a relatively easy one where not much paper work is involved.  It has much less stress involved than the patrol position.  (Leaf Affidavit, Exhibit B).  The Court Officer  worked significantly more overtime hours than the midnight patrol position did.  (Defendant's Exhibit 4; Leaf 112-13; Leaf Affidavit, Exhibit B)

When the full time Court Officer position was created and posted, Dan Nevins was the most Senior employee.  (See Seniority List; Exhibit J).  However, he was not interested in the position so it was offered to the next officer in line, Tom Hildrith.  Officer Hildrith occupied the position for close to a year when he suffered a heart attack.  When Hildrith was off on medical leave, Officer Nevins was asked if he wanted the position temporarily.  Nevins accepted.  When Officer Hildrith came back from his medical leave, he wanted his position back.  Nevins did not want to give it back.  The position was posted and Nevins successfully bid for the position as he had the most seniority.  (Defendants' Exhibit 4).

After some time, Officer Nevins was removed from the position due to performance and misconduct issues.  When this occurred, Sgt. Abendroth  approached Sue Delcatto about the Court Officer position and asked her if she wanted the position because she was 'next in line.', Officer  Delcatto accepted, and was in the position for 5 years.  She testified during arbitration that the position had always been filled according to seniority. (Defendants' Exhibit 4).

Officer Sue Delcatto announced her retirement effective June 2001.  When the position opened in June of 2001, Leaf was in the School Liaison position.   Officer Joel

Funk was the most senior officer interested in the position. He was offered and accepted the position. The funding came through for a second full-time Court Officer position effective January 2002. The position was posted for the first time on 12/10/01. (Leaf 152-53). Though Dar Leaf applied for the position and had the most seniority of all who applied, it was Officer DeMaagd that received the position.[9]

## III. ISSUES

      **1.**     **Whether or not Plaintiff's NRA related activities, associations, and support of the CCW law is protected under the First Amendment;**

      **2.**     **Whether or not removing Plaintiff from his favored school position on first shift and putting him back to a midnight patrol shift is a materially adverse employment action;**

      **3.**     **Whether or not there is a genuine issue of material fact regarding Plaintiff's allegations that his activity protected by the First Amendment was a motivating factor in the adverse employment determination he suffered;**

      **4.**     **Whether or not retaliating against a plaintiff under the circumstances of this case was clearly established prior to the adverse action taken against him.**

## IV. LAW AND ARGUMENT

**(a)**     **Summary Judgment Standard**

Under Rule 56(C) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment,

---

[9]A grievance was filed and an arbitration took place regarding a breach of the collective bargaining agreement between Teamsters 214 and the Department. Arbitrator Kreuger held in favor of the Employer due to certain "increase in force" language of the relevant provision in question and remarked that because the Judge favored Officer DeMaagd, that the contract was not violated. (Defendants' Exhibit 4)

the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If Defendants carry their burden of showing there is an absence of evidence to support a claim, then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories and admissions on file that there is a genuine issue of material fact for trial.  *Celotex Corp.,v. Catrett*, 477 U.S. 317, 324-325 (1986).

'On summary judgment, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the parties opposing the motion.' *Hanover Ins. Co. v. American Engineering Co.*, 33 F3d 727, 730 (6th Cir. 1994)(citing *Matshushita, 475 U.S.* at 586-88).  Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In considering whether summary judgment is appropriate, this Court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Sowards v. Louden County*, 203 F3d 426, 431 (6th Cir. 2001).  The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for Plaintiff.  See *Nemetz v. Price et al.* Case No. 1:00-CV-702, (W.D. Mich. Nov. 28, 2001).

### (b)    First Amendment/Retaliation Elements

A plaintiff alleging unconstitutional retaliation in violation of the First Amendment's guarantee of freedom of speech and association must establish three elements:

**(1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury**

**that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights. *Bloch v. Ribar*, 156 F3d 673, 678 (6th Cir. 1998).**

To state a retaliation claim under §1983 for the exercise of constitutional rights, the Plaintiff needs only to allege a chronology of events from which retaliation may be inferred. *Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994). An act taken in retaliation for the exercise of a constitutionally protected right is actionable under §1983 even if the act when taken for a different reason would have been proper. *Deloach v. Bevers*, 922 F.2d 618; citing, *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir. 1984); see also *Norwell v. City of Cincinnati*, 414 U.S. 1416 (1973); *Haynesworth v. Miller*, 820 F.2d 1245, 1257 (D.C. Cir. 1987); *Losch v. Borough of Parkesburg*, 736 F.2d 903, 907-908 (3d Cir. 1984). The unlawful intent inherent in such a retaliatory action places it beyond the scope of a police officer's qualified immunity if the right retaliated against was clearly established. *Coen v. Runner*, 854 F.2d. 374, 378-9 (10th Cir. 1988); *Losch*, 736 F.2d at 909-10.

The rights of political expression and association are well established under the Constitution. See e.g. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990)(quoting *Elrod v. Burns*, 427 U.S. 347, 356 (1976)(plurality opinion). "**Political belief and association constitute the core of those activities protected by the First Amendment.** Moreover, even practices that only potentially threaten political association are highly suspect." *McCloud v. Testa*, 97 F3d 1536, 1552 (6th Cir. 1996, cert. denied, 522 U.S. 914 (1997)(*McCloud* I).

The protection extends beyond the context of firings to include areas such as transfers, promotions and recoals from layoffs. *Rutan*, 497, U.S. at 64. Abolition of

positions, reassignments and/or demotions are also included. *Thaddeus-X v. Blatter*, 175 F3d 378, 396 (6th Cir. 1999)(en banc); *Hager v. Pike Co. Bd. of Ed.*, 286 F3d 366 (6th Cir. 2002).

To determine whether a public employee's speech is entitled to constitutional protection, a two-part inquiry is applied. *Dambrot v. Cent. Mich Univ.*, 55 F3d 1177, 1186 (6th Cir. 1995). First the plaintiff must establish that his or her speech was related to a matter of public concern. *Connick v. Meyers*, 461 U.S. 138, 146 (1983). If Plaintiff's speech in this regard is found to be a matter of public concern and thus protected, the next inquiry is whether Plaintiff's free speech interests outweighed Defendants' interest in regulating the speech.

Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record. *Id.* at 147-148. These considerations differentiate between an employee's speech that touches upon matters of public concern and speech that is of particular interest only to the speaker. If "any part of an employee's speech, which contributes to the [disciplinary action], relates to a matter of public concern, the court must conduct a balancing of interests test as set forth in *Pickering v. Board of Education* 391 U.S. 563 (1968)*." Rahn v. Drake Ctr., Inc.* 31 F.3d 407, 412 (6th Cir. 1994). Matters regarding gun laws are seen as matters of public concern. *Thomas v. Whalen,* 51 F3d 1285 (6th Cir. 1995).

Once the plaintiff can establish the three elements of her First Amendment retaliation claim, the burden of persuasion then shifts to the defendants, who must show, by a preponderance of the evidence, that they would have taken the same action

even in the absence of the protected conduct. *Leary v. Daeschner,* 228 F3d 729, 737 (6th Cir. 2000).

Protected conduct need not be the only motivating factor for the adverse action, it is enough that the action be partially motivated by the protected conduct. *Greene v. Barber, 80* F.3d 1101, 1104 (6th Cir. 2002).

### (c)    Plaintiff Leaf's activity and associations are protected by the First Amendment

As discussed above, political belief and association constitute the core of those activities protected by the First Amendment.  The First Amendment's purpose is to protect the beliefs of individuals and allow them to participate in speech and activities which evidence those beliefs.  It is Plaintiff's contention that he was punished because of his beliefs about gun laws and his support for the CCW law, and his activities and associations which evidenced those beliefs. He circulated a petition regarding the law and taught gun safety classes under the law once it was passed.  He associated with NRA members who supported the law and who encouraged him to support the law.  He applied for a board in which he would be able to have a voice regarding gun laws. Defendants confuse the issue with a comparison with "intimate association" which protects individuals' marital rights.  This case is simpler than that.  Plaintiff's claims of association rights are akin to political association, not intimate association.  The gun issue is political.  His association with Dave Stevens as a fellow NRA member and opponent to the Sheriff's decisions is a political association.

Defendants ignore the context of the adverse actions that took place.  Trouble began for Plaintiff Leaf when he first began showing support for the CCW law in 1999.

14

This is when the Sheriff first started warning Leaf. The Sheriff was vehemently and vocally opposed to this law. As his activities regarding his support for this law continued, the Sheriff began calling Leaf into his office more and more regarding his "concern" regarding him teaching the classes, and his "concern" regarding the fact that he was becoming associated with the local NRA president. Not only was the Sheriff calling Leaf into his office to discuss these matters (and without requested Union representation), he was visibly and audibly angry when did so. Finally, after Leaf continued not to be deterred by the Sheriff's "concerns," he applied for the Gun Board of Barry County on which the Sheriff sat but was not selected as the Sheriff did not want him on the Board. Six days later, for absolutely inexplicable reasons, Leaf was removed from his favored School Liaison position.

Defendants also point out that Leaf was always "allowed" to teach the CCW classes. Yet this is not a case where Plaintiff claims his speech was restricted, only that he was punished for his political beliefs.[10] Plaintiff's political beliefs, activities and associations are protected by the First Amendment.

It is the collective actions of Leaf regarding his beliefs on gun ownership and the CCW law that make up his protected activity; circulating the CCW law petition, teaching CCW law gun safety classes, teaching the classes with NRA president Dave Stevens, and finally applying for the gun board so he could have a say in the gun laws and represent a voice for the NRA all make up protected activities. See *Leary v. Daeshner,* ___ F3d ___, (6th Cir., No. 01-6118, November 19, 2003, attached as Exhibit K), where

---

[10]It is assumed that Defendants concede that speech/activity involved in this case is a matter of public concern that passes the *Pickering* balancing test.

the Sixth Circuit recently recognized as protected activity school employees being known for being vocally opposed to their employer and for being known for speaking out on "school related issues."

**(d)** **The Removal from a favored first-shift position to a lesser midnight-shift position and a failure to promote from a less favored midnight-shift to a favored first-shift position are adverse employment actions**

In *Hollis v. Atlantic Co.*, 188 F3d 652 (6th Cir. 1999), the court discussed the elements for establishing a materially adverse employment action:

> {A} materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities or other indices that might be unique to a particular situation. *Id.* at 662.

The Sixth Circuit has consistently held that *de minimus* employment actions are not materially adverse and, thus, not actionable. See e.g. *Jacklyn v. Schering-Plough HealthCare Prod.*, 176 F3d 921, 930 (6th Cir. 1999)(holding that "neither requiring plaintiff to work at home while she was recovering from out-patient surgery, nor rejecting computer expenses that previously had been approved, were materially adverse employment actions"). See also *Bowman v. Shawnee State Univ.*, ___ F3d ___, (6th Cir. 2000)(Stated that the permanent loss of a coordinator position may well have constituted a tangible job detriment, it was clear that the Plaintiff did not suffer an adverse employment action by the very temporary loss of his position as Coordinator).

Recently, the Sixth Circuit in *Laery v. Daeschner* set forth a broad interpretation of "adverse action":

**Clearly, involuntary transfer from one job to another is action that "would likely chill a person of ordinary firmness from continuing to engage in that constitutionally protected activity." *Bloch v. Ribar*, 156 F3d 673, 679 (6th Cir. 1998). Moreover, we previously determined that an involuntary job transfer, where neither grade nor salary is affected, qualifies as adverse action for purposes of the First Amendment. See *Boger*, 950 F2d at 321. Here, evidence in the record suggests that being transferred from one school in the district to another causes Plaintiffs to suffer harm to their reputations, while the transfers also remain notations in their files for a year. The act of transferring Plaintiffs to another school additionally can negatively impact their daily experiences including their commute, coworker friendships and community relationships. *Id.* at 19, attached.**

There are two actions complained of in this case and both are materially adverse under Sixth Circuit standards. Being removed from the favored position of School Liaison is both objectively and subjectively materially adverse. In addition to the difference between working day shift and a midnight shift, and receiving nearly double the overtime hours (whether it be comp time or cash payments), the work itself is favored.

As explained by the testimony of Leaf, the School Liaison assignment is more gratifying, has a more pleasant environment, works with more pleasant people, is lower stress, and has much more time off as the ability to accumulate overtime is significantly increased. Also it is a day shift rather than a midnight shift which makes family life easier and allows the person to engage in other extracurricular activities. Being removed from this position is comparably worse than a demotion in title, reduction in pay or being suspended for a given time.

Likewise, the failure to assign Plaintiff to the Court Officer position is materially adverse in that it is a much easier job that has a better working environment, lower stress, significantly more overtime opportunity and pay, and is a day shift. Both actions were objectively materially adverse actions.

17

**(e)** **A genuine issue of fact exists as to whether Plaintiff's protected activity was a motivating factor in the adverse employment actions Leaf suffered.**

(1) The evidence shows the causal link

Dar Leaf had been working without incident for the department since 1989. It was not until he began evidencing his support for the CCW law that Sheriff DeBoer began riding Leaf's back. Over the course of the next two-years when the law passed and Leaf continued to engage in CCW-related activity, and associate with others who supported the law[11], the Sheriff progressively became more hostile to him. Apparently, the last straw for DeBoer was Leaf's application to the area Gun Board, which the Sheriff admittedly found out and did not approve. Leaf was punished six days later by being taken off the School Liaison grant and put on midnight patrol. DeBoer continued to punish him by refusing to appoint him Court Officer even when it had always been selected according to seniority and Leaf was the most senior qualified person to apply.

A jury could easily find that but for Leaf's political beliefs, activities and associations, he would not have been removed as School Liaison and/or been overlooked for the Court Officer position.

---

[11]Defendants' argument that Leaf admitted that he stopped associating with Stevens by the time he was questioned by the Sheriff is irrelevant. It was the Sheriff's perception that he was involved with Stevens in circulating the petition, teaching classes, and in the publishing of the newspaper article that indicated the deputies' support of the position.

**(f)    The Defendants' proffered reasons for its adverse actions are pretextual**

(1) Removal from School Liaison

The given reasons by the Sheriff for removing Leaf from the School Liaison position are pure pretext.  First, the reasons have changed as time has gone on.  First the reason was because the Sheriff 'said so.'  Then the reason became because Leaf 'had been late' - though it was never clear what Leaf had allegedly been late to or on.  Then later, the explanation became that it was because of a lack of summer programs.  However, Leaf was never told there was a problem with his summer programs and there is no evidence offered to show that there was any problem at all.  Leaf was never late to report to work or on his reports or otherwise and there was no evidence to show he was.  Leaf was loved by students, teachers, principals and superintendents.  He was successful every year he was on the grant and was lauded for his successes.  The fact that the Sheriff was not influenced in the least by the public outcry and evidence of support for Leaf, shows his motives were not performance related.  The reasons given for the removal are pure fiction.


(2) Failure to assign to Court Officer position

This position had always been assigned according to seniority.  When it was Dar Leaf's time to be up for the assignment (four months after being removed as School Liaison) the position is posted for the first time and the decision is said to have been left to the Judges in a private discussion.   It is not Plaintiff's contention that Judge Fischer didn't state, when asked, that he wanted Officer DeMaagd to get the position. It's Plaintiff's contention that it was not appropriately posed to the Judge as it had always

been assigned by seniority and it is unclear how the question was posed to him by the Sheriff.   This failure to assign is just a continuation of the Sheriff's retaliation against Plaintiff for his beliefs.

### (g)      Sheriff DeBoer is not entitled to Qualified Immunity

(1) Qualified Immunity Standard

_____When a motion for summary judgement is brought claiming qualified immunity to §1983 action, Plaintiff must state claim of violation of clearly established law and must present sufficient evidence to create genuine issue as to whether Defendant, in fact, committed acts that violated law.  *Adams v. Metiva*, 31 F.3d 375 (6th Cir. 1994).  The qualified immunity defense is available only as long as the official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A person has a clearly established constitutional right not to be arrested without probable cause.  *Cook v. Sheldon,* 41 F.3d 73 (2nd Cir. 1994).  To be shielded by qualified immunity from liability under §1983 for wrongful prosecution, an officer's request for arrest warrant must have been objectively reasonable.  *Moran v. Marker,* 889 F.Supp 284 (1995).

The sequential analysis prescribed by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001) should be used to determine if qualified immunity attaches.  "First, we must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged are sufficient to make out a violation of the Constitution. *Saucier v. Katz,* 533 U.S. at 201.  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquires concerning

qualified immunity."  If, however, "a violation could be made out on a favorable view of the parties submissions, the next sequential step is to ask whether the right was clearly established." *Id*.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, at 202.

Here, if Plaintiff's facts are believed, then Defendant DeBoer did commit the acts that violated Leaf's rights.  If Defendant DeBoer is believed, he was making assignments as he has the authority to do as Sheriff.  Therefore, the legal question of qualified immunity turns on which facts are believed, and should be decided by a jury." *See Sova v. City of Mount Pleasant,* 142 F.3d 898, 903 (6th Cir. 1998).


(2)　　Defining "Clearly Established"

Plaintiff has shown that Defendant DeBoer violated his constitutional rights.  Now he must establish that the right was clearly established as of August 16, 2001.  The right is clearly established when it is sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *Anderson v Creighton*, 483 U.S. 635 (1987).

In *Blake v. Wright*, 179 F.3d 1003 (1999) the Sixth Circuit discussed how precedent "clearly establishes" a constitutional right:

> . . the Court must examine whether the alleged constitutional or statutory violations were "clearly established" at the time of the alleged violations. A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, or the district court itself, or case law from other circuits which is directly on point. Although the absence of a case on point does not necessarily endow a public official with public immunity, when this court can uncover only some generally applicable principle, its specific application to relevant controversy must again have been 'clearly foreshadowed by applicable direct

authority." *Blake* at 1004 (citations omitted; emphasis added). *Id.* at 1004

Applying those standards here, it is clear that Defendant DeBoer is not entitled to qualified immunity for several reasons. The law traditionally gives great protection to First Amendment rights, particularly where political affiliation, association and beliefs may be affected.

This is a typical political belief and association case where Plaintiff is claiming to be punished for his political beliefs and activities. Punishing for beliefs and political activity has always been a clear violation of the First Amendment of which Defendant DeBoer was undoubtably aware.

## CONCLUSION

For the reasons set forth above, Plaintiff asks this Court to dismiss this motion for Summary Judgment and allow his case to go to a jury.

PINSKY, SMITH, FAYETTE & HULSWIT
Attorneys for Plaintiff

Dated: May 18, 2004          By    /s/ Katherine Smith Kennedy
                                          Katherine Smith Kennedy (P54881)
                             Business Address and Telephone:
                                    146 Monroe Center St NW, #1515
                                    Grand Rapids, MI 49503
                                    616-451-8496