C



# TRANSCRIPT of the TESTIMONY of

Witness:  **Darin S. Leaf**

Date:  **November 11, 2003**

Case Name:  **Darin Leaf v. Sheriff Stephen DeBoer**

METROPOLITAN REPORTING, INC.
517-886-4068

Page 29

```
1   Q.   And what did she say to you at the time as best as you
2        can recall?
3   A.   I don't really remember.
4   Q.   And did you have an understanding as to why she was
5        telling you you received the job?
6   A.   Well, my understanding was she was the grant writer,
7        and my feeling was that she was going to be in charge
8        of it, I think.  I am not sure how to say it.
9   Q.   Did she tell you anything about -- I don't get the
10       impression that she told you anything about how long
11       you are going to be in the position or -- well, let's
12       just stick with that for a minute.
13            She didn't tell you you were going to have
14       this job for six years, ten years?
15  A.   Five years.
16  Q.   Five years she told you?
17  A.   Yes.
18  Q.   And tell me exactly the best you can recall what she
19       said about that.
20  A.   Best I can recall, I believe she said it was -- be
21       ready for a five-year commitment.
22  Q.   That was the length of the grant?
23  A.   My understanding is the grant was for four years, and
24       then the fifth year the schools had to take over the
25       payments or something like that.  It was 90/10, 90
```

Page 30

```
1        paid by the government and 10 percent paid by the
2        schools all pitched in together the first year, and
3        then I think it went 75 the next year, the government,
4        and 25, and then it kind of worked its way down, and
5        the fifth year I believe they were supposed to pay for
6        it all, the schools.
7   Q.   And this would be the end of that fifth year right now
8        where we are now?
9   A.   It started in '98.  No, this would be -- is it sixth
10       year now?
11  Q.   If you don't know, just tell me.
12  A.   I am not really sure.  I would have to go back and
13       count.
14  Q.   To whom did you report in that position?
15  A.   Report about what?
16  Q.   Well, let's say you had to submit the reports.  To
17       whom did you submit the reports?
18  A.   Well, like the quarterly report you mean?
19  Q.   Well, any report.
20  A.   Well, daily report went in to the sergeant.  Quarterly
21       report went in to the sheriff's secretary, Alice.
22  Q.   Any other reports that you submitted to other people?
23  A.   Year-end report went in to Alice.
24  Q.   Sheriff's secretary?
25  A.   Yes.
```

Page 31

```
1   Q.   Did you get your pay then continued from the
2        Barry County Sheriff's Department, is that correct?
3   A.   I don't understand.
4   Q.   You kept getting paid as a deputy?
5   A.   Yes.
6   Q.   You weren't paid by the school districts directly?
7   A.   No, not directly.
8   Q.   To your knowledge did Ms. DeBoer have any supervisory
9        authority over you?
10  A.   I believe she was the grant overseer.  I don't know
11       that for sure.
12  Q.   But, I mean, she couldn't hire and fire and discipline
13       and that kind of stuff with respect to you?
14  A.   No, I don't think so.
15  Q.   So you wouldn't characterize her as your supervisor?
16  A.   No.  Supervisor I would characterize as Bob Abendroth.
17  Q.   Your supervisor?
18            MS. KENNEDY:  You do need to keep your voice
19       up a little bit I think, because we are in a small
20       room with a high ceiling.  I am having a hard time
21       hearing you, so I imagine she might too.
22            THE WITNESS:  All right.
23  Q.   (BY MR. ASELTYNE)  You mentioned a moment ago that you
24       submitted various reports, some would be to your
25       sergeant, some to the sheriff.  Did you have a report
```

Page 32

```
1        called the distance report?
2   A.   It's a quarterly report.
3   Q.   That's the quarterly report?
4   A.   Uh-huh.
5   Q.   That's called the distance?
6   A.   There is four quarterlies and also the year-end
7        report.
8   Q.   And what was the -- were the quarterly reports called
9        distance reports?
10  A.   Yes.
11  Q.   And what were the annual reports called?
12  A.   Just year-end reports.  That's all I ever called them.
13  Q.   And you told us to whom you would submit those reports
14       already, correct?
15  A.   Yes.
16  Q.   From time to time did you meet with any supervisors
17       regarding the progress that you may have been making
18       on the position of school liaison officer?
19  A.   Not that I remember, no.
20  Q.   And that would include the sheriff, correct?
21  A.   Yes.
22  Q.   We know that you did meet with him in August of 2001
23       when he informed you that you would no longer be the
24       school liaison, is that correct?
25  A.   That's correct.
```

Page 37

1  A.   He told me I could not do the one with the driver's
2      training group because it didn't target the middle
3      school age kids. I tried to make an argument that 8th
4      grade kids, the driver age dropped down to 14 years 9
5      months, something like that, you can start driver
6      training class, and that targeted the upper middle
7      school kids, and he argued that it did not target the
8      middle school.
9  Q.   And this discussion took, these comments, I know you
10     are not giving me verbatim, but these comments took
11     place in this meeting?
12  A.   Yes.
13  Q.   As opposed to you telling me what your thinking was,
14     you are telling me what was expressed in the meeting,
15     correct?
16  A.   Yes.
17  Q.   Go ahead. I am sorry to interrupt.
18  A.   Then the STAND picnics, that those are okay, but we
19     had some of them rained out.
20  Q.   That's not discussed in the meeting I assume?
21  A.   No, but the STAND picnics were rained out that summer.
22  Q.   Go ahead.
23  A.   Prior to that he seemed to be more concerned about who
24     I was hanging out with off duty, concerned about
25     teaching pistol classes.

Page 38

1  Q.   Before you get into that, have you exhausted all your
2     recollection about what was discussed besides your
3     school liaison position in that meeting?
4  A.   That was very short conversation.
5  Q.   Could you answer my question.
6  A.   Again, I don't remember if it was this meeting or not,
7     but there was a time when I went in and asked him if I
8     could do a -- we had a rifle and shotgun, call it the
9     Safety First Kids Shoot, two years prior.
10  Q.   Two years prior to what?
11  A.   The last summer I was there.
12  Q.   So sometime in 1999?
13  A.   Right, '99 and 2000, the summers of, and I asked him
14     if we could get that going again this year, and he
15     adamantly got red in the face and looked at me and
16     said no. So that I left that alone. I don't know
17     if that was at that specific meeting. I remember
18     going in and asking him if I could do that again for
19     summer activities, and the reason I was asking about
20     it was because that we had hunting, this is a big
21     hunting community, and we had Ducks Unlimited, Turkey
22     Federation, White Tail Federation, Pheasants Forever,
23     and Turkey Federation all wanting to take part in that
24     and get the kids activated in that, because they got
25     youth -- I know that Turkey Federation, Pheasants

Page 39

1     Forever have little youth groups too and were trying
2     to get the kids activated in that, and that was part
3     of the grant.
4  Q.   So to the best of your recollection in the meeting in
5     which you discussed having the shooting program the
6     sheriff didn't tell you why he didn't think that was a
7     good idea?
8  A.   No.
9  Q.   He just said no?
10  A.   Yeah.
11  Q.   Okay.
12  A.   Yes.
13  Q.   Anything else that you can recall related to the
14     school liaison officer position that was discussed in
15     this meeting you were talking to us about that you
16     think took place in either the summer of 2001 or
17     summer of 2000?
18  A.   I am pretty sure it was 2001 when we were, had that
19     discussion.
20  Q.   Anything else?
21  A.   I can't think of anything right off the top of my head
22     right now.
23  Q.   And other than the meeting in the summer of 2001 and
24     maybe this other meeting that you may have had in 2000
25     about the school liaison officer position, are there

Page 40

1     any other meetings that you can recall meeting with
2     the sheriff about the school liaison officer position?
3  A.   I was called in several times. It wasn't about the
4     school liaison.
5  Q.   I am just interested in school liaison at this point
6     in time.
7  A.   I don't remember any others.
8  Q.   How about Sergeant Abendroth?
9  A.   Abendroth.
10  Q.   Did you meet with him at all about the school liaison
11     position?
12  A.   No.
13  Q.   You submitted reports, did you not, regarding the
14     school liaison position? You already told us that,
15     correct?
16  A.   Yes.
17  Q.   And were you familiar with the grant? You didn't
18     write the grant, but you were familiar with it, is
19     that fair to say?
20  A.   The grant was kind of dumped in my lap, and I didn't
21     really understand what I was supposed to be doing.
22     When I asked his wife what do I do to follow the
23     grant, she said, I don't know. Just make a good
24     daily, and it took me a while to get my daily adjusted
25     to what the needs of the grant were.

## Page 61

1  Q.  Is there any other document in that pile that you need
2      to review to refresh your recollection about this
3      meeting that took place, the first meeting that took
4      place about your teaching CCW classes between yourself
5      and the sheriff?
6  A.  With reference to this meeting?
7  Q.  Correct.
8  A.  No.
9  Q.  Okay.  Now, after having reviewed that document, can
10     you tell me anything else that was discussed in the
11     meeting, the first meeting, following your submitting
12     Exhibit 4?
13 A.  I don't recall anything in the meeting before,
14     submitting before.  I don't recall anything further on
15     that meeting.
16 Q.  So the only things you can recall are the two
17     questions that I went over with you before, who is
18     teaching the classes and who you are hanging out with?
19 A.  No, that would be this meeting here.
20 Q.  We are not communicating.  You had a meeting with the
21     sheriff on March the 9th of 2001?
22 A.  Right.
23 Q.  According to the notes you have in front of you,
24     correct?
25 A.  Yes.

## Page 62

1  Q.  And at that meeting the sheriff asked you who is going
2      to be teaching the classes and who are you hanging out
3      with, correct?
4  A.  It doesn't say on here, no.
5  Q.  You already told us you can remember him saying that.
6  A.  I don't remember he asked who was teaching.  What I
7      remember saying is that he was concerned about who I
8      was hanging out with.
9  Q.  Whatever you testified to, I am not going to go back
10     there, we have already spent enough time on that.  You
11     have already testified that way, and sobeit.
12         What else can you recall taking place at the
13     meeting March 9th?
14 A.  Okay.  He said he was concerned with me teaching CCW
15     classes.  He also said he was concerned about the
16     company I keep outside of work, and I told him that I
17     had separated myself from that company.  And he said
18     he was concerned about the liability the county faced
19     by me teaching.  He said I did not have money but the
20     county did, and I explained to him that the NRA, which
21     is the National Rifle Association, has insurance
22     companies that cover instructors and also told him
23     that the laws said the instructor would have to be
24     held grossly negligent.
25 Q.  Where did you come up with that?

## Page 63

1  A.  It's in the law itself.
2  Q.  Where did you find that?  Did you go to a book and
3      look it up?
4  A.  It's in a CCW law, the new concealed pistol law.
5  Q.  That's right from the statute?
6  A.  Yes.  I told him I would give him the information on
7      the insurance.  I also told him the classes were split
8      in two because of the weather and asked if I could
9      fulfill my obligations to do these, and he agreed, but
10     he wanted to see the insurance.
11 Q.  And then you subsequently gave him the insurance, is
12     that correct?
13 A.  I gave him the insurance and d/b/a both together.
14     Should have that.
15 Q.  When I say subsequent, I mean after the meeting of
16     March 9th.
17 A.  I would have to look at the date, but yes.
18 Q.  Okay.  Did you tape record these meetings or this
19     meeting of March 9?
20 A.  No.
21 Q.  And when did you put the note together that you have
22     just reviewed?
23 A.  I am not sure exactly on this one.  It was, it wasn't
24     right afterwards.
25 Q.  Well, give me an estimate of when.

## Page 64

1  A.  I really couldn't give you an estimate.  I don't know.
2  Q.  Was it that month?
3  A.  Yes.
4  Q.  So sometime in March of 2001 you wrote the note that
5      you just referred to?
6  A.  Yes, I believe it might have been on the 19th that I
7      wrote the note.
8  Q.  Referencing the meeting --
9  A.  Another meeting.
10 Q.  Referencing the meeting that took place March the 9th?
11 A.  Yes.
12 Q.  Why was it that you wrote the note referencing a
13     meeting on March 9th?
14 A.  I started getting a little concerned about my future
15     there, being able to teach classes, being able to --
16 Q.  Teach the CCW classes?
17 A.  Yes.
18 Q.  Okay.  Was there ever a period of time that the
19     sheriff said you could not teach the CCW classes?
20 A.  No, I don't think so.
21 Q.  And are you currently teaching CCW classes?
22 A.  Yes, I still have the d/b/a and the insurance, yes,
23     and I taught one, I think it was the 25th of October,
24     so, yes.
25 Q.  And how many CCW classes roughly would you say you

Page 65

1   have taught between March 9th, 2001 and October 25th,
2   2003?
3   A.  I wouldn't know right now.  I would have to go back
4       and look.  Started out maybe one a month, and then it
5       really got sparse after that.  The 25th is the first
6       one I taught in quite a while.
7   Q.  Do you have any estimate?
8   A.  It would be a guess, but I am not really sure.
9   A.  Well, more than 20, more than 30?
10  A.  I don't think it was quite 20, I don't think.
11  Q.  So somewhere between 10 and 20?
12  A.  That would be just a guess, but yes.
13  Q.  And did you receive income for teaching those classes?
14  A.  Some of them, yes.
15  Q.  And would that all be run through your d/b/a?
16  A.  Yes.
17  Q.  And to your knowledge was a 1099 issued for you from
18      the d/b/a, if you know?
19  A.  I am not sure what a 1099 is.
20  Q.  Any other sources of income for the d/b/a other than
21      teaching the CCW classes?  You mentioned --
22  A.  I mean, are you talking about the martial arts?
23  Q.  Sure.
24  A.  That would be the only other one, yes.
25  Q.  How much would it cost for somebody to take your CCW

Page 66

1   class?
2   A.  It depends.
3   Q.  On what?
4   A.  $50.
5   Q.  And how many sessions is that?
6   A.  Well, depends too.  You got to be flexible on that,
7       because if you can get it done in one day, you do it
8       in one day.  Some places want you to do it two, three
9       days.
10  Q.  What do you mean places?
11  A.  Lakeview Conservation Club, depending on the group you
12      get, if people can make it in one day, you get it in
13      one day.  If people can't make it one day, then you do
14      it in two, three days.
15  Q.  Who keeps the books for The Right Fight?
16  A.  I do.
17  Q.  And where are they kept?
18  A.  At home.
19  Q.  And if you find those books, would you provide those
20      for your attorney to provide to me?
21  A.  Sure.
22  Q.  Thank you.  Do you recall anything more specific being
23      said about who you were hanging out with?
24  A.  Well, I mentioned his name.
25  Q.  Who is that?

Page 67

1   A.  Dave Stevens.
2   Q.  And who is Dave Stevens?
3   A.  He is a school teacher out of, I think Hamilton
4       schools.
5   Q.  And what, if you can recall, did the sheriff say about
6       Dave Stevens?  Well, first of all, did he use the name
7       Dave Stevens?
8   A.  I believe so at one of the meetings.
9   Q.  I don't see it referenced in your note on the meeting
10      of March 9th.  Is it in there?
11  A.  No, it's not in that one.  I don't know if I put it in
12      any of these.
13  Q.  Did the sheriff mention the name Dave Stevens at any
14      of your meetings with him?
15  A.  Mr. Stevens I think he referred to him as.
16  Q.  And what did he say, if anything, about Mr. Stevens?
17  A.  He kept it -- it wasn't much of a conversation, but
18      when he asked -- probably when he told me he was
19      concerned about whom I was hanging out with, I don't
20      know if he said or if I asked Mr. Stevens or something
21      like that.  I don't remember exactly how it all went,
22      but that's who he was referring to as whom I was
23      hanging out with off duty.
24  Q.  And other than being a school teacher in Hamilton --
25  A.  He is also -- go ahead.

Page 68

1   Q.  What does Mr. Stevens do?
2   A.  He is also an instructor for the concealed pistol
3       certified through the National Rifle Association.
4   Q.  And did you ask the sheriff why he was concerned about
5       who you were hanging out with?
6   A.  I don't remember if I did or not.
7   Q.  At any of your meetings?
8   A.  I don't remember.
9   Q.  Did the sheriff ever tell you that you weren't to hang
10      out with Mr. Stevens?
11  A.  He never come right out and said it, no.
12  Q.  Did the sheriff ever tell you that he didn't approve
13      of Mr. Stevens?
14  A.  No, very careful on what he told me.
15  Q.  Did the sheriff ever tell you anything about your
16      teaching of CCW classes other than he was concerned
17      about the issue of liability?
18  A.  Yeah, and whom I was hanging out with and whom I was
19      teaching with.
20  Q.  And did you teach with Mr. Stevens?
21  A.  For a brief time.
22  Q.  And why don't you teach with Mr. Stevens anymore?
23  A.  He, rather than focusing on the concealed pistol class
24      itself, he made a lot of comments that were getting
25      too political, and I wanted to get my focus on just

## Page 73

1  A.  There is one thing I didn't put in there is that he
2  made comment that I was trying to undermine his
3  authority.  That's why that sentence is in there.  I
4  told him I was not trying to undermine his authority.
5  Q.  That's on here, isn't it?
6  A.  His comment is not on there.  I don't see it on there.
7  Said I was out of line.
8  Q.  Anything else other than that that you can recall?
9  A.  No.
10 Q.  And at any time during the meeting of March 19th did
11 the sheriff tell you you couldn't teach the CCW class?
12 A.  No.
13 Q.  And at no point subsequent to that meeting did he tell
14 you you couldn't teach the CCW class?
15 A.  No.
16 Q.  Were you the only two people present for this meeting?
17 A.  Yes.
18 Q.  It was held in the sheriff's office?
19 A.  Yes.
20 Q.  Did anybody ever tell you after the meeting that they
21 heard what happened in the meeting?
22 A.  No, the door was closed.
23         Can you close that curtain?
24 Q.  Let's turn to Exhibit Number 10.
25

## Page 74

1         (Deposition Exhibit Number 10 marked for
2         identification.)
3  Q.  (BY MR. ASELTYNE)  By the way, with respect to
4  Exhibits 8 and 9, did you ever show those exhibits to
5  anyone other than your attorney?
6  A.  My wife.
7  Q.  Anybody else other than those two people?
8  A.  Fred Bennett, Teamsters rep.
9  Q.  Would that have been in conjunction with your
10 grievance for the removal from the --
11 A.  Yes.
12 Q.  -- from the school liaison position?
13 A.  Yes.
14 Q.  Anybody else other than those three people?
15 A.  I don't know if I showed -- I don't know.
16 Q.  You didn't show these to the sheriff --
17 A.  No.
18 Q.  -- before today?
19 A.  No.
20 Q.  What is Exhibit Number 10?
21 A.  It's another statement that I wrote out after another
22 meeting.
23 Q.  And when did you actually write this?
24 A.  The same day, as soon as I got out of there.
25 Q.  So that would be August the 16th?

## Page 75

1  A.  Yes.
2  Q.  This meeting was not tape recorded, was it?
3  A.  No.
4  Q.  At least not by you?
5  A.  No.
6         MS. KENNEDY:  Is there a second side to that
7  page?
8         THE WITNESS:  Yes.
9         MS. KENNEDY:  Okay.
10 Q.  (BY MR. ASELTYNE)  Had you ever been told by the
11 sheriff that you would stay in the position of school
12 liaison officer for a particular length of time?
13 A.  Not the sheriff, by his wife.
14 Q.  The answer is no?
15 A.  The answer is no.
16 Q.  How about the undersheriff?
17 A.  No.
18 Q.  Were the assignments, to the best of your knowledge,
19 to positions of liaison officer and the SWET team and
20 the court officer, were those assignments generally
21 ones that were made by management at the department?
22 A.  What do you mean?
23 Q.  You told us before that when you applied for the
24 position of school liaison officer it was in response
25 to a posting, correct?

## Page 76

1  A.  Yes.
2  Q.  And you submitted a letter of interest, I think you
3  said, to the sheriff, is that correct?
4  A.  Yes.
5  Q.  And was it your understanding that the determination
6  of who actually received that position would be
7  ultimately made by the sheriff?
8  A.  Yes.
9  Q.  It wouldn't be made by the Board of Commissioners, for
10 example?
11 A.  No.  I am sorry, no.
12 Q.  And that was true to the best of your knowledge with
13 respect to the court officer and the SWET team
14 assignments also, those were made by the sheriff, is
15 that correct?
16 A.  Yes.
17 Q.  Let me see the flip side of that, since I don't have a
18 copy.
19         How loud a voice were you using when you
20 responded to the sheriff?
21 A.  I don't know.  I just blurted out why, or what part
22 are you talking about?
23 Q.  When?
24 A.  About when.
25 Q.  You say it was in a loud voice.  How loud?

Page 97

1    five years old some of it. I didn't know that he and
2    the sheriff were, I don't know if you want to call it
3    locking horns over concealed pistol issue.
4 Q. Who is he?
5 A. Dave Stevens. Because back when we were doing that
6    safety shoot he was basically talking about the
7    federal and state politics, and I didn't want that
8    there. I wanted to focus on let's go teach these kids
9    gun safety.
10 Q. When was that?
11 A. I would say the summer of 2000.
12 Q. You thought that was sometime back in 2000 --
13 A. The summer of 2000, yes. There was me, helping out me
14    Tom Stockwell, Ron Miles and Dave Stevens, and when we
15    started that program, and, like I say, I didn't know
16    the two of them had been arguing about a concealed
17    pistol issue at that time, what had happened before I
18    asked him to leave, he asked me if I would sign a
19    specific petition. It wasn't a legal petition. It
20    was a petition to give to, I don't know if they were
21    giving it to a senator, state rep in the state here to
22    show the interest of getting private citizens to carry
23    a concealed pistol.
24         Well, I went and signed the petition, and I
25    kind of chuckled, said I am not really worried about

Page 98

1    being shot at by a private citizen, and then he asked
2    me, he said, Hey, would you ask some of the guys
3    around the department to sign the petition?
4 Q. This is Mr. Stevens?
5 A. Yes. And so I said, Sure, I will give it a shot.
6         So I don't remember if it was the next day or
7    two days or a week later in between shifts I had it
8    and caught some of the guys in the midshift.
9 Q. Where?
10 A. In the locker room.
11 Q. At the sheriff's department? You were in the
12    sheriff's department locker room?
13 A. Between shifts.
14 Q. Circulating petitions?
15 A. Yes. And I handed it to one of the guys to sign it,
16    and he said, Absolutely. He made a comment, quote,
17    shit already has it concealed, so why not give the law
18    abiding citizens a chance, and then I remember you
19    called me in the office on that.
20 Q. Unfortunately when you point and say you -- the
21    sheriff?
22 A. The sheriff called me in the office and asked me if I
23    was circulating that petition, and I said yeah. He
24    asked me not to do it again, so I didn't. In fact, I
25    don't even know if I turned that one in to him.

Page 99

1 Q. Did the sheriff in that meeting tell you that he
2    didn't want you to do that because you were at the
3    sheriff's department and some of those people were on
4    duty?
5 A. I don't remember the full conversation. I think he
6    said, You probably shouldn't do that when you are on
7    duty. But that's stretching my memory.
8 Q. Okay.
9 A. And I didn't. I didn't think it was any big deal.
10    Later on Dave Stevens called me up and he said, How
11    did you do? I said, Well, jeez, I bet you 95 percent
12    of our deputies signed it, and, Hey, thanks for
13    circulating that. That was about the end of the
14    conversation.
15         And then next thing I know it made the
16    newspaper, and then he called me in his office again.
17         MS. KENNEDY: He?
18         THE WITNESS: I am sorry. The sheriff called
19    me in the office again, asked me how he got that
20    information, and I told him.
21 Q. (BY MR. ASELTYNE) How?
22 A. How Dave Stevens got the information to put in the
23    newspaper, and I told him. I didn't think it was any
24    big deal.
25 Q. This is in the summer of 2000?

Page 100

1 A. No, it had to have been '99, because the law was
2    signed in 2000, so it had to have been the summer of
3    '99.
4 Q. When you said Mr. Stevens was talking to the kids and
5    you didn't think that was appropriate, that would have
6    been the summer of '99?
7 A. I am not sure.
8 Q. Well, it kind of stands to --
9 A. No, I am not sure.
10 Q. Let me word it this way. If the law was passed and
11    went into effect in 2000, you told me that this was a
12    summer class that --
13 A. We did it two summers in a row.
14 Q. But it wouldn't make any sense for him to be
15    circulating petitions on a law that's already passed?
16 A. It was '99, because 2000 we wouldn't let him come back
17    in. In fact, he didn't even try.
18 Q. So 1999 is when he spoke with the children and then
19    you objected to that?
20 A. It wasn't speaking to the children. He was talking to
21    adults and the kids were present.
22 Q. I understand. I am just trying to summarize here, and
23    you told him you didn't think that was appropriate,
24    and then he gave you this petition to sign, so that
25    would have been 1999?

**Page 109**

1   Just for the record, I previously marked a
2   letter dated November 18th, '01 as Exhibit 5, and I
3   have used one of the stickers designating that as 15
4   also, and we are going to just delete 15.
5   Q.   (BY MR. ASELTYNE)  Let's look at Exhibit 5 then, if
6   you can take a look at that.  That is a letter that
7   you wrote?
8   A.   Yes.
9   Q.   And was this in response to a posting for the position
10  of court officer that started January 1, 2002?
11  A.   Yes.
12  Q.   And was this -- I think you have already told us
13  before this was a position that was within the
14  discretion of management to determine who takes that
15  position, is that fair to say under the contract?
16  A.   Under the contract, but they went by seniority before.
17  Q.   And when you say they went by seniority before, you
18  are talking --
19  A.   The administration.
20  Q.   Let me finish.
21  A.   I am sorry.
22  Q.   You are talking about in appointing certain people
23  before for that position, court officer, you believe
24  they did that solely on the basis of seniority?
25  A.   Yes.

**Page 110**

1   Q.   And how many examples of that do you know of?
2   A.   Four.
3   Q.   And in terms of your letter, was what you said in your
4   letter correct?
5   A.   Which letter?  This one?
6   Q.   Exhibit 5, the one we are looking at here.
7   A.   What do you mean correct?  Yes.
8   Q.   I mean is it accurate?
9   A.   Yes.
10  Q.   Now, you didn't mention in your letter that you had
11  the most seniority of anybody who applied, did you?
12  A.   No.
13  Q.   And did you have the most seniority?
14  A.   Yes.
15  Q.   And did you know that?
16  A.   Yes, it was discussed between us and our, some of our
17  guys in our union.
18  Q.   Isn't it true in this letter you conclude the letter
19  by saying, I would appreciate being considered for the
20  position?  Aren't those your words?
21  A.   Sure, yes.
22  Q.   Isn't it true, sir, that you knew that it wasn't
23  automatic that you would get this position?
24  A.   No, that's not true.
25  Q.   You thought you would get the position simply because

**Page 111**

1   you were the most senior person?
2   A.   Yeah, yes.
3   Q.   And the basis for that conclusion is Article IV,
4   Section 3 of the contract?
5   A.   No, past practice.
6   Q.   And the past practice would be the prior four examples
7   that you just mentioned?
8   A.   Yes, yes, go with seniority, yes.
9   Q.   And it's also true, is it not, that the arbitrator
10  when he addressed this particular issue ruled against
11  you?
12  A.   Yes.  I am sorry, okay.
13  Q.   Have you ever held the position of court officer if
14  only on an interim basis?
15  A.   No, not this position referred to, no.
16  Q.   As a court officer do you have the -- if you know.  If
17  you don't know, just let me know, but as a court
18  officer would the particular deputy who is serving in
19  that capacity, would he or she have the ability to
20  work overtime that's posted?
21  A.   Yes.
22  Q.   And that would be depending upon whether they were
23  working the court officer position at that time or
24  not, is that fair to say?
25  A.   If they are a court officer and overtime was posted

**Page 112**

1   for regular road patrol, they have an opportunity to
2   do that, but we don't have that the other way.
3   Q.   Correct.
4   A.   Yes.
5   Q.   Do you know, let's say, for the people who were court
6   officers in the year 2002, who would that have been,
7   for example, the two people who were court officers in
8   2002?
9   A.   Prior to this or --
10  Q.   No, this letter was written in '01, so we are talking
11  about the people who took the position in 2002 or who
12  served in that position in 2002.  I think that's
13  Mr. Funk and Mr. DeMaagd.
14  A.   DeMaagd.  Who are currently doing it.
15  Q.   Correct.  Do you know how much overtime either one of
16  them earned in the position of court officer?  I am
17  not talking about in the position of a deputy who can
18  work on the posted overtime slots.  You understand the
19  distinction we have been making here?
20  A.   Repeat that one more time just to make sure.
21  Q.   Sure.  Do you know how much overtime either one of
22  those folks earned as a court officer?
23  A.   About five hours per week per -- like Deputy Funk
24  might get five hours, Dave DeMaagd five hours.
25  Q.   Five hours each or five hours either one?

METROPOLITAN REPORTING, INC.

Page 117

1   Q.   Have you ever met Bob Eaton?
2   A.   No.
3   Q.   Is all the information that you know about what
4        Mr. Eaton allegedly said contained within the four
5        corners of this document?
6   A.   Yes.
7   Q.   Did you present this document at the arbitration?
8   A.   I don't think we did.
9   Q.   Where does Mr. Sheldon -- you told me where he works.
10       Where does he live?
11  A.   Battle Creek.
12  Q.   And do you have an address?
13            MS. KENNEDY:  That's on his 26(a)(1)
14       disclosure.
15  Q.   (BY MR. ASELTYNE)  You also submitted a number of
16       other documents, and I don't know if we are going to
17       mark those, but let me just run through those.
18            This is the seniority list of the department,
19       is that correct?
20  A.   Yes.
21  Q.   This is a memo that you authored, or excuse me, the
22       sheriff authored, and it's dated August 21st, '01.  Is
23       this the notice of a new person taking over in the
24       school liaison position?
25  A.   Yes.

Page 118

1   Q.   Is there any other, anything else significant about
2        that other than notifying the schools that there is a
3        new person?
4             MS. KENNEDY:  If you know.
5   Q.   (BY MR. ASELTYNE)  If you know.
6   A.   Well, this is already after the school year had
7        started.
8   Q.   The date is?
9   A.   8-21.  The date here, the memo, and the meeting was
10       September 5th.
11  Q.   Here is another document you provided to me which
12       appears to be a policy number 1.3.  What's significant
13       about that, if you know?
14  A.   That's our seniority within divisions.
15  Q.   And what significance, if any, is that?
16  A.   Basically policy on how seniority shall -- says to
17       establish a means of determining starting pay,
18       advancement, and chain of command, that's the purpose.
19  Q.   Okay.  You have also supplied me with copies of
20       various work schedules.  It looks like they are about
21       four pages for the period from October 6, 2001 through
22       January 25, 2002.  What significance are those four?
23  A.   The reason why I copied these is because we look at
24       the list here of who is on what shift or who is doing
25       what -- I don't know if you want to call it program.

Page 119

1             What this does, it shows that my name was on
2        all these lists as the school liaison officer all the
3        way through November 30th of 2001, and why that is so
4        significant is because after, sometime during the
5        summer the prosecutor, according to the new law, said
6        that he wanted to -- it allowed the prosecutor to step
7        down from the Gun Board, and I had some people ask me
8        if I wanted to take the prosecutor's spot on the Gun
9        Board.
10            I told them, no, they would have to -- at the
11       fair I ran into a posse member who is also one of our
12       commissioners, Ken Wheeler.  He invited me into the
13       posse mailer, and he was discussing to me or with me
14       about applying for the Gun Board, and I told him, I
15       said, Why would you want me to sign for the Gun Board?
16       He said he disagreed with the sheriff, and he said I
17       also got a letter from a former commissioner, last
18       name Gobbo, G-o-b-b-o.  Apparently the commissioners
19       got one recommending that they consider me for the Gun
20       Board position.
21            He asked me if I was going to put in for it.
22       I told him, No.  He said, Why not?  I said, Well,
23       because I am worried about retaliation from the
24       sheriff.  And he said, Retaliation for what?  And I
25       told him, I said, Well, there is a lot of stuff, kind

Page 120

1        of odd stuff been going on, and I said I am real
2        suspicious that he'd pull me off the school liaison
3        job if I applied for the Gun Board.  He said, Well, I
4        really don't -- I forgot how he worded it.  Was like,
5        I am sorry to hear that, but I would like you to apply
6        for the Gun Board, and so I was thinking about it, and
7        the last day I went and put my application in.
8             Then after I put my application in I got a
9        letter saying, I think it was August 9th I had an
10       interview in front of the county commissioners.  I
11       went in to the interview, and they were talking about
12       the times and stuff like that.  I believe I put on my
13       application that it might interfere with the school
14       liaison duties and I wouldn't be willing to do it if
15       it interfered with the school liaison duties.
16            There had been a lot of --
17  Q.   Before you continue on -- I will let you continue in a
18       minute.  I am a little confused.  You just told me
19       that you told this commissioner that you thought you
20       were retaliated against in the school liaison position
21       by being taken off?
22  A.   No, I thought I would be if I went and applied.
23  Q.   Okay.  And when was that?
24  A.   It was during the fair.
25  Q.   Which is?

## Page 133

1   pistol permit. He kept getting denied, so he filed a
2   $5 million lawsuit against the Gun Board. Right after
3   that happened I got called into the office, and that's
4   when he was explaining to me about concern about the
5   liability of teaching CCW classes, and I told him I
6   had my own insurance and stuff like that.
7           So then brought the lawsuit, got called in.
8   That's when he was explaining to me he was concerned
9   about hanging out and stuff like that.
10  Q.  Did Stevens file his lawsuit before he obtained a
11      concealed pistol permit under the new legislation?
12  A.  Yes, this is before the new law passed. It was just
13      before it passed.
14  Q.  So it would have been sometime in late '99, early
15      2000?
16  A.  I believe early 2000 is when he filed.
17  Q.  Thank you. Jeff Kulhanek.
18  A.  He is the assistant principal Thornapple Kellogg.
19  Q.  Again, something to do with your performance as a
20      school liaison officer?
21  A.  No. Well, he can be, yes, and when they had the
22      meeting on September 25th, 2001, I was ordered by the
23      sheriff that I couldn't go to that meeting. They were
24      introducing the new school liaison. It was a real
25      heated meeting with the principals wanting to know why

## Page 134

1   they were pulling me out of the schools.
2   Q.  Were you at the meeting?
3   A.  No, I was ordered not to go.
4   Q.  You were getting this secondhand?
5   A.  From Mr. Kulhanek.
6   Q.  Who was at the meeting according to Kulhanek?
7   A.  Mr. Kulhanek, the ISD for Kent. He is principal, his
8       name is Ross Cate (sp). Ross Cate -- Jeff Kulhanek
9       was assistant principal for Thornapple Kellogg Middle
10      School, Ross Cate was Kent County Intermediate School
11      District principal, and Thornapple Kellogg, which is
12      Middleville area, is part of Kent Intermediate School
13      District, so he was there.
14          Gary Kimble was the principal of Delton
15      Kellogg schools. Dave Nisbet, N-i-s-b-e-t, he is the
16      principal of Lakewood Middle School. He was there
17      with his superintendent, and all I remember -- Gunner
18      is his first name. I don't remember his last name.
19      Principal from Maple Valley school, which is Todd
20      Ganzer (sp), and their superintendent, which is Clark
21      Volz, V-o-l-z, something like that.
22          The principal, assistant principal for
23      Hastings I believe was there, but I am not really
24      sure. But Mr. Kulhanek told me that when Mr. Cate
25      asked why they were removing me and started rattling

## Page 135

1   off my statistics on truancy and how I was doing that
2   the sheriff told him that we didn't want to go start
3   opening skeletons out of closets. Nobody knew exactly
4   what he meant, but the assistant principal said he
5   took it as kind of an attack towards me.
6           He also -- I worked hand in hand with
7   Mr. Kulhanek in a lot of the truancy and a lot of the
8   bomb threats.
9   Q.  Has anybody ever reported to you, sir, that they, in a
10      conversation with the sheriff, heard the sheriff tell
11      them that the reason you were removed as the school
12      liaison officer was because of any first amendment
13      issues you may have raised or freedom of speech issues
14      you may have raised? Has anybody ever told you that?
15  A.  That the sheriff has said that?
16  Q.  To them.
17  A.  No, he is smarter than that. He wouldn't say it.
18  Q.  So the answer to my question is no?
19  A.  That's correct.
20  Q.  How about Janette Shaffer, who is she?
21  A.  She is one of our deputies, and right two days after
22      we had an arbitration hearing on the court officer's
23      job -- this is actual hearing, we are sitting in front
24      of the --
25  Q.  Arbitrator?

## Page 136

1   A.  Arbitrator, thank you. I was called into the
2       undersheriff's office, and I was written up for
3       something that happened three weeks prior to that we
4       already had settled with the sergeant, and what had
5       happened was about three weeks prior to there was a
6       deputy that had less than a year's experience in our
7       department --
8   Q.  Is this the police chase with the radio issue?
9   A.  Yes, sir.
10  Q.  Okay. What is she going to testify about that?
11  A.  Well, okay, I am getting to that. Anyways, when I
12      went back on midnights I was told that senior officer,
13      if anything happens when senior officer is working
14      it's the senior officer's ass, so I called her off of
15      pursuit because I didn't hear all these things she was
16      calling out.
17          Shortly before that then the sheriff called
18      me in and we discussed it, discussed the issue, told
19      them I already discussed it with the Sergeant Rouse
20      (sp), and we had it all handled. I told him what had
21      happened. I thought it was a dead issue. I was off
22      duty on that when he called me in, and it was a dead
23      issue, left, never told me there was going to be any
24      discipline, never told me any of that.
25          Anyways, we had the arbitration hearing, and

METROPOLITAN REPORTING, INC.

## Page 149

1  A.  Yes.

2  Q.  Are you currently treating with any physicians?

3  A.  What do you mean?

4  Q.  Do you presently have, for example, any appointments

5      on a regular basis to see any physicians other than I

6      am not talking about an annual physical, okay, and I

7      am not talking about if you have the flu you go see

8      the doctor.  Are you treating with them for any

9      ongoing conditions?

10 A.  Talking like psychiatrist or like --

11 Q.  Could be a psychologist, could be a psychiatrist,

12     could be the family doctor treating you for arthritis,

13     whatever the condition may be.

14 A.  A bad back.  Go to a chiropractor on that on a regular

15     basis.  I go on this Friday to get this problem taken

16     care of where I got to cough all the time and plus to

17     talk to them about having kind of a reflux I have

18     never had before.

19 Q.  Acid reflux condition?

20 A.  Yeah.  Essentially when I lay down I can feel it, so

21     that's this Friday I am talking to him, but I --

22 Q.  Are you taking any medication for any condition?

23 A.  Nothing prescribed.  I take Tums whenever I get that

24     or some liquid, I forget what it is for that right

25     there.

## Page 150

1  Q.  Are you taking any medication for anything?

2  A.  No.

3  Q.  How long have you had a bad back?

4  A.  Trying to think when it started bothering me.  It's

5      been a little bit over a year.  Probably around 2001

6      when it first started bothering me.

7  Q.  Have you since August of 2001 treated with any

8      psychologist or psychiatrist or counselor for any

9      condition?

10 A.  No.

11 Q.  Do you have plans to see one at the current time?

12 A.  No.

13         MR. ASELTYNE:  I think that's all the

14     questions I have right now.

15         MS. KENNEDY:  I would like to mark the

16     remainder of the notes as exhibits.  Not these.  The

17     only one I want of these is the seniority list.  That

18     was referred to.  There we go.  Let's go notes and

19     then seniority list.  What number are we on?

20         MR. ASELTYNE:  17 I believe.

21         (Deposition Exhibit Numbers 17 through 20

22     marked for identification.)

23         MS. KENNEDY:  Let's go 17 for 8-17-01,  18

24     for 8-20-01, 19 for 8-23-01, and I am using the date

25     that's at the first part o-f the paragraph.  And then

## Page 151

1      20 for the seniority list.

2                     EXAMINATION

3  BY MS. KENNEDY:

4  Q.  And first question I have, I am not going to question

5      you about the notes, because you referred to them, and

6      we have talked about them before, but with the

7      seniority list, did you compile that seniority list?

8  A.  Yes, it was, we have a departmental line seniority

9      list, and what I did is take road patrol off it.

10     Departmental includes corrections, secretary,

11     sergeants, everything in there.

12 Q.  And when was that seniority list accurate as of?

13 A.  June 1st.

14 Q.  And when you compiled it for as of June 1st, why did

15     you compile it for as of June 1st?  Why did you use

16     that as the cutoff date?

17 A.  Because it showed the seniority list from

18     Deputy Nevins when he was employed and Deputy Delcotto

19     when she was employed.  Both of them have since

20     retired and actually Deputy Hildreth, he just retired,

21     H-i-l-d-r-e-t-h.

22 Q.  And when did Delcotto retire?

23 A.  I think it was June of 2001.  That's when Deputy Funk

24     took over the court officer's job from her.

25 Q.  And then the court officer's job that is the subject

## Page 152

1      matter, one of the subject matters of this lawsuit was

2      the subject matter of arbitration that was a new

3      position, correct?

4  A.  The one Funk took?

5  Q.  No, the one that's the subject matter of this one.

6  A.  Yes, that is a new position, yes.

7  Q.  Why don't you explain that for the record.

8  A.  Okay.  It started out it was going to be a part-time

9      position, then they did an agreement between, it was a

10     written agreement between the union and the

11     administration about how that was only going to be a

12     part-time position until January of 2002.  I guess it

13     was the only one that's ever been posted, when it was

14     my turn in seniority to look for people who were

15     interested in doing that job.

16 Q.  You testified in the beginning of the deposition that

17     when there were positions open that they were posted.

18     Is it also your testimony that when there is positions

19     open they were not posted?

20 A.  Yes.

21         MR. ASELTYNE:  Objection, lack of foundation.

22 Q.  (BY MS. KENNEDY)  Well, why don't we get the

23     foundation.  How are you aware that there would be

24     openings in the department and that those positions

25     would be filled without being posted?

## Page 153

1  A.  Well, like in a case where Sue Delcotto got the
2      position, it wasn't posted.  Sergeant went over and
3      asked her if she was interested in that job as the
4      court officer, and it was never posted.  They just
5      went up and asked her.  He made a statement to her
6      that, Sue, you are next, because Sue was her first
7      name, and then that one was never posted.
8  Q.  Any other examples that you are aware of throughout
9      your employment with Barry County Sheriff's Department
10     where things were not posted?
11 A.  Yes, when Deputy Delcotto, Sue Delcotto, retired, this
12     sergeant went over and asked Joel Funk if he was
13     interested in that position, and it wasn't posted
14     again.
15 Q.  Were those two situations rarities or did this happen
16     on occasion or how regularly would it happen that
17     positions would be opened and then filled without
18     being posted?
19         MR. ASELTYNE:  Same objection.
20 Q.  (BY MS. KENNEDY)  You can answer the question.
21 A.  Okay.  The 416 grant, that hasn't been posted all the
22     time.  Sometimes it is, sometimes it isn't.  The
23     school job, when Deputy Pearson was taking it over,
24     was not posted.  In fact, there was quite a few
25     deputies were upset that they didn't have the

## Page 154

1      opportunity.  What they are upset about is that
2      Deputy Pearson was asked to leave by the lieutenant in
3      charge of that Southwest Enforcement Team.  He was
4      asked to leave before his two years were up and not to
5      reapply, and I don't know what the friction was, but
6      they were upset that he didn't -- that happened, and
7      they still selected him for the school liaison job.
8  Q.  You also testified when we were talking about the
9      criteria for being selected for various positions that
10     written tests were sometimes given and sometimes not.
11 A.  That's correct.
12 Q.  Can you explain that a little bit?
13 A.  Well, if it's a promotion to like a sergeant, usually
14     there is a written test.  When there is movement from
15     a position, especially a new one -- usually the time
16     there is a written test is when there is a promotion
17     to sergeant.  I have never seen one any other time.
18 Q.  And regarding the letter I think we decided is
19     Exhibit 5 where you are submitting some of your
20     qualifications as to the court officer position --
21 A.  Yes.
22 Q.  -- you understood that you not only had to be the next
23     senior person in line but that you also had to be
24     qualified for the position, correct?
25 A.  Yes.

## Page 155

1  Q.  Mr. Aseltyne asked you whether or not the sheriff ever
2      told you that he was taking you off the school liaison
3      position because of the CCW classes or because of who
4      you were hanging out with.  Remember you testifying to
5      that, him asking you that?
6  A.  Vaguely, yes.
7  Q.  And you responded that, quote, he wouldn't do that.
8      Do you remember testifying to that?
9  A.  Repeat that again.
10 Q.  Mr. Aseltyne asked you whether the sheriff ever told
11     you that he took you off the school liaison position
12     because you were teaching CCW classes and then asked
13     you another question did he tell you it because of who
14     you were hanging out with, and your response was, He
15     wouldn't do that?
16 A.  Yes, I remember that.
17 Q.  What did you mean by he wouldn't do that?
18 A.  I think he is smart enough not to make a statement
19     like that because it might for contractual reasons and
20     for because we are here for a federal suit.
21 Q.  So you weren't saying he wouldn't have pulled you off
22     because of those things, you were responding he --
23         MR. ASELTYNE:  Objection.
24 Q.  (BY MS. KENNEDY)  -- he wouldn't say that?
25         MR. ASELTYNE:  Objection leading.

## Page 156

1          MS. KENNEDY:  I am trying to clarify his
2      answer.
3          THE WITNESS:  I am saying he wouldn't say
4      that because he is smart enough not to say something
5      like that.
6  Q.  (BY MS. KENNEDY)  Do you know whether or not the
7      sheriff was aware you applied for the Gun Board in
8      August of 2001?
9  A.  My understanding what happens is once you apply the
10     applications went in to the undersheriff, and I am not
11     sure if they did a background check or not on them.
12 Q.  Who do you apply to?
13 A.  We applied to Ellie Norton, her office up on the third
14     floor here.
15 Q.  Who is she?
16 A.  She is, I believe, the secretary to county
17     administrator, Michael Brown.
18 Q.  And then after she receives them they go into the
19     sheriff's office?
20 A.  Correct.
21 Q.  They are given to the undersheriff, but they are given
22     to the sheriff's office?
23 A.  Yes.
24         MS. KENNEDY:  That's all I have.
25         MR. ASELTYNE:  All set.



# TRANSCRIPT of the TESTIMONY of

Witness: **Stephen H. DeBoer**

Date: **November 12, 2003**

Case Name: **Darin Leaf v. Sheriff Stephen DeBoer**

METROPOLITAN REPORTING, INC.
517-886-4068

**Page 5**

1  Q.  And what school did you attend?

2  A.  Calvin College.

3  Q.  What made you stop two classes short of getting your

4      degree?

5  A.  Time.

6  Q.  What do you mean by that?

7  A.  I needed to find the time to complete them.

8  Q.  Oh, I see. You didn't do it all on a full-time basis;

9      you were gradually getting it?

10  A.  I went back to school in '94 and took an accelerated

11      class for 15 months one night a week for

12      four hours that brought me up to two classes short to

13      get a degree.

14  Q.  So this organizational leadership degree, this is

15      something you are pursuing in conjunction with your

16      duties as a sheriff?

17  A.  I started it when I was still in the State Police and

18      finished it after I became sheriff.

19  Q.  Okay. And you are married, correct?

20  A.  Yes.

21  Q.  What is your wife's name?

22  A.  Julie.

23  Q.  Julie DeBoer?

24  A.  Uh-huh, yes.

25  Q.  How long have you been married for?

**Page 6**

1  A.  Eighteen years.

2  Q.  And where is she currently employed?

3  A.  She is executive director of the Barry County Area

4      Chamber of Commerce.

5  Q.  How long has she occupied that position?

6  A.  June of this year.

7  Q.  And what position did she have prior to June of '03?

8  A.  She was a half-time employee of the sheriff's office

9      in charge of the VALOES program. VALOES was Violence

10      Against Loved Ones Ends Soon.

11  Q.  Loved Ones?

12  A.  Ends, e-n-d-s, Soon, s-o-o-n, an acronym.

13  Q.  And I have heard a lot of acronyms today. What is

14      this particular organization focused on?

15  A.  This was an intensive follow-up on domestic violence

16      cases.

17  Q.  And how long did she occupy that position for?

18  A.  I believe three and a half years.

19  Q.  And did she occupy any other position while she was

20      occupying that position?

21  A.  She was also the head of the Victim Services Unit,

22      which is a volunteer position.

23  Q.  Did she have anything to do with the school liaison

24      grant or position or program that is the subject

25      matter, was one of the subject matters of this

**Page 7**

1      lawsuit?

2  A.  Yes.

3  Q.  Tell me about that.

4  A.  She wrote the grant.

5  Q.  In what capacity did she write the grant?

6  A.  As an unpaid grant writer.

7  Q.  And if I may --

8  A.  You may.

9  Q.  Did you simply ask her, Could you write this grant for

10      me? Was it along those lines?

11  A.  She wrote a number of grants for us, over a million

12      dollars worth.

13  Q.  But she was not paid for this?

14  A.  She was not.

15  Q.  Just as a citizen she --

16  A.  As a favor to me.

17  Q.  As a favor to you, okay. And how long has she been

18      writing grants?

19  A.  Basically shortly after I started as sheriff.

20  Q.  Okay. And she does it as the need arises?

21  A.  As the need arises and as the, you know, if there is a

22      grant that's available that we feel that we could

23      benefit from, yes.

24  Q.  Other than writing the grant, does she have any

25      other -- does she then follow up on the grant itself

**Page 8**

1      other than writing it when it, again when it expires?

2  A.  To renew them?

3  Q.  Yes.

4  A.  Yes.

5  Q.  Explain that to me.

6  A.  Well, generally the grants that we apply, and there

7      are different grants, but the grants that we are

8      talking about were grants that were applied for

9      through the Office of Drug Control Policy.

10  Q.  Okay.

11  A.  And they are yearly grants that, and some of them are

12      renewable, as the school liaison grant was, the VALOES

13      grant was.

14  Q.  Okay.

15  A.  So that as they came time to be renewed we would again

16      apply for the grant.

17  Q.  Does she have any duties or responsibilities or

18      interests in the programs that she is writing the

19      grants for? Does she oversee them at all or have any

20      involvement with them after she writes the grant?

21  A.  Well, if there are questions about the grants that she

22      could answer, then she would try to answer them, yes.

23  Q.  Questions from who?

24  A.  Whomever, the board of commissioners, whoever had

25      questions.

Page 13

```
 1        and a part-time court officer.
 2   Q.   And are the sergeants part of a bargaining unit?
 3   A.   Yes, the Command Officers Association.
 4   Q.   And the 25 deputies are all part of the bargaining
 5        unit that used to be represented by Teamsters 214 and
 6        is now represented by POAM, correct?
 7   A.   No, POLC, POLC, Police Officers Labor Council.
 8   Q.   And are any of the other positions you mentioned part
 9        of the bargaining unit, sheriff, secretary --
10   A.   The corrections have a bargaining unit.
11   Q.   Who are they represented by?
12   A.   Government Employees Labor Council.
13   Q.   How often are the deputies evaluated?
14   A.   They are not formally.
15   Q.   What do you mean by formally?
16   A.   There is not a formal evaluation process.
17   Q.   How do you determine whether or not the employees are
18        doing a good job?
19   A.   Review their, what they do.
20   Q.   Who reviews what they do?
21   A.   Undersheriff, sergeants.
22   Q.   When do they do that?
23   A.   On a daily basis.
24   Q.   Tell me what the process is.
25   A.   Well, the sergeants and the undersheriff reviews both
```

Page 14

```
 1        the dailies, which is a written record of what the
 2        deputy has done during their shift, and also reviews
 3        the complaint reports that, incident reports that the
 4        deputies have prepared.
 5   Q.   And the undersheriff and sergeants do this on a daily
 6        basis?
 7   A.   Yes.
 8   Q.   As part of their duties and responsibilities?
 9   A.   Yes.
10   Q.   Is it part of their job descriptions, do you know?
11   A.   I would assume so, but I don't know that for sure.
12   Q.   And after they go through the process of reviewing the
13        dailies and reviewing the complaint reports, do they
14        then do a written assessment?
15   A.   No.  If there are deficiencies, they will bring those
16        to the deputy's attention.
17   Q.   And if they are not, they don't, correct?
18   A.   Correct.
19   Q.   So as far as the deputies go, as long as they are not
20        being told that there is deficiencies, they can assume
21        that they are doing a good job?
22   A.   I think that would be a fair statement.
23   Q.   When did you first come to know Dar Leaf?
24   A.   I can't recall.  I believe it was probably sometime in
25        the early nineties when we were playing softball
```

Page 15

```
 1        together.
 2   Q.   So you knew him prior to you becoming the sheriff of
 3        Barry County?
 4   A.   Yes.
 5   Q.   In some sort of a casual acquaintance?
 6   A.   Yes.
 7   Q.   And when you first became the sheriff of Barry County,
 8        how would you describe your relationship with
 9        Dar Leaf?
10   A.   I would assume on a -- it was as an employer and
11        employee I guess.
12   Q.   And did you have a good working relationship when you
13        first came in?
14   A.   As far as I know, yes.
15   Q.   And did that change at any point as far as you are
16        concerned?
17   A.   Yes.
18   Q.   What point do you believe that changed?
19   A.   When we began having disagreements about the school
20        liaison position.
21   Q.   And when was that?
22   A.   When I removed him.
23   Q.   So when you removed him is when you began having
24        disagreements about it?
25   A.   Yes.  We had had discussions about it prior to then,
```

Page 16

```
 1        but I would say it got into the disagreement stage
 2        when --
 3   Q.   When you removed him?
 4   A.   When I removed him.
 5   Q.   The seniority list that we marked, Exhibit 20, go
 6        ahead and take a look at that.  Do you have any reason
 7        to disagree that that is not accurate as of June 2001?
 8   A.   As far as the rank, it appears to be correct.  I
 9        couldn't testify as to the dates.
10   Q.   Nothing sticks out?
11   A.   But as far as the ranking goes, it appears to be
12        correct.
13            (Deposition Exhibit number 21 marked for
14            identification.)
15   Q.   (BY MS. KENNEDY)  Do you recognize what that is?
16            MR. ASELTYNE:  Didn't we already mark this?
17            MS. KENNEDY:  We didn't mark it.
18            MR. ASELTYNE:  That's fine.
19   Q.   (BY MS. KENNEDY)  Do you recognize what that is?
20   A.   Yes.
21   Q.   And what is it?
22   A.   It's policies that pertains to seniority within the
23        division.
24   Q.   I see for this one on the effective date it states
25        3-1-2002.  Was there a similar policy in place prior
```

Page 17

```
1     to 3-1-2002?
2  A. I believe so, yes.
3  Q. When was Dar Leaf asked to do the school liaison
4     position?
5  A. I don't recall the date.
6  Q. I think he testified it was in 1998.  Does that sound
7     correct?
8  A. Yes.
9  Q. And the program began at that time when Dar Leaf first
10    took it, correct?
11 A. Yes.
12 Q. And do you remember the process of selecting Dar Leaf
13    for that position?
14 A. I believe what he stated is correct, that it was
15    posted and that he was the person that applied for the
16    position.
17 Q. Do you remember more than just Dar Leaf applying, or
18    was he the only applicant.
19 A. I believe that he was the only one.
20 Q. Isn't it true that for every year that Dar Leaf was
21    the school liaison officer the grant funding for that
22    position was renewed for the following year?
23 A. Yes.
24 Q. Did you ever receive any complaints about Dar Leaf in
25    that position?
```

Page 18

```
1  A. In what regard?
2  Q. Any complaints at all about his performance.
3  A. There were some times when the reports weren't done in
4     a timely fashion.
5  Q. And who complained about that?
6  A. My secretary.
7  Q. And how often did that occur?
8  A. I don't recall how many.
9  Q. And did you bring that to Dar Leaf's attention?
10 A. Yes.
11 Q. How many times?
12 A. I do not recall.
13 Q. Do you have written documentation when you brought
14    that to his attention?
15 A. I do not.
16 Q. Any other complaints?
17 A. The volunteers or the Victim Services Unit complained
18    when they set up a picnic and ordered all the food and
19    the picnic was cancelled the day before.
20 Q. And when did that occur?
21 A. I don't recall the date.
22 Q. Who complained?
23 A. Shelia Peruka (sp).
24 Q. And did she give you a call or did she write a letter?
25 A. Yes.  No, she called.
```

Page 19

```
1  Q. She called you directly?
2  A. I believe so, yes.
3  Q. You had a conversation with her?
4  A. I don't recall if I had a conversation with her.
5  Q. Did you document that conversation with her?
6  A. No.
7  Q. Why was it cancelled?  What was your understanding of
8     why it was cancelled from your conversation with her?
9  A. It was cancelled by Dar Leaf.
10 Q. Okay.  Why?
11 A. Because he didn't have enough people coming.
12 Q. And what was the problem with doing that, of
13    cancelling something that there was not enough people
14    coming?
15 A. Well, we had already purchased all the food and we
16    were all prepared to have this, and we weren't given
17    enough prior warning that it was not going to happen.
18 Q. So what should he have done in the alternative?
19 A. Planned better.
20 Q. And?
21 A. If you are going to plan an event, then prior to
22    making the last minute arrangements, i.e. buying the
23    food, you would make sure that you have enough people
24    coming and how many people are coming, et cetera, and
25    that apparently was not done.
```

Page 20

```
1  Q. And I know you don't recall when the complaint
2     occurred, but when was the event supposed to occur?
3  A. As one of the summer programs.
4  Q. Which summer?
5  A. I believe 2001.
6  Q. Do you know what month?
7  A. No.
8  Q. And did you discipline Dar Leaf for this?
9  A. No.
10 Q. When did you tell him about the complaint?
11 A. I don't recall.
12 Q. Anything in his personnel file that indicates there
13    was a complaint about this?
14 A. No.
15 Q. Anything in his personnel file that indicates there
16    was a complaint about him not timely issuing reports?
17 A. Not that I am aware of.
18 Q. You didn't submit any?
19 A. No.
20 Q. What was the effect of him not timely submitting
21    reports?
22 A. By not doing that you put the grant in jeopardy.
23 Q. But nothing ever happened with the grant?
24 A. No.
25 Q. How was the grant put in jeopardy?
```

**Page 21**

1  A.  If they don't get their reports there is a possibility
2      that they won't be renewed.
3  Q.  And you don't recall how often he was not timely?
4  A.  No, I do not.
5  Q.  Did you receive good feedback about Dar Leaf's
6      performance as a school liaison officer, and I am
7      talking about prior to removal?
8  A.  Yes.
9  Q.  Tell me about that.
10 A.  I got good feedback.
11 Q.  From who?
12 A.  The schools.
13 Q.  Principals?
14 A.  Yes.
15 Q.  Teachers?
16 A.  Probably.
17 Q.  Students at all?
18 A.  Not that I recall.
19 Q.  Superintendents?
20 A.  Yes.
21 Q.  And how long did Dar Leaf occupy the school liaison
22      position?
23 A.  I believe three years.
24 Q.  Do you know when the school year starts, and if it
25      starts at different dates for different schools, let

**Page 22**

1      me know?
2  A.  It does.  Generally around Labor Day, but some schools
3      start in August.
4  Q.  What is your testimony today as far as the reason that
5      you removed Dar Leaf from the school liaison position?
6  A.  I wanted someone else in that position.
7  Q.  Why?
8  A.  Because I wasn't happy with the summer programs that
9      he had been doing.  We had talked about it, and there
10     didn't seem to be any improvement, so --
11 Q.  When did you talk about it?
12 A.  During the summer.
13 Q.  Which summer?
14 A.  Both summers.  I didn't -- we didn't discuss it the
15     first summer, but the second two we had conversation
16     about we needed to involve more children, and it just
17     didn't seem to be getting done.  It wasn't a priority.
18 Q.  And did you issue him written discipline because of
19     his, what you saw as his lack of doing summer
20     programs?
21 A.  No.
22 Q.  Anything written that is in his personnel file about
23     him not doing summer programs?
24 A.  No.
25 Q.  Anything in the description of the program that talks

**Page 23**

1      about the summer programs?
2  A.  Yeah, I believe there is.
3  Q.  What does it say about summer programs?
4  A.  I can't recall their exact wording.  It just said
5      there were to be summer programs and they were to
6      involve more children.
7  Q.  So it's your testimony today that the reason you took
8      Dar Leaf off the school liaison position was because
9      of his lack of getting children involved in summer
10     programs?
11 A.  Yes.
12 Q.  Did you tell that to Dar Leaf at the time you removed
13     him?
14 A.  I don't recall.
15 Q.  As the school liaison officer Dar Leaf was able to
16     accumulate comp time, correct?
17 A.  Yes.
18 Q.  And as the school liaison officer he was not allowed
19     to receive overtime cash payments, correct?
20 A.  Correct.
21 Q.  And what was your expectation as far as when he would
22     take that comp time?
23 A.  When he could, when school wasn't in session.
24 Q.  And the largest amount of time when school is not in
25     session is in the summer, correct?

**Page 24**

1  A.  Yes.
2  Q.  So you expected him to take a lot of his comp time
3      during the summer?
4  A.  We had a conversation.
5  Q.  You have got to answer my question.
6  A.  Yes, ma'am.
7  Q.  So you expected that in the summer he would be taking
8      a lot of the comp time that he had accumulated over
9      the year, correct?
10 A.  Yes.
11 Q.  Okay.  Now, were you going to say something about a
12     conversation?
13 A.  We had several conversations about not accumulating a
14     large amount of comp time because of the fact that
15     comp time then needs to be taken off at a different
16     time, and that was counterproductive to the program.
17     In other words, I didn't want him accumulating a large
18     amount of comp time during the year and then taking a
19     large block of time off during the summer.
20 Q.  Okay.  What should he have done to avoid that?  He
21     didn't have the options of taking overtime cash
22     payments, correct?
23 A.  Correct.
24 Q.  What else could he have done?
25 A.  Limit the amount of comp time that he worked.

Page 25

1 Q. What if he needed to work those hours in order to get
2    the job done?
3 A. There is a difference between working hours to get the
4    job done and working hours that are convenient, if you
5    will.
6 Q. Okay. Was he ever written up for working hours that
7    were simply convenient?
8 A. No.
9 Q. Was he ever disciplined for it?
10 A. No.
11 Q. What reason did you give parents, teachers, or
12    principals for removing Dar Leaf off the school
13    liaison position?
14 A. I told them it was a personnel issue.
15 Q. And then when they asked, well, what does that mean,
16    what did you say?
17 A. I meant that it was my decision.
18 Q. And you didn't give a further explanation than that?
19 A. No.
20 Q. And would the people leave satisfied with that answer?
21 A. I don't know if they were satisfied or not.
22 Q. They wouldn't continue asking about what that meant?
23 A. I just said I wasn't going to discuss a personnel
24    issue with them.
25 Q. Do you remember the conversation in August of 2001

Page 26

1    where you told Dar Leaf that you were going to remove
2    him from that position?
3 A. Yes.
4 Q. Tell me about that.
5 A. I told him I was going to remove him from the position
6    and put someone else in there.
7 Q. How did the conversation come about?
8 A. I believe I called him in my office and told him.
9 Q. So you called him into the office and then you simply
10    stated that?
11 A. Yes.
12 Q. And what did he say?
13 A. Why?
14 Q. And what did you say?
15 A. I said because I want to.
16 Q. Anything else about that conversation?
17 A. I didn't write -- I didn't take any notes, no.
18 Q. Anything else you recall?
19 A. No.
20 Q. And do you remember the date of that --
21 A. No, I don't.
22 Q. -- meeting?
23    Does August 19th sound about right?
24 A. Yes.
25 Q. In the teens of August?

Page 27

1 A. Yep.
2 Q. And is it fair to say that that's about a week before
3    school started?
4 A. I would say a couple weeks before school started.
5 Q. When did you make the decision to take him off the
6    school liaison position?
7 A. I don't remember the exact date.
8 Q. How soon?
9 A. But I would say probably within a week or two of that.
10 Q. And is it your testimony today that there is no other
11    reason why you took him off that school liaison
12    position other than his summer program issue?
13 A. I wasn't happy with the entire program, the way it was
14    going, so I wanted to try something different.
15 Q. Yet you made the decision a couple weeks before school
16    started?
17 A. That's when I did.
18 Q. Do you recall a meeting in September 2001 where you
19    introduced the new school liaison to a group of
20    people?
21 A. Yes.
22 Q. Tell me about that meeting.
23 A. I introduced Gary Pearson as the new school liaison
24    position. People said, Well, why, and I said again it
25    was a decision that I made, it was a personnel issue

Page 28

1    and that I wasn't going to go into someone's personnel
2    issues with them, and apparently they understood that.
3 Q. Do you remember using the term skeletons in the
4    closet?
5 A. I don't recall saying that.
6 Q. Could you have said it?
7 A. It's possible.
8 Q. Did you have any complaints from teachers,
9    superintendents, or principals about the summer
10    programs?
11 A. I don't know that they were aware of the summer
12    programs.
13 Q. So the answer would be no?
14 A. The answer would be no.
15 Q. And did you receive any complaints or feedback from
16    parents, teachers, superintendents, principals after
17    Dar Leaf was removed from the position?
18 A. Yes.
19 Q. And what type of feedback or complaints did you get?
20 A. There were letters that were written.
21 Q. And we have some letters here that were --
22    MS. KENNEDY: Did we mark those letters?
23    MR. ASELTYNE: No.
24    MS. KENNEDY: I will mark them then.
25

7 (Pages 25 to 28)

Page 29

1    (Deposition Exhibit Numbers 22 & 23 marked
2    for identification.)
3 Q. (BY MS. KENNEDY) And the documents that we have
4    marked as Exhibit 22, were you familiar with all those
5    documents from receiving them at some time?
6 A. Some of them were addressed to the board of
7    commissioners, but, yes, I think I have seen all of
8    them.
9 Q. And isn't it true that, in fact, you received more
10   letters than even this?
11 A. That's -- yes.
12 Q. Okay. And did you take those letters into
13   consideration at all and reconsider your decision to
14   remove Dar Leaf from that position?
15 A. No, I didn't.
16 Q. Why not?
17 A. Because I had made my decision.
18 Q. And that wasn't going to influence you, these letters
19   weren't going to influence you at all?
20 A. They didn't.
21 Q. Did you ever receive any complaints from the State of
22   Michigan, who would obviously have been the authority
23   that would grant the funding, about the summer
24   programs when Dar Leaf was the school liaison?
25 A. No.

Page 30

1 Q. I marked this as Exhibit 23. Do you recognize these
2    two documents?
3 A. It's a letter I had written, I authored.
4 Q. And the second document is one from Michael Brown?
5 A. Yes.
6 Q. And you had seen that before?
7 A. Yes.
8    MR. ASELTYNE: What's the date on the second
9    letter?
10   THE WITNESS: August 30, 2001.
11   MR. ASELTYNE: Thank you.
12 Q. (BY MS. KENNEDY) Tell me about the People Who Care
13   About Kids organization.
14 A. I was invited to a meeting in the Detroit area, I
15   believe by then Attorney General Granholm, and met
16   with a number of people representing a number of
17   organizations, and we talked about the pending CCW
18   legislation, and it was the consensus of that group
19   anyway that we were in opposition to the legislation.
20 Q. You are saying that when you went to meet with
21   Governor Granholm and these other people, that group
22   was the People Who Care About Kids organization or you
23   went to that group as a member of that organization?
24   I am a little confused on that.
25 A. Well, I am not exactly clear on it myself. It was --

Page 31

1 Q. Let's start this way. What is the People Who Care
2    About Kids organization?
3 A. It was an organization that I believe was started by
4    the prosecutor of Wayne County, whose name escapes me
5    at the moment, but basically the purpose was to oppose
6    the legislation.
7 Q. So sometime after this legislation was drafted a group
8    of people came together led by this prosecutor in
9    Wayne County who called themselves the People Who Care
10   About Kids, and the purpose was to oppose this
11   legislation of the carrying the concealed weapons
12   bill?
13 A. To liberalize the carrying.
14 Q. What do you mean to liberalize?
15 A. There were, there was a law on the books about
16   carrying a concealed weapon, and there were people who
17   felt that these laws were too strict or stringent and
18   they wanted them, they wanted, they wanted to change
19   the application process to make it easier to obtain a
20   CCW license.
21 Q. And when do you believe, if you can recall, that this
22   organization was founded?
23 A. I don't know.
24 Q. Do you know when the bill was up for passing?
25 A. Well, I believe it passed in 2000, and there was -- so

Page 32

1    it would have been in that --
2 Q. Prior year?
3 A. -- legislative term.
4 Q. Legislative term, okay.
5    And was your wife also a member of this
6    group?
7 A. No.
8 Q. Anyone else from Barry County Sheriff's Department
9    part of this group?
10 A. Not that I am aware of, no.
11 Q. Any other people from Barry County?
12 A. Not that I am aware of.
13 Q. When did you go meet with Attorney General Granholm?
14 A. I don't remember the date.
15 Q. Kind of ballpark it for me.
16 A. I would assume it would be either in 2000 or 1999 when
17   the legislation was being talked about.
18 Q. And how long was the meeting?
19 A. Two, three hours.
20 Q. And was this meeting a discussion of ideas of how to
21   oppose this, or was this meeting trying to get
22   everyone's opinion?
23 A. No, I think the consensus of the people that were at
24   the meeting was that all of those people were in
25   opposition to the new legislation.

8 (Pages 29 to 32)

## Page 33

1  Q.  And was Attorney General Granholm ultimately in
2      opposition to it?
3  A.  Yes.
4  Q.  Were you a part of any other organization that opposed
5      this law?
6  A.  Well, we had a number of conversations at the Michigan
7      Sheriffs Association meetings and also joint meetings
8      with the Michigan Association of Chiefs of Police, and
9      I am not sure if either organization took a formal
10     stand either in opposition or in favor.  There was
11     quite a bit of discussion and opinions on both sides
12     of the issue.
13 Q.  And tell me your reasons for opposing this law.
14 A.  I felt that it would put the deputies in harms way by
15     putting more guns on the street and, therefore, I was
16     opposed to doing that.
17 Q.  Did you feel fairly passionate about this position
18     that you are taking?
19 A.  I felt strongly about it, yes.
20 Q.  Other than in the two meetings that you have already
21     testified about, did you have any other discussions
22     with any other groups about this law prior to it being
23     passed?
24 A.  There was more than one meeting that we talked about
25     it with the Sheriffs Association and the Chiefs of

## Page 34

1      Police, but I don't, I don't ever recall going to a
2      meeting other than those.
3  Q.  Any groups of citizens that you would have discussions
4      with or anything along those lines?
5  A.  Not that I recall in an organized basis.  I mean, if
6      somebody would ask me my opinion I would tell them.
7  Q.  Was your wife a part of any organization that opposed
8      this law?
9  A.  I don't believe so.
10 Q.  Does she share your view?
11 A.  I think so.
12 Q.  Well, did you have discussions with her about it?
13 A.  She knew how I felt.  I guess she didn't argue with
14     me, so I guess she must have felt the same way.
15 Q.  Any other efforts made in an attempt to keep this law
16     from passing by you?
17 A.  I know that I probably -- well, I know that I talked
18     to Gary Newell about it, who was my state
19     representative, and he knew that I was opposed to the
20     legislation.
21 Q.  What about any groups of judges or any judges?
22 A.  No, not that I recall.
23 Q.  Ever talk to Judge Fisher about the law?
24 A.  I don't know that I did.
25 Q.  Would it be fair to say if you did you don't remember

## Page 35

1      or do you have --
2  A.  If I did I don't remember.
3  Q.  At some point you became aware that Dar Leaf was
4      supporting the CCW law, correct?
5  A.  Yes.
6  Q.  When was that?
7  A.  I don't know a date.
8  Q.  You don't have a specific instance that you remember?
9  A.  The instant that was brought up earlier in his
10     testimony was when we had a conversation about who he
11     was associating with was in regards to the petition
12     that he was circulating on duty, so he and I had a
13     conversation about that.  I said that it was
14     inappropriate and that maybe he was getting some bad
15     advice from the people he was hanging around.
16 Q.  What was inappropriate about Dar Leaf circulating a
17     petition?
18 A.  That's not part of his duty. · I mean, that's a
19     political issue that shouldn't be done at work.  If he
20     wanted to do it off duty, that's another issue.
21 Q.  And you said you had a discussion with Dar Leaf about
22     this?
23 A.  Yes.
24 Q.  And what was his reaction when you brought that up?
25 A.  I guess he was -- he said, Okay.

## Page 36

1  Q.  And are you aware of him ever doing it again after you
2      told him not to?
3  A.  No.
4  Q.  What did you know about the people that he was
5      associating with that you just referenced?
6  A.  Well, basically I was referring to Mr. Stevens.
7  Q.  And what were you referring to in regards to
8      Mr. Stevens?
9  A.  Well, if Mr. Stevens was asking Dar to do this while
10     on duty he was getting, I thought he was going beyond
11     what he should do as a deputy, and I thought that that
12     was inappropriate.
13 Q.  And how do you know Mr. Stevens?
14 A.  We had numerous conversations about the CCW issue.
15 Q.  In what context did those conversations arise?
16 A.  He would call, he would come to my office and talk
17     about his not being able to get a CCW license.
18 Q.  And what did you know about that situation of why he
19     couldn't get a CCW license?
20 A.  Because the CCW Board didn't feel that he met the
21     criteria.
22 Q.  Are we talking before the legislation in question
23     passed or after?
24 A.  Yes -- no, this is before.  After the legislation
25     passed he was able to get a CCW.

## Page 37

1   Q.   What would your testimony be as to why he would come
2        to you about his complaints about not getting a CCW
3        license?
4   A.   Because at the time there were three people that
5        comprised the Gun Board.
6   Q.   Okay.
7   A.   The prosecutor, the State Police commander, post
8        commander, and then the sheriff had one position.
9   Q.   So you were on the Gun Board?
10  A.   No, the undersheriff was on the Gun Board, but he was
11       acting as the representative of the sheriff's office.
12  Q.   So the undersheriff was on the Gun Board?
13  A.   Yes.
14  Q.   At this time, and the time frame we are looking at is
15       '99?
16  A.   Yes.  Undersheriff has been on the Gun Board since I
17       have been sheriff.
18  Q.   Okay.  And the undersheriff is?
19  A.   Donald Ford.
20  Q.   Donald Ford?
21  A.   Yes.
22  Q.   And who is the prosecutor at this time?
23  A.   I believe it was Gordon Shane McNeill.
24  Q.   Gordon Shane?
25  A.   McNeill, M-c-N-e-i-l-l.

## Page 38

1   Q.   And who would be the third person on the Gun Board at
2        that time?
3   A.   First Lieutenant Gregory Kruisenga, K-r-u-i-s-e-n-g-a.
4   Q.   And how long was Gordon Shane McNeill the prosecutor
5        for?
6   A.   He still is.
7   Q.   So '99 or prior to and he continues to be?
8   A.   I don't, you know, I don't know if he was or not.  It
9        was either Shane McNeill or Dale Crowley, I am sorry,
10       C-r-o-w-l-e-y, and at some point Mr. Crowley left
11       office and Mr. McNeill was appointed to finish out his
12       term and then run for election.
13  Q.   Okay.
14  A.   And I am not, I am thinking that that was happening
15       right about that time.
16  Q.   So during this time in '99 or prior to the CCW law
17       passing David Stevens was coming to you and
18       complaining to you that he was not getting a CCW
19       license, correct?
20  A.   Yes.
21  Q.   And is this the reason you did not -- I don't know how
22       to phrase this.
23            You had a problem with Dar Leaf receiving
24       advice from Dave Stevens?
25            MR. ASELTYNE:  Objection, asked and answered.

## Page 39

1        Go ahead.  You can answer.
2            THE WITNESS:  If Mr. Stevens had asked Dar to
3        circulate this petition while he was on duty, then I
4        felt that that was inappropriate.
5   Q.   (BY MS. KENNEDY)  Right, but you believed it would
6        have been inappropriate no matter who would have asked
7        him to do this, correct?
8   A.   Yeah, but --
9   Q.   Let me ask it this way:  I can't understand from what
10       you are saying how it was inappropriate for Dave
11       Stevens to tell Dar Leaf this advice.
12  A.   Because it was David Stevens that asked him to do it.
13  Q.   Okay.  That's the reason it was inappropriate.
14  A.   No, no, no, no, no.
15  Q.   Feel free to explain.
16  A.   What he did was inappropriate.
17  Q.   What Dar Leaf did was inappropriate?
18  A.   Yes.
19  Q.   Okay.
20  A.   If Santa Claus had asked him to do this I would have
21       advised him that maybe he shouldn't take advice from
22       Santa Claus.  Does that make it --
23  Q.   Yes, and I want to follow up on that.  Did you have
24       any other problem with Dave Stevens other than him
25       telling Dar Leaf to circulate this petition?

## Page 40

1   A.   Mr. Stevens was very angry that he was not getting his
2        license and made threats that they would recall me and
3        have my job and those sort of things if I didn't, if I
4        didn't give him a CCW.
5   Q.   He was making threats to you about your job?
6   A.   Yes.  Well, that they would, that they would either
7        recall me or go after me in the election.
8   Q.   Okay.  And who is they?
9   A.   I don't know who they was, but he had, he said that
10       there were other people that were of like mind with
11       him.
12  Q.   Okay.  And you testified to the fact that he had this
13       position and made these threats.  You were
14       testifying -- you were explaining why you have a
15       problem with David Stevens.
16  A.   You said did I have any other problem with
17       Mr. Stevens, and I said yes, I did.
18  Q.   And that's the problem?
19  A.   Yeah.
20  Q.   Is this a fair statement:  That when you told Dar Leaf
21       about not circulating that petition anymore, it's not
22       only that it was inappropriate but it's also that it
23       was David Stevens that was involved in this?
24            MR. ASELTYNE:  Objection, asked and answered
25       two or three times already.

**Page 41**

1        MS. KENNEDY:  That's a little different.  I
2    am just trying to get the gist of his testimony.
3        THE WITNESS:  It was inappropriate regardless
4    of who asked him to do it.  What he did was wrong, and
5    I asked him not to do it again.
6    Q.  (BY MS. KENNEDY)  Okay.  Did you have any other
7        problems with Dave Stevens other than the one you,
8        ones you have already testified to?
9    A.  No.
10   Q.  Other than the circulating the petition issue, did you
11       have any other discussions with Dar Leaf about David
12       Stevens?
13   A.  Not that I recall, no.
14   Q.  Did you have any other discussions with him about
15       people he associated with?
16   A.  No.
17   Q.  You heard Dar Leaf testify earlier that in March of
18       2001 that you had discussions with him about people he
19       was associating with, correct?
20   A.  It is my recollection that the conversation that he is
21       referring to about me telling him he should be careful
22       who he was associating with was part of that
23       conversation about circulating the petition.  I don't
24       ever recall having any other conversation about who he
25       was associating with.

**Page 42**

1    Q.  When did you first become aware that Dar Leaf was
2        interested in teaching gun safety classes?
3    A.  I believe it was when he put, when he submitted his
4        request.
5    Q.  And we had marked earlier as Exhibit 4, a request
6        regarding teaching gun safety classes.  Is this the
7        one you --
8    A.  I believe that's it, yes.
9    Q.  Do you believe that this was your first indication
10       that Dar Leaf wanted to teach gun safety classes?
11   A.  As far as I recall, yes.
12   Q.  And it would also be your testimony today that --
13       strike that.  Did you have a conversation with
14       Dar Leaf about this after he submitted it to you?
15   A.  Yes.
16   Q.  Tell me about that conversation.
17   A.  I said that I was concerned about the fact that he was
18       a deputy with the Barry County Sheriff's Office and
19       that he would be teaching the legal aspects of
20       carrying a concealed weapon and that I wanted to make
21       sure that that did not put the county in any position
22       to be liable for his actions for what he had been
23       teaching.
24   Q.  And when you say when you were referring to liability,
25       what type of liability were you referring to?

**Page 43**

1    A.  That he would be teaching a class and that as a member
2        of the Barry County Sheriff's Office if the
3        information was erroneous or someone went out and
4        misused their CCW license that someone would come back
5        on the Barry County Sheriff's Office and say your
6        deputy taught us X, Y, and Z and this wasn't right and,
7        therefore, we would be liable.  That was my concern.
8    Q.  What was his response to that?
9    A.  He said he would bring in proof of his liability
10       insurance.
11   Q.  And did he do so?
12   A.  Yes.
13   Q.  And did that satisfy your concern with that issue?
14   A.  It did.
15   Q.  In reference to any of these things that we have just
16       talked about, it would be your testimony today that
17       you didn't have any discussions about people he was
18       associating with as far as teaching these classes?
19   A.  No.
20   Q.  Did you have any discussions with Dar Leaf about who
21       he was teaching these classes with?
22   A.  If I did I don't recall.
23   Q.  Were you aware of who he was teaching these classes
24       with?
25   A.  I think I knew there was some kind of an incident, I

**Page 44**

1    guess, for want of a better word.  When the new CCW
2    law was approved, the State police came out with an
3    application packet so that if someone wanted to apply
4    for that, all of the paperwork would be in that
5    packet, and so we had a stack of those packets at the
6    front desk, and someone put an advertisement for the
7    gun classes that they were teaching in that packet,
8    and we had to go and remove all of those.  So it seems
9    to me that that's how I knew who he was teaching with.
10   Q.  And who was he teaching with?
11   A.  I believe it was Mr. Stevens.
12   Q.  And did you have any other discussions with him after
13       you discovered that he was teaching with Mr. Stevens?
14   A.  Not that I recall.
15   Q.  Did you have any problem with the fact that he was
16       teaching these --
17   A.  I gave him permission to do it, to teach the classes,
18       so if I had had a problem I wouldn't have given him
19       permission.
20   Q.  Did you give him permission before or after finding
21       out that he would be teaching with Mr. Stevens?
22   A.  Before.
23   Q.  So you gave him permission to teach the classes, and
24       then you found out he was teaching with Mr. Stevens?
25   A.  Uh-huh.

11 (Pages 41 to 44)

Page 49

1    prosecutor, but not inappropriately.
2  Q.  I mean about the same subject.
3  A.  Right.
4  Q.  Okay.  Did David Stevens file a lawsuit against you?
5  A.  Yes.
6  Q.  When was that?
7  A.  Prior to the passage of the legislation.
8  Q.  And eventually was that dismissed on a motion?
9  A.  Apparently he withdrew.
10 Q.  Oh, he withdrew it?
11 A.  I guess.
12 Q.  After the legislation passed?
13 A.  I don't know the timing of when it happened.
14 Q.  In August of 2001 did you become aware that Dar Leaf
15     applied for a position on the Gun Board?
16 A.  Yeah, I think I did.
17 Q.  When did you become aware of it?
18 A.  I don't know.
19 Q.  Prior to the time you removed him as school liaison?
20 A.  I don't know the timing of that.  I really don't.
21 Q.  How did you become aware that Dar Leaf was applying
22     for the position on the Gun Board?
23 A.  I don't know.  Someone told me.
24 Q.  Did you approve of Dar Leaf doing that?
25 A.  No, I didn't want him on that.

Page 50

1  Q.  Why not?
2  A.  Because I felt that that should be someone from the
3      general public as opposed to another member of the
4      sheriff's office.
5  Q.  Did you express that to anyone?
6  A.  Probably did.
7  Q.  You don't remember who?
8  A.  No.
9  Q.  Anyone on the Gun Board?
10 A.  I don't know who -- I probably talked to my
11     commissioner, but I don't know that for sure.  I
12     believe, and I am not even sure how that position was
13     appointed, and I believe it was by the board of
14     commissioners, so I may have talked to my
15     commissioners about it.
16 Q.  Prior to the appointing of the position?
17 A.  Yes.
18 Q.  Because you did not want Dar Leaf in that position?
19 A.  No, I didn't, but it wasn't because it was Dar Leaf.
20     I would have felt -- if someone else had applied for
21     it from our organization, I would have felt the same
22     way.
23 Q.  If the appropriate documents reflected that the
24     decision about who would be appointed to the Gun Board
25     occurred around August 10th, 2001, would you have any

Page 51

1    reason to dispute that?
2  A.  Nope.  If there is documents that say that's when it
3      happened, I wouldn't dispute it.
4  Q.  And it was August 19th, that was your meeting with
5      Dar Leaf when you told him that you were going to
6      remove him from the school liaison position, correct?
7  A.  Yes.
8      MR. ASELTYNE:  Let me just object.  Counsel,
9      I think the records say it was the 16th, and I may
10     stand corrected.  I think the notes that your client
11     took say the 16th.
12     MS. KENNEDY:  Okay.
13     THE WITNESS:  Then it would be the 16th.
14     MS. KENNEDY:  That the decision regarding the
15     Gun Board was made.
16     MR. ASELTYNE:  No, no, no, that the meeting
17     took place that your client has testified to between
18     your client and the sheriff.
19     MS. KENNEDY:  And I keep saying the 19th.
20     MR. ASELTYNE:  You did.
21     MS. KENNEDY:  Thank you.
22 Q.  (BY MS. KENNEDY)  When did you ask Gary Pearson to
23     become the school liaison officer?
24 A.  Two days before I told Dar that he wouldn't have it.
25 Q.  And why did you choose Gary Pearson?

Page 52

1  A.  Because that's who I wanted in the position.
2  Q.  Why?
3  A.  My decision.
4  Q.  Why did you decide that?
5  A.  I just thought he would do a good job.
6  Q.  What was it about him that made you think he would do
7      a good job?
8  A.  I don't know if it's any one thing.  It's just that I
9      felt he would do a good job.
10 Q.  Isn't it true that Gary Pearson was removed from the
11     SWET team?
12 A.  Gary Pearson and the lieutenant in charge had a
13     disagreement, and it was my decision that he would
14     come back prior to the two years.  SWET doesn't make
15     that decision.
16 Q.  Okay.  What does come back mean?
17 A.  Go off.
18 Q.  Go --
19 A.  Go off SWET, come back to --
20 Q.  Road patrol.
21 A.  -- road patrol.
22 Q.  Why did you make that decision?
23 A.  Just so there wouldn't be any hard feelings.
24 Q.  Between?
25 A.  The lieutenant and Gary.

13 (Pages 49 to 52)