K

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2003 FED App. 0409P (6th Cir.)
File Name: 03a0409p.06

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

MARY ELIZABETH LEARY and
GLENDA H. WILLIAMS,
*Plaintiffs-Appellants,*

v.

STEPHEN DAESCHNER,
*Defendant-Appellee.*

No. 01-6118

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 99-00465—Charles R. Simpson III, District Judge.

Argued: January 30, 2003

Decided and Filed: November 19, 2003

Before: BATCHELDER, MOORE, and CLAY, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** Daniel T. Taylor III, Louisville, Kentucky, for
Appellants. Michael Keith Kirk, WYATT, TARRANT &
COMBS, Louisville, Kentucky, for Appellee. **ON BRIEF:**

---

Daniel T. Taylor III, Louisville, Kentucky, for Appellants.
Michael Keith Kirk, WYATT, TARRANT & COMBS,
Louisville, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court, in which
CLAY, J., joined. BATCHELDER, J. (pp. 37-42), delivered
a separate dissenting opinion.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Plaintiffs-
Appellants Mary Elizabeth Leary ("Leary") and Glenda H.
Williams ("Williams") (collectively "Plaintiffs"), previously
school teachers at the Atkinson Elementary School
("Atkinson") in Jefferson County, Kentucky, appeal the
following district court orders: (1) the July 31, 2000 order
granting summary judgment in favor of Defendant-Appellee
Superintendent Stephen Daeschner ("Daeschner") and thereby
dismissing Plaintiffs' First Amendment retaliation claims;
and (2) the June 13, 2001 order denying Plaintiffs' motion to
amend their complaint, dismissing their due process claims,
and dismissing all remaining claims. In addition, Plaintiffs
argue that the district court failed to provide them a trial by
jury in violation of the Seventh Amendment. Plaintiffs allege
in their complaint and amended complaint that they were
transferred from Atkinson to another elementary school in the
same district in retaliation for exercising their First
Amendment rights and that the last-minute hearing violated
their right to due process. The district court granted summary
judgment to Daeschner on Plaintiffs' First Amendment claims
because Plaintiffs failed to meet their burden of proof for
establishing a First Amendment violation. The district court
also denied Plaintiffs' motion to amend their previously
amended complaint to add a demand for monetary relief
because the deadline for filing amended pleadings had passed
and Plaintiffs failed to show good cause excusing this late

No. 01-6118    *Leary et al. v. Daeschner*    3

attempt to amend. The district court announced that Plaintiffs cannot reformulate their due process claims for injunctive relief as monetary damages claims based on breach of the Collective Bargaining Agreement ("CBA"). Finally, the district court denied Plaintiffs' Rule 59(e) motion to set aside or vacate the decision granting summary judgment in Daeschner's favor because the Plaintiffs did not provide the court with any new evidence justifying such a decision.

We now **REVERSE** the district court's grant of summary judgment to Defendant on Plaintiffs' First Amendment claims because there is a genuine issue of material fact as to whether Plaintiffs' transfers were in retaliation for their protected speech, and we **REMAND** for further proceedings. However, we **AFFIRM** the district court's denial of Plaintiffs' motion for leave to amend because Plaintiffs failed to show good cause for their failure to amend their complaint earlier and Defendant would suffer prejudice by allowing this amendment which would require the reopening of discovery at this late stage of the proceedings. We also conclude that the district court did not err when it failed to grant Plaintiffs' motion for a jury trial because the only claims remaining demand injunctive relief.

## I. BACKGROUND

### A. Factual History

Plaintiffs were school teachers at Atkinson, a troubled public elementary school in Jefferson County, Kentucky, consistently producing low performance test scores and placing in the lowest range for Kentucky public schools. Leary taught special-education students for sixteen years at Atkinson, while Williams, a fourteen-year veteran, taught reading to "at risk" children, part-time, in a program called Reading Recovery. Williams split her teaching time with her responsibility as the Jefferson County Teachers Association ("JCTA") representative for Atkinson. Plaintiffs' fellow teachers viewed Plaintiffs as staff leaders who often spoke

4    *Leary et al. v. Daeschner*    No. 01-6118

out, on behalf of themselves and others, about issues affecting Atkinson, such as student discipline. Administrators at Atkinson viewed Plaintiffs differently, stating that they were neither dedicated leaders nor supportive of the administration, and that they resisted positive change.[1]

Exacerbating Atkinson's academic woes were its divisive faculty and its glaring student-discipline problem. Because the Atkinson faculty was not cohesive, the school struggled to make decisions on everything from reading-program selection to curriculum choices. From the administration's perspective, too many academic decisions were made individually rather than collectively as an institution. Strong faculty commitment to particular programs developed which made it difficult for the administration to suggest alternative approaches. The long-standing student discipline issues concerned teachers school-wide. Some teachers, such as Leary, were vocal in their complaints about discipline[2] and took action by compiling signatures on a petition that proposed changes to Atkinson's discipline policies.[3]

Under Principal LaDita Howard's ("Howard") leadership, Atkinson set out to change its poor reputation and institutional problems by embracing new programs and procedures to improve academic success. One such program

---

[1] In addition, testimony revealed that Leary intimidated other teachers and behaved unprofessionally in the classroom. Williams, on the other hand, constantly questioned the principal's authority and decisions and failed to participate in meetings and other activities.

[2] A number of Atkinson teachers testified that they also were vocal in their complaints regarding discipline. In Leary's opinion, the degree of her protest sets her apart from other vocal teachers.

[3] At the time of Leary's testimony, the petition had been signed and submitted to the administration two or three years earlier. Once Atkinson's discipline committee received the petition, it proposed discipline policies and put a discipline procedure in place.

involved what Jefferson County Public Schools ("JCPS") called Dialogue Teams. These teams, comprised of district-level administrators, would meet with a school's faculty and principal to discuss plans for improvement and to evaluate success. The particular team involved with evaluating Atkinson was headed by Assistant Superintendent for District Wide Instruction, Freda Meriweather ("Meriweather"), whose primary responsibilities consisted of supervising the JCPS primary-school principals and developing school improvement initiatives.[4] One of the team's first tasks involved evaluating the three reading programs in use at Atkinson and then recommending to Howard and her staff that one program be used consistently throughout the school. Ultimately, the school accepted this advice and chose to reject all other reading programs in favor of the "Success for All" program.

Atkinson's academic troubles allowed it to qualify under the Kentucky Education Reform Act ("KERA") to receive a Distinguished Educator or "Highly Skilled Educator," a school-district employee with a proven record of success in aiding troubled schools. Between 1998-99, Meriweather enlisted the help of Distinguished Educator Nancy Bowlds ("Bowlds") to work with Atkinson's faculty and principal over an extended period of time and advise them of how the school's academic performance might be improved.

In the spring of 1999, Atkinson contacted Dr. Sharon Davis, Director of Exceptional Child Education ("ECE"), to evaluate the ECE programs designed for the special education students. The evaluation was completed and resulted in a recommendation for Atkinson to adopt the "collaborative"

---

[4] Additional team members were Bill Eckels ("Eckels"), the Executive Director of Human Resources, and Superintendent Daeschner.

model."[5] Meanwhile in April 1999, Howard gave notice that she was resigning as Atkinson's principal at the end of the school-year. This resignation sparked discussions between Meriweather and her Dialogue Team to anticipate the needs of Atkinson in the wake of Howard's departure. In addition to the recruitment and retention of a talented principal, the team believed that faculty changes also were necessary to ensure support for the school's chosen principal and new programs: "Success for All" and the ECE "collaborative model." Both programs required faculty support: "Success for All" needed a high percentage of faculty acceptance before a grant would issue, and the "collaborative model" required substantial backing because it involved a drastic change. The Dialogue Team concluded that four or five teachers would need to be transferred before the start of the 1999 school-year.[6]

After the Dialogue Team made this decision to transfer teachers, Meriweather asked Howard and Bowlds each to compose a list of four to five teachers that they recommended for transfer because they thought the teachers would resist change and progress at Atkinson. Howard's list did not include the current Plaintiffs; Bowlds's list, however, included Leary. After Meriweather received Howard's and Bowlds's lists, Meriweather called Howard to determine whether she agreed with Bowlds that Leary belonged on the list. Howard agreed, allowing Leary to be added to her list because Howard believed that Leary, the ECE-team leader,

---

[5] The "collaborative model" requires both regular and ECE-curriculum students to be taught together in one classroom.

[6] The Dialogue Team considered changing the entire Atkinson staff, but ultimately concluded that only a few chosen teachers needed to be transferred in order to create a climate of change so that the long-standing and unsuccessful education programs could be dropped and new programs embraced.

No. 01-6118    *Leary et al. v. Daeschner*    7

would not embrace the new "collaborative model."[7] Bowlds included Leary on her initial list for a variety of reasons, most important of these was Leary's failure to accept leadership by attending monthly district meetings even though she was the ECE-team leader. In addition, Leary was accused of yelling at students, fellow teachers, and administrators.

Once Meriweather learned that Williams intended to return for the 1999-2000 school-year, she contacted Howard and Bowlds again and asked if they agreed that Williams also should be on the transfer list. Both Bowlds and Howard agreed that Williams was a proper candidate for transfer because: (1) she was in a leadership position but failed to lead, (2) she failed to participate in a grant-writing process for an early-literacy program, and (3) she continuously questioned the principal's authority, decisions, and judgment. Moreover, Williams's status as a part-time employee made her a desirable candidate for transfer.

These proposed transfers were supplied to the Dialogue Team, which then selected five teachers to transfer; amongst those selected were Leary and Williams. These names were then delivered to Daeschner as Superintendent, and he gave the final approval. At the close of the 1998-99 school-year, Bowlds delivered letters to Leary, Williams, and three other teachers that indicated that they would be transferred in the upcoming year pursuant to section D of the CBA between the JCTA and the Jefferson County Board of Education. Section D in the CBA read: "[t]he Superintendent or designee for good cause and extenuating circumstances will execute transfers as may be necessary for the efficient operation of the

---

[7] Howard testified that Leary expressly declined to implement the "collaborative model" in her classroom. Interestingly, when Leary was transferred she requested to be placed in a "collaborative model" program. Joint Appendix ("J.A.") at 335 (Leary Test.).

---

8    *Leary et al. v. Daeschner*    No. 01-6118

school district." Joint Appendix ("J.A.")[8] at 32 (Compl. for Inj. Relief, Attach. A).

## B. Procedural History

The Plaintiffs filed their original suit under 42 U.S.C. § 1983 on July 16, 1999, requesting a preliminary injunction, permanent injunction, and declaratory relief on the basis that Daeschner violated their right to freedom of speech under the First Amendment and their right to procedural due process under the Due Process Clause. Plaintiffs advanced a theory that they were transferred because "they were vocal and complained about various issues" involving discipline and substitute teachers. Appellee's Br. at 20; Appellants Br. at 8-10. As evidence, the Plaintiffs referenced a petition which they previously signed and presented to Atkinson's School-Based Decision Committee[9] demanding change in the administration's student-discipline policies, see J.A. at 33 (Compl., Attach. B); a list of questions they raised regarding the principal's authority; and their complaints about "hallway committee meetings" where staff members made business decisions for the school without following proper protocol. Plaintiffs' evidence also tended to show that they were considered leaders among the faculty for vociferously expressing their disagreement with Atkinson's administration. In addition, Williams argued that her role as JCTA

---

[8] Eckels states that a Section D transfer is not a disciplinary measure and has been used previously in similar situations.

We have personality conflicts between individuals in a building. Best interest of the building and the instructional program and the building for one of the individuals to be moved to another building. We've had examples where individuals disagreed with the instructional program or proposed instructional programs going into a building, and we have Section D'ed the individual hopefully to a program where their philosophy fits better.

J.A. at 209 (Eckels Test.).

[9] This committee functioned as a school-governance board and handled solely Atkinson issues.

representative required her regularly to raise contentious issues on behalf of the faculty.

After a hearing lasting several days, on August 13, 1999, the district court determined that Plaintiffs were not entitled to the requested relief on their First Amendment claims, but they were entitled to more pre-deprivation process before they could be transferred. In response to the court's order, on the morning of August 16, 1999,[10] Defendant gave Plaintiffs written notice of their transfers, explaining the reasons for the transfers, and providing Plaintiffs with an opportunity to respond at hearings scheduled for noon and one o'clock in the afternoon, that very day. Instead of making an appearance at the scheduled hearings or requesting a continuance, Plaintiffs chose to file a "Motion in Furtherance of a Preliminary Injunction; and for Order of Contempt in Regard to Superintendent Steven W. Daeschner." The district court decided that Daeschner's short-notice hearing complied with the court's August 13, 1999 order[11] and provided Plaintiffs with sufficient process. Thus, Plaintiffs' failure to participate in the hearing was a waiver of the due process rights afforded them by the district court's order. Plaintiffs appealed this decision to a panel of this court. On appeal, we affirmed the district court's decision to deny the preliminary injunction requested by Plaintiffs. *Leary v. Daeschner*, 228 F.3d 729, 734 (6th Cir. 2000).

While the interlocutory appeal was pending, Plaintiffs were permitted to file an amended complaint on March 17, 2000, adding four new claims: damages for loss of their liberty interests and violation of procedural due process in post-deprivation procedure (Count V); damages under the state and

---

10. The school year was scheduled to begin on the next day, August 17, 1999.

11. The district court cited the imminent start of the school year as one justification for this hurried hearing.

federal whistleblower laws (Count VI); state law damages under various and sundry theories including false imprisonment, defamation, libel, emotional distress, interference with contract rights, and interference with advantageous relationship (Count VII); and punitive damages (Count VIII). Notably, Plaintiffs' amended complaint did not restate the injunctive claims contained in the original complaint as claims for monetary damages. Daeschner filed numerous summary judgment motions in response to these claims. On July 31, 2000, the district court entered an order granting Daeschner's partial motion for summary judgment with respect to Plaintiffs' First Amendment claims but denying it as to their due process claims. Almost a month later, on August 29, 2000, the district court entered another order granting Daeschner's second motion for summary judgment with respect to Count V,[12] and portions of Count VII from the amended complaint. On March 1, 2001, the district court granted Daeschner's third motion for summary judgment, this time dismissing the remaining claims in Count VII.

After Daeschner's fourth motion for summary judgment was filed but before the district court issued its June 13, 2001 decision, Plaintiffs moved on April 30, 2001 to amend their complaint a second time. More than one year after they were permitted to file an amended complaint and close to two years after this litigation began, the Plaintiffs wanted to add claims for general, compensatory, and punitive damages for the due process violations, damages for breach of the CBA, and a renewed demand for a jury trial. Finally, on June 13, 2001, the district court entered an order granting Daeschner's fourth motion for summary judgment which disposed of all of Plaintiffs' remaining claims. In addition, this order denied

---

12. We note that both the July 31, 2000 and the August 29, 2000 district court orders were issued before we published our opinion in *Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000), which addressed Plaintiffs' appeal from the district court's denial of a preliminary injunction.

Plaintiffs' motion for leave to file a second amended complaint. The court stated that the Plaintiffs did not show good cause pursuant to Federal Rules of Civil Procedure 16 and 15 for failure to move earlier for leave to amend. Furthermore, Plaintiffs did not highlight any authority supporting the notion that damages are appropriate in cases where Plaintiffs waived their right to due process, and thus an amendment adding damages claims would be futile. Pursuant to Federal Rule of Civil Procedure 59(e), Plaintiffs moved to have the judgment set aside. On August 7, 2001, the district court denied this motion. The Plaintiffs then filed this timely appeal.

## II. ANALYSIS

### A. Summary Judgment Standard

We review a district court's order granting summary judgment de novo. *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 447 (6th Cir. 2001), *cert. denied*, 534 U.S. 1132 (2002). In accordance with Federal Rule of Civil Procedure 56(c), a grant of summary judgment is affirmed "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Initially, the moving party has the burden of proving that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477, 1479 (6th Cir. 1989) (noting "that not every issue of fact or conflicting inference presents the denial of a genuine issue of material fact which requires the denial of a summary judgment motion"). To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or on the failure of the nonmoving party to produce "more than a mere scintilla of

evidence" which would create a genuine dispute for the jury. *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001); *see also Street*, 886 F.2d at 1477 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." (quotation omitted)). In reviewing the district court's decision to grant summary judgment, we must view all evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. First Amendment Retaliation Analysis

Plaintiffs claim that they were transferred in retaliation for engaging in protected speech. Because we believe a review of the record reveals that genuine issues of material fact exist, we hold that the district court improperly granted summary judgment on Plaintiffs' First Amendment claims.

In order to state a retaliation claim under the First Amendment a plaintiff must show that: "1) [she] engaged in constitutionally protected speech; 2) [she] was subjected to adverse action or was deprived of some benefit; and 3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action." *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Public employee plaintiffs are required to meet additional standards to establish that the speech at issue is constitutionally protected. First, a public employee plaintiff must demonstrate that the speech involved matters of public interest or concern. *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001), *cert. denied*, -- U.S. --, 123 S. Ct. 73 (2002). Second, the plaintiff must show that her interest in addressing these matters of public concern outweighs the interest of her employer "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). The Pickering balancing

test must be used "[i]f any part of an employee's speech relating to a matter of public concern is a substantial or motivating factor in the adverse action." *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 893 (6th Cir. 2003). "Whether speech addresses a matter of public concern is a question of law." *Id.* at 892.

Once the public-employee plaintiff has met her burden and established a prima facie case, the burden of persuasion shifts to the defendant who must show by a preponderance of the evidence that there were other reasons for the adverse action and that the same adverse action would have resulted even if the plaintiff had not engaged in the protected activity at issue. *See Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999); *Boger v. Wayne County*, 950 F.2d 316, 322 (6th Cir. 1991). "These are issues of fact, however, and may not be decided on a motion for summary judgment unless the evidence 'is so one-sided that one party must prevail as a matter of law.'" *Boger*, 950 F.2d at 322-23 (quotation omitted).

When this case was before the district court on Plaintiffs' request for preliminary equitable relief, that court agreed that Plaintiffs' speech involved matters of public concern. The district court altogether skipped the question of whether the transfers were an adverse action and focused instead on the third essential element. The district court determined that Plaintiffs failed to show that their transfers were precipitated "in substantial part" by their constitutionally protected speech. J.A. at 476 (Tr. on Mot. for Inj. Relief). The district court pointed to other reasons for Plaintiffs' transfers including the troubled state of the school and the principal's pending departure. Moreover, the district court determined that Plaintiffs failed to sustain their burden because the evidence they provided involved generalized First Amendment activities over a period of years in which many other non-transferred teachers also participated.

On Plaintiffs' appeal from the denial of preliminary injunctive relief, we mentioned the "close" nature of this case

when we upheld the district court's finding that Plaintiffs failed to show a strong likelihood of success on the merits. *See Leary*, 228 F.3d at 739. Recognizing that the standard on a motion for summary judgment is less deferential than the "stringent" standard applied to a district court's findings on a preliminary injunction, we made clear that we were not commenting on the merits of the Plaintiffs' case. *Id.* We concluded our analysis.

Thus, we do not decide whether we would grant a preliminary injunction if we were acting in the place of the district court, nor do we decide whether summary judgment is appropriate. Rather, given the closeness of the question, and the fact that the plaintiffs' arguments, while shedding some doubt on the district court's interpretation of the facts, do not show the district court's factual findings to be clearly erroneous, we affirm the district court's conclusion that the plaintiffs have not, for the purpose of the preliminary injunction, shown that the plaintiffs' transfer was motivated by their protected speech, and therefore that the plaintiffs have not shown a strong likelihood of success on the merits.

*Id.*

While the interlocutory appeal was pending before this court on the preliminary injunction ruling, the district court granted Daeschner's motion for summary judgment, noting that the Plaintiffs did not present any new evidence in support of their First Amendment retaliation claims.[13] Therefore, because there was no genuine issue for the jury to decide, the district court granted Daeschner's summary judgment motion for the reasons stated in the court's August 13, 1999

---

[13] We cannot help but note that because the district court ruled on some of Daeschner's summary judgment motions while the interlocutory appeal still was pending, the urgency for Plaintiffs to collect new evidence in support of their claims was diminished. Likewise, the district court did not have the benefit of our opinion to assist in its decision-making.

injunction hearing. When the district court granted the summary judgment motion, the only evidence on the record was the August 1999 hearing and the deposition testimony of Bowlds and Daeschner.[14]

## 1. Protected Activity

"Speech of a public employee is entitled to First Amendment protection if it relates to a matter of public concern." *Boger*, 950 F.2d at 322. In *Connick v. Myers*, 461 U.S. 138 (1983) the Supreme Court held that speech involves a matter of public concern when it relates to "any matter of political, social, or other concern to the community." *Id.* at 146. This must be differentiated from a matter of public speech that involves matters of personal interest which are not protected. *Id.* at 147 (holding that when a public employee speaks "as an employee upon matters only of personal interest . . . a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior"). "In general, 'speech involves matters of public concern when it involves 'issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Banks*, 330 F.3d at 893 (quoting *Brandenburg*, 253 F.3d at 898). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48.

Plaintiffs' theory is that they were transferred in retaliation for actively voicing their complaints regarding the problems at Atkinson. Plaintiffs assert that their complaints involved subjects ranging from discipline of the students to the legality

---

[14] The only truly new testimony was Daeschner's deposition, because Bowlds's deposition contained the same information as her testimony at her 1999 hearing.

and desirability of suggested educational programs to other teachers' disregard for school procedures when making school-related decisions. In our previous decision, based on the evidence available at that time, we agreed with the district court's conclusion that Plaintiffs' speech was constitutionally protected. *See Leary*, 228 F.3d at 738 (finding the balance in favor of Plaintiffs and noting that "the school board ha[d] essentially conceded the point"). Although at that stage of the litigation all that the Plaintiffs needed to show was that their speech was constitutionally protected for preliminary injunction purposes, there is no new evidence in the record to support a contradictory conclusion on summary judgment.

A public employee's speech that relates "to any matter of political, social, or other concern to the community [at large]" is properly considered speech on a matter of public concern. *Connick*, 461 U.S. at 146. Even if some of the complaints raised by Plaintiffs more properly are classified as matters of personal concern, at the very least comments regarding the legality of educational programs, the discipline of students, and the violation of school procedures constitute protected speech because "some portion of the speech touches on a matter of public concern." *Banks*, 330 F.3d at 895 (noting that allegations that the school board violated state law and their own internal policies are matters of public concern); *see also Leary*, 228 F.3d at 737 (noting that student discipline and educational program implementation are "matters of concern to the community at large" and that the legality of proposed school programs is "undoubtedly of the highest public concern"). Here, Plaintiffs' speech receives constitutional protection under the First Amendment because it pertains to issues of community importance. Looking at the "content, form, and context," we conclude that these statements "are of public import in evaluating the performance of [Atkinson Elementary School]." *Connick*, 461 U.S. at 147-48.

Once we hold that Plaintiffs' speech touches on matters of public concern, *Pickering* instructs us to balance the Plaintiffs' interest, as citizens, in addressing these matters of

No. 01-6118                                    Leary et al. v. Daeschner    17

public concern with the school's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. When balancing these two competing interests, we "consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Cockrel*, 270 F.3d at 1053 (quotation omitted). In essence, the speech complained of must interfere with the job Plaintiffs are hired to perform or the functioning of the workplace in general. *Pickering*, 391 U.S. at 568. The public employee's speech will be constitutionally protected only if the *Pickering* balancing test proves the employee's interest to outweigh the employer's interest.

Helping tip the balance in Daeschner's favor is the fact that the volatility of the school's situation necessitated functional efficiency. *Leary*, 228 F.3d at 738. In addition, because Leary was known to yell at her coworkers and Williams was known to challenge Howard's authority, Plaintiffs' speech can be characterized as disruptive in the work environment. *Id.* Moreover, because certain aspects of Plaintiffs' speech can be identified as directed toward coworkers and supervisors, it posed a "question of maintaining either discipline by immediate superiors or harmony among coworkers." *Pickering*, 391 U.S. at 570. On the other hand, Plaintiffs' speech obviously did not interfere with their job performance because they consistently received stellar reviews. Moreover, there was no evidence that either teacher had been disciplined previously for failure to perform her duties. Daeschner never suggested how Plaintiffs' speech on student discipline or choice of educational programs "undermine[d] a legitimate goal or mission of the employer." *Cockrel*, 270 F.3d at 1053. Because the evidence has not

---

18    *Leary et al. v. Daeschner*                                    No. 01-6118

changed since our last *Pickering* balance of these factors[15] and because Daeschner provides no reason why we should approach the balancing differently simply because we now are evaluating the First Amendment claims after a grant of summary judgment, we adhere to our original balancing of these factors and hold that the Plaintiffs' speech was constitutionally protected.

### 2. Adverse Action

Our previous opinion noted that Daeschner conceded that an involuntary transfer to another school within the district "would have a sufficient chilling effect to qualify as an adverse action under the First Amendment retaliation analysis." *Leary*, 228 F.3d at 738. Again, no new evidence exists for a different finding. The fact that we now review a district court's disposition of a summary judgment motion as opposed to a request for a preliminary injunction does not change our conclusion. Clearly, involuntary transfer from one job to another is action that "would likely chill a person of ordinary firmness from continuing to engage in that constitutionally protected activity." *Bloch v. Ribar*, 156 F.3d 673, 679 (6th Cir. 1998). Moreover, we previously determined that an involuntary job transfer, where neither grade nor salary is affected, qualifies as adverse action for purposes of the First Amendment. *See Boger*, 950 F.2d at 321. Here, evidence in the record suggests that being transferred from one school in the district to another causes Plaintiffs to suffer harm to their reputations, while the transfers also remain notations in their files for a year. The act of transferring Plaintiffs to another school additionally can negatively impact their daily experiences including their commute, coworker friendships, and community

[15] After we assessed the factors in the balance, we determined that "the plaintiffs' speaking out on discipline, choice of educational approaches, and potential violations of the law by the school district is of sufficient public importance to outweigh the employer's interest in limiting that speech." *Leary*, 228 F.3d at 738.

relationships. *See* J.A. at 101-03 (Drescher Test.), 354 (Williams Test.).

### 3. Substantial or Motivating Factor

The final showing that the Plaintiffs must make before the burden shifts to the Defendant is that their "protected speech was a substantial or a motivating factor in the adverse action." *Brandenburg*, 253 F.3d at 897 (quotation omitted). On the Plaintiffs' request for injunctive relief, the district court determined that Plaintiffs failed to make the showing of a substantial or motivating factor because the evidence that they were transferred for confrontations with Howard was undermined by Howard's resignation and because the protected speech occurred over a long period of time. We affirmed that decision on the basis that the district court's factual findings were not clearly erroneous. *Leary*, 228 F.3d at 739.[16] Because Plaintiffs failed to produce any new evidence on this issue in response to Daeschner's motion for summary judgment, the district court relied on its findings from the preliminary injunction hearing.[17] On this appeal, Plaintiffs redirect our attention to evidence that their transfers were motivated, at least in part, by their vocal behavior.

The determination of the reason for Plaintiffs' transfers is a question of fact because it involves whether to believe

---

[16] Although we affirmed the district court's denial of a preliminary injunction, we clearly stated that the standard required for a preliminary injunction is more "stringent" than that required for summary judgment. We explicitly declined to express an opinion on the merits of Plaintiffs' case. *Leary*, 228 F.3d at 739.

[17] The district court seemed to focus almost entirely on whether Plaintiffs showed that their transfers were based "in substantial part" on their protected speech. The actual test provides that the protected speech must be *either* a substantial *or* a motivating factor in bringing about the adverse action. *But see Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287 (suggesting that "substantial factor" and "motivating factor" are one and the same).

Daeschner's evidence on the reasons for Plaintiffs' transfers or whether to believe Plaintiffs' contrasting evidence on the reasons for their transfers. While it is true that not every question of fact saves a case from disposition on summary judgment, summary judgment is not proper when Plaintiffs create a jury issue by raising a genuine issue of material fact. In order for a factual issue to be "genuine" a reasonable jury must be able to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. Here, construing the evidence in a light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, we conclude that Plaintiffs' evidence that their transfers were motivated by their protected speech, while not overwhelming, is more than a scintilla and is sufficient to survive a motion for summary judgment. *See Street*, 886 F.2d at 1477.

Plaintiffs' most promising evidence showing that their transfers were motivated by their outspokenness is that Howard testified that Leary was "probably [transferred] because of [her speaking out on school-related issues] and some other things." J.A. at 296 (Howard Test.). Leary regards Howard's later-retracted statement[18] as clear and direct evidence that her transfer was precipitated by her protected speech. In addition to Howard's suggestive statement, Plaintiffs point to testimony from fellow teachers expressing opinions that Plaintiffs were transferred because they were too vocal. Plaintiffs ask us to draw logical inferences from the evidence that Plaintiffs had excellent records at Atkinson and from the various administrators' poor treatment of Plaintiffs, to reach the conclusion that Plaintiffs' vocal behavior caused their transfers.[19] Plaintiffs also

---

[18] Howard later retracted this testimony, stating that Leary was transferred because she failed to "embrace change." J.A. at 297 (Howard Test.).

[19] At a staff meeting, Howard told the faculty that some of them were "nagging, bitching, complainers," and that they knew who they were. J.A. at 317 (Howard Test.). Plaintiffs suggest that this comment was

provide us with their own testimony explaining their roles in the Atkinson community and their proclivity to speak on behalf of others. For example, Williams acted as the part-time JCTA representative, which required her to advocate on behalf of other teachers for a period of three or four years. Moreover, Leary testified that she had no idea why she was transferred, so her "best guess is being too vocal"." J.A. at 338-39 (Leary Test.). Likewise, Williams seemed baffled by her transfer and testified that "[t]he only conclusion I could come to is that I was too vocal." J.A. at 460 (Williams Test.).

Daescher argues that the Plaintiffs were transferred not because they were vocal, but because they were not "team players" and they would impede the changes necessary for Atkinson's success.[20] In addition, Daescher recites Plaintiffs' behavioral problems to undermine Plaintiffs' contention that the transfers were retaliatory. Because a determination of the reasons for Plaintiffs' transfers involves disputed issues of fact, summary judgment is not proper "unless the evidence is 'so one-sided that one party must prevail as a matter of law.'" *Boger*, 950 F.2d at 322-23 (quotation omitted). On the record before us, this is not the case. In fact, the Plaintiffs produced ample evidence on the allegedly unconstitutional basis for their transfers which is in direct conflict with Daeschner's evidence. This creates "a genuine issue of material fact that must be resolved by the trier of fact," not on summary judgment. *Id.* at 323.

---

directed to them. In addition, testimony was heard that if Leary did not agree with Bowlds in team leader meetings, Bowlds would 'cut her off' mid-sentence." J.A. at 354 (McAvinue Test.).

20
Daeschner relies on testimony from Bowlds to insist that the transfers were not arranged in violation of Plaintiffs' First Amendment rights. Bowlds testified that Leary's transfer "certainly had nothing to do with speaking out." J.A. at 173 (Bowlds Test.). With respect to Williams, Bowlds testified: "I certainly, certainly, certainly could never have recommended her because of being vocal. I never heard a word [from Williams]." J.A. at 176, 178 (Bowlds Test.).

## 4. Defendant's Alternative Explanation

As stated previously, once Plaintiffs have established their prima facie case, the burden shifts to the Defendant to prove by a preponderance of the evidence that the same adverse action would have occurred regardless of the protected speech. *See Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287. Daeschner has produced no evidence, other than the evidence used to counter Plaintiffs' evidence that their transfers were unconstitutional, to show that the transfers would have occurred at this time and in this manner with or without Plaintiffs' vocal behavior. Because a genuine issue of material fact still exists with respect to the reason for Plaintiffs' transfers, whether Plaintiffs' transfers would have occurred in the absence of the protected speech also requires further proceedings.

## 5. Supervisor Liability

The Supreme Court has stated that § 1983 liability cannot be premised on a theory of respondeat superior. *Taylor v. Michigan Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). However, supervisor liability under § 1983 is appropriate when "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it," or "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845 (1984). "[Section] 1983 liability of supervisory personnel must be based on more than the right to control employees." *Id.* Likewise, simple awareness of employees' misconduct does not lead to supervisor liability. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 728 (6th Cir. 1996).

Daeschner argues that even if Plaintiffs' transfers were precipitated by their protected speech, he cannot be liable for his employees' constitutional violations because Plaintiffs

cannot show how Daeschner, who did not know either of the Plaintiffs, had a retaliatory motive in issuing the final approval for Plaintiffs' transfers. In our prior published opinion in this case, we identified a number of ways in which Daeschner could be liable. One way Daeschner could be exposed to liability is if he encouraged or acquiesced in the unconstitutional behavior. *Leary*, 228 F.3d at 740. Another possible way would be if the Plaintiffs could show that "because Daeschner was primarily responsible for approving the transfer of teachers, he [was] responsible for failing to perform his job properly or for acquiescing in the constitutional violations resulting from his delegation of this responsibility." *Id.* Finally, we noted that "Daeschner might be liable if the plaintiffs can show that he encouraged his subordinates to transfer teachers who were particularly vocal in speaking out against school policy through his mandate to transfer those teachers who were not 'team players.'" *Id.*

In *Taylor*, we determined that summary judgment for a prison warden in a § 1983 action was improper because a genuine issue of material fact existed as to whether the warden was aware and acquiesced in his subordinates' failure to review properly prisoner-transfer orders resulting in violation of a transferred prisoner's Eighth Amendment rights. *Taylor*, 69 F.3d at 80. We commented that the prison warden in *Taylor* was not "merely a supervisor, but [was] the official directly responsible both for transfers and for adopting reasonable transfer procedures." *Id.* at 81. In our estimation, the warden "abandon[ed] the specific duties of his position — adopting and implementing an operating procedure that would require a review of the inmate's files before authorizing the transfers." *Id.*

Much like the situation in *Taylor*, a reasonable fact finder "could find on the facts that [Daeschner] personally had a job to do, and that he did not do it." *Taylor*, 69 F.3d at 81. Daeschner stated in his deposition that he was the one who put the transfers "into operation." J.A. at 127 (Daeschner Dep.). However, he also stated that he did know of any

specific instances where either Leary or Williams impeded progress at Atkinson. J.A. at 132 (Daeschner Dep.). Considering that Meriweather's directive to Bowlds and Howard was to identify teachers for transfer who would resist change and progress at Atkinson, a reasonable fact finder could determine that even though the school was in crisis mode and needed to effectuate change through transfers, change should stem from reasonable procedures that ensure that teachers are chosen for transfers based on proper criteria and not based on their proclivity to vocalize concerns of public importance. *Cf. Taylor*, 69 F.3d at 81 (noting that a jury could find a supervisor liable for failure to adopt policies for transfer that ensure inmate safety). Moreover, a reasonable fact finder could determine that reliance on people in leadership positions to recommend transfers is insufficient to ensure that transferees are not chosen for unconstitutional reasons. In Eckels and Meriweather who gave him the recommendations who in turn relied on the recommendations of Howard and Bowlds). Thus, whether Daeschner can be held liable in his supervisory capacity for the violation of Plaintiffs' First Amendment rights remains an issue for the trier of fact.

## C. Denial of Leave to Amend Analysis

### 1. Standard of Review

Denial of a motion for leave to amend is reviewed by this court for an abuse of discretion. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 833 (6th Cir. 1999). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996), *cert. denied*, 522 U.S. 906 (1997) (quotation omitted). A district court's decision is to be afforded great deference; it "will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Blue Cross & Blue*

No. 01-6118

*Leary et al. v. Daeschner*    25

*Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir. 1997). However, if leave to amend is denied on the grounds that it would be "futile," then de novo review is appropriate. *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 625 (6th Cir. 2002).

### 2. Leave to Amend

The prayer for relief in Plaintiffs' original complaint requested that the district court hold a hearing on Plaintiffs' motion for a preliminary injunction, issue a permanent injunction prohibiting Defendant's violation of Plaintiffs' constitutional rights, declare Section D of the CBA unconstitutional, order the Defendant to pay Plaintiffs' costs and attorney fees, and grant "all further and proper relief to which [Plaintiffs] may be herein entitled." J.A. at 31 (Compl.). The first amended complaint added four new claims, all seeking damages. Plaintiffs sought to amend their complaint a second time "to clear up any confusion in regard to damages claimed." J.A. at 91 (Mem. in Supp. of Second Am. Compl.). The proposed second amended complaint sought to add claims for monetary damages — general, compensatory, and punitive — for the due process claims contained in the original complaint.[21] The district court

---

[21] Plaintiffs' original complaint requested only declaratory and injunctive relief for their due process claims, whereas the first amended complaint added new claims with requests for monetary damages but never requested monetary damages for the due process claims contained in the original complaint. One claim in the first amended complaint requested monetary damages for post-deprivation violations of due process, but the first amended complaint did not request monetary damages for the pre-deprivation due process violation alleged in the original complaint.

[22] Because we already have determined that there was no due process violation, *see Leary,* 228 F.2d at 744, Plaintiffs' motion for leave to amend their complaint to include a damages claim for the violation of their right to due process (Counts IX–XI) is moot. Indeed, it is unclear what due process issues remain after we determined that Plaintiffs

---

26    *Leary et al. v. Daeschner*

No. 01-6118

denied Plaintiffs' motion for leave to amend their complaint because Plaintiffs did not show good cause for failure to move for leave to amend before expiration of the deadlines in the court's scheduling order, as called for in Federal Rule of Civil Procedure 16. The court concluded:

> The plaintiffs seek at this late date to recast the due process violation as one for breach of the collective bargaining agreement. They have provided no justification for their failure to raise this legal theory earlier. The plaintiffs have referenced the collective bargaining agreement throughout this litigation, and the claim has clearly been available to them.

J.A. at 103 (Mem. Op. & Or.). As an aside, the district court noted that even if Plaintiffs had been permitted to amend their claims, the amendment would be futile because they did not include any binding precedent to support their contention that damages are available when Plaintiffs waive "process which was due [and] subsequently afforded them." *Id.*[23]

Federal Rule of Civil Procedure 15 provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Supreme Court, commenting on the mandate in Rule 15(a), stated:

---

received all the process that was due. Thus, even if the district court abused its discretion by denying Plaintiffs an opportunity to amend their complaint, Plaintiffs have not shown how the district court could have granted any damages when no due process violation had occurred. Thus, we could decide that the district court reached the correct result on an alternative ground — concluding that the proposed amendment would be futile.

[23] This was merely dicta because the district court expressly stated that it did not need to reach the question of futility. J.A. at 103 (Mem. Op. & Or.). Thus, the proper standard of review on appeal is abuse of discretion. *See Duggins,* 195 F.3d at 833.

In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. — the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962). The Court noted that although leave to amend remains within the sound discretion of the trial court, the lower court must announce some reason for its decision, i.e., exercise discretion, or risk being reversed for an abuse of discretion. *Id.*

More than twenty years after the Court's decision in *Foman*, the 1983 amendments to the Federal Rules of Civil Procedure altered Rule 16 to contain a provision restricting the timing of amendments. Fed. R. Civ. P. 16, 1983 advisory committee's notes. Rule 16 states, in relevant part: "the district judge . . . shall, after receiving the report from the parties under Rule 26(f) . . . enter a scheduling order that limits the time (1) to join other parties and *to amend the pleadings* . . . ." Fed. R. Civ. P. 16(b) (emphasis added). The Rule is designed to ensure that "at some point both the parties and the pleadings will be fixed." Fed. R. Civ. P. 16, 1983 advisory committee's notes. The Rule permits modification to the scheduling order "upon a showing of good cause *and* by leave of the district judge." Fed. R. Civ. P. 16(b) (emphasis added). But a court choosing to modify the schedule upon a showing of good cause, may do so only "if it cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16 1983 advisory committee's notes; *see also Inge*, 281 F.3d at 625 (stating that good cause is measured by the movant's "diligence in attempting to meet the case management order's requirements" (quotation omitted)). Another important consideration for a district court deciding whether Rule 16's "good cause" standard is met is whether the opposing party

will suffer prejudice by virtue of the amendment. *Inge*, 281 F.3d at 625.

A number of circuit courts have previously considered the intersection of Rule 15's liberal amendment mandate and Rule 16's good cause requirement. *See generally Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000) (holding that "despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause"); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir. 1998) ("[B]ecause [plaintiff's] motion to amend was filed after the scheduling order's deadline, [plaintiff] must first demonstrate good cause under Rule 16(b) before we will consider whether amendment is proper under Rule 15(a)."); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992) (noting that Rule 16's standards may not be "short-circuited" by those of Rule 15 because "[d]isregard of the [scheduling] order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier"). Although we never have commented explicitly on the intersection of the two Rules, one of our recent decisions addresses the "good cause" requirement in Rule 16. *See Inge*, 281 F.3d at 625-26.

In *Inge*, we concluded that the district court's denial of leave to amend based on Rule 16(b) was an abuse of discretion because the plaintiff acted diligently when she sought to amend her complaint to "remedy pleading deficiencies." *Id.* at 626. We determined that while prejudice to the defendant is not an express component of Rule 16, it is nonetheless a "relevant consideration," and the *Inge* defendant would not suffer significant prejudice if plaintiff was allowed to amend her complaint to remedy the errors that caused the complaint to be dismissed seven days earlier. *Id.*; *cf. Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986) (noting that the denial of plaintiff's motion to amend was an abuse of

discretion where "rejection of the amendment would preclude plaintiff's opportunity to be heard on the merits on facts which are well known to the parties and which were pleaded at the outset although relief was erroneously sought under § 1985" and where the defendant suffered only "relatively light prejudice")." Even though in *Inge* we held that the district court abused its discretion, we relied solely on Rule 16 to reach this conclusion, never once mentioning Rule 15 and its liberal amendment policy.

An earlier decision of this court required a district court to find "at least some significant showing of prejudice to the opponent,'" before it could deny a motion for leave to amend. *Duggins*, 195 F.3d at 834 (quoting *Moore*, 790 F.2d at 562). In that case, we determined that the district court did not abuse its discretion when it denied plaintiff's motion for leave to amend based on plaintiff's undue delay and the prejudice to the opposition. *Id.* We noted that prior to the plaintiff's motion, the time for discovery and dispositive motions had passed and a summary judgment motion had been filed. *Id.* We also considered the "significant prejudice" the defendant would suffer if the plaintiff were allowed to amend the complaint because not only would discovery have to be reopened, but a new defense would be necessary to defeat the new claim. *Id.*

In the present case, the Rule 16 order stated that "[any] motions for . . . amendment of pleadings shall be filed *no later than November 8, 1999.*" J.A. at 62 (Mem. of R. 16 Scheduling Conf. & Or.).[24] Plaintiffs sought to amend their complaint for a second time on April 30, 2001. This attempt at amendment was filed nine months after the district court's grant of summary judgment on Plaintiffs' First Amendment retaliation claims, eight months after the district court

---

[24] Plaintiffs correctly point out that the first amended complaint was filed on November 18, 1999, 10 days after the deadline, but was nevertheless allowed.

dismissed most of the claims in the first amended complaint, seven months after we issued an opinion in this case agreeing with the district court that Plaintiffs received sufficient pre-deprivation process, one month after the district court dismissed the interference and emotional distress claims from the first amended complaint, and one month after Daeschner filed his last summary judgment motion to dismiss Plaintiffs' sole remaining claim for punitive damages. Plaintiffs sought leave for an amendment almost two years after the scheduling order's discovery and dispositive motion deadlines had passed. *See Inge*, 281 F.3d at 625 (requiring that a party diligently attempt to meet the scheduling order's deadlines before the deadline can be changed), *but see Moore*, 790 F.2d at 560 (noting that "delay alone, regardless of its length is not enough to bar it [amendment] if the other party is not prejudiced" (quotation omitted)).

Once the deadline passed, the district court could allow Plaintiffs to file their second amended complaint only if the scheduling order was modified. As noted previously, modification is permitted under Rule 16 if Plaintiffs can demonstrate "good cause" for their failure to comply with the original schedule, by showing that despite their diligence they could not meet the original deadline. Fed. R. Civ. P. 16, 1983 advisory committee's notes; *see also Inge*, 281 F.3d at 625. Instead, Plaintiffs gave the district court no excuse for their considerable delay in seeking monetary damages.[25] *See Duggins*, 195 F.3d at 834 (denying plaintiff's motion, in part, because plaintiff gave no justification for her delay); *Moore*, 790 F.2d at 559-62 (stating that failure to provide justification for tardy filings is insufficient by itself for a court to deny an attempt at modification). In fact, Plaintiffs attempted to characterize their damages claim as a mere clarification,

---

[25] Plaintiffs offered no excuse in their memorandum in support of their second amended complaint, but in their appellate brief they suggest that it should have been "obvious" that they were requesting monetary damages all along and that a monetary damage component was implied.

suggesting that they had sought damages for the due process claims all along.[28] It comes as no surprise, then, that the district court rejected Plaintiffs' request pursuant to Rule 16.

Much like the plaintiff in *Duggins*, Plaintiffs here were "obviously aware of the basis of the claim for many months," but nonetheless failed to pursue the claim until after it was brought to their attention by Daeschner's final summary judgment motion. *Duggins*, 195 F.3d at 834 (holding that the district court did not abuse its discretion when it denied plaintiff's amendment on the grounds of both undue delay and undue prejudice); *see also Sosa*, 133 F.3d at 1419 ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."). Plaintiffs were aware of the "underlying facts" and the varying types of relief available, as evidenced by the fact that they sought injunctive relief for their constitutional claims and damages for their state law claims. *See Duggins*, 195 F.3d at 834 ("The plaintiff was obviously aware of the basis of the claim for many months, especially since some underlying facts made a part of the complaint."). Moreover, Plaintiffs' inclusion of the phrase "all further and proper relief to which [Plaintiffs] may be herein entitled," 1 J.A. at 31 (Compl.), does not transform "the prayer for purely equitable relief into a legal claim." *See Deringer v. Columbia Transp. Div., Oglebay Norton Co.*, 866 F.2d 859, 863 (6th Cir. 1989); *see also* Fed. R. Civ. P. 8(a) (stating that pleadings must contain "a demand for judgment for the relief the pleader seeks").

---

28

— As a preliminary matter, this characterization is undeniably false — the first amended complaint requested damages only for a newly-asserted post-deprivation due process claim. However, even if we were to agree that Plaintiffs had asserted a damages claim for the pre-deprivation due process violation, that does not change the fact that we previously have determined that Plaintiffs received all the process that was due. Thus, any damages claim set forth by Plaintiffs was rendered moot by our prior judgment.

As for prejudice, we already have indicated that prejudice to the defendant is also a "relevant consideration." *Inge*, 281 F.3d at 625. In the present case, the district court did not expressly reference the prejudice to Daeschner, nor did it make a finding that there has been a "significant showing of prejudice." *Moore*, 790 F.2d at 562. However, some language in the district court opinion suggests that the court considered prejudice to Daeschner. The district court challenged the Plaintiffs' amendment as an attempt to change their legal theory by "recast[ing] the due process violation as one for breach of the collective bargaining agreement." J.A. at 103 (Mem. Op. & Or.); *cf. Inge*, 281 F.3d at 626 (holding that the defendant would not suffer prejudice when the plaintiff sought to refine existing claims rather than add brand-new claims). Obviously Daeschner would suffer prejudice if the district court permitted the Plaintiffs to file a second amended complaint which essentially transformed the original due process claims into new claims for breach of the CBA. Moreover, because we previously evaluated the merits of Plaintiffs' claims and ruled that Plaintiffs' received sufficient pre-deprivation due process, the prejudice to Defendant is even more apparent. *Cf. Moore*, 790 F.2d at 562 (noting that is "principal basis for [its] decision is that the rejection of the amendment would preclude plaintiff's opportunity to be heard on the merits on facts which are well known to the parties and which were pleaded at the outset"). Daeschner also can show prejudice by the fact that discovery will have to be reopened, years after it was closed, on the issue of damages if this amendment were permitted.

The question, then, is whether the district court abused its discretion in denying Plaintiffs' motion for leave to amend their complaint because the motion was filed after the Rule 16 deadline for amendments had passed. The answer is decidedly "no," because the Plaintiffs failed to show good cause and because Daeschner would suffer undue prejudice. This is so even though the clear language of Rule 15 states that leave to amend "shall be freely given." Fed. R. Civ. P. 15(a). Once the scheduling order's deadline passes, a plaintiff

No. 01-6118                                        *Leary et al. v. Daescher*   33

first must show good cause under Rule 16(b) for failure earlier to seek leave to amend before a court will consider whether amendment is proper under Rule 15(a). *See Sosa*, 133 F.3d at 1419. Our previous decisions suggest that the district court also is required to evaluate prejudice to the opponent before modifying the scheduling order. *See Inge*, 281 F.3d at 625; *see also Duggins*, 195 F.3d at 834; *Moore*, 790 F.2d at 562.[27] Thus, in addition to Rule 16's explicit "good cause" requirement, we hold that a determination of the potential prejudice to the nonmovant also is required when a district court decides whether or not to amend a scheduling order. Here, the district court did not abuse its discretion when it denied Plaintiffs' motion for leave to amend their complaint after the dispositive motion deadline had passed. First, the district court determined that Plaintiffs failed to show good cause for modification of the scheduling order. Second, the district court's opinion implicitly, if not explicitly, commented on the prejudice that Daeschner would suffer if the Plaintiffs were permitted to "recast" their claims at this late stage in the proceedings. Because the district court properly applied the governing law, we must conclude that it did not abuse its discretion.

**D. Motion to Schedule Jury Trial**

Plaintiffs moved for a jury trial on November 8, 2000. The district court never ruled on this motion, and Plaintiffs allege that the district court erred by denying them a jury trial. According to Federal Rule of Civil Procedure 38, "[t]he right of a trial by jury as declared by the Seventh Amendment to the Constitution . . . shall be preserved to the parties inviolate." Fed. R. Civ. P. 38. The Seventh Amendment provides: "In Suits at common law . . . the right of trial by

---

27 We note that, in both *Moore* and *Duggins*, a showing of prejudice was required, even though the plaintiffs advanced brand-new claims which more obviously create prejudice because the defendant must contend with an entirely different substantive issue. *See generally Moore*, 790 F.2d at 559; *Duggins*, 195 F.3d at 833.

34   *Leary et al. v. Daescher*                                        No. 01-6118

jury shall be preserved." U.S. Const. amend. VII. Assessing whether the "Seventh Amendment provides for a jury trial in a specific case "depends on the nature of the issue to be tried rather than the character of the overall action." *Ross v. Bernhard*, 396 U.S. 531, 538 (1970); *see also* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2302, at 18 (2d ed. 1994) ("There is no right to jury trial if viewed historically the issue would have been tried in the courts of equity or otherwise would have been tried without a jury."). Thus, we resolve the question of whether Plaintiffs are entitled to a jury trial by determining whether the issues involved in the case are legal or equitable in nature.

In *Ross*, the Supreme Court identified a three-part test for reaching the legal-versus-equitable-in-nature conclusion. First, we consider the "pre-merger custom with reference to such questions." *Ross*, 396 U.S. at 538 n.10. Second, we consider the "remedy sought" by the plaintiff. *Id.* Third, we evaluate "the practical abilities and limitations of juries" with respect to the issue presented. *Id.* The first element troubled many courts, but as we noted in *Hildebrand v. Bd. of Tr. of Mich. State Univ.*, 607 F.2d 705 (1979), *cert. denied*, 456 U.S. 910 (1982), the Supreme Court in a later case "shift[ed] the focus to the second issue: the nature of the relief sought." *Id.* at 708 (citing *Curtis v. Loether*, 415 U.S. 189 (1974)). Thus we noted that:

[T]he chief focus to be made when determining whether a jury trial exists is the nature of the relief sought. If the remedy sought is injunctive relief and/or back pay, no jury trial right attaches. In the ordinary case, if the relief sought includes compensatory and/or punitive damages, then there does exist a right to trial by jury.

*Id.* ("A key dividing line between law and equity has historically been that the former deals with money damages and the latter with injunctive relief."); *see also Tull v. United States*, 481 U.S. 412, 417 (1987) (noting that the court must examine the nature of the action and whether the remedy

No. 01-6118                                    *Leary et al. v. Daeschner*   35

sought is legal or equitable before it can determine if the claim should be tried to a jury).

In light of these factors, because Plaintiffs' original complaint involved only claims that were equitable in nature, Plaintiffs were not entitled to a jury trial. *See Harris v. Richards Mfg. Co.*, 675 F.2d 811, 815 (6th Cir. 1982); *Bereslavsky v. Kloeb*, 162 F.2d 862, 864 (6th Cir.), *cert. denied*, 332 U.S. 816 (1947); *see also Deringer*, 866 F.2d at 863 (concluding that because plaintiff's claims were "equitable in nature and sought purely equitable remedies, the district court properly denied [plaintiff's] request for a jury trial"). However, once Plaintiffs filed an amended complaint on March 17, 2000 with claims at law, they were entitled to demand a jury trial. *See Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 660 (6th Cir.), *cert. denied*, 519 U.S. 807 (1996) ("Once a court determines that a case involves legal issues, the litigants have a right to a jury trial on those issues, regardless of how insignificant they may appear in relation to equitable issues."). Indeed, Plaintiffs expressly demanded a jury trial in the first amended complaint, and this demand was timely. *See Local 783, Allied Indus. Workers of Am., AFL-CIO v. Gen. Elec. Co.*, 471 F.2d 751, 755 (6th Cir.), *cert. denied*, 414 U.S. 822 (1973). Although Plaintiffs preserved their right to a trial by jury, a district court is not required to impanel a jury unless a trial will take place. In the instant case, no trial took place because the district court disposed of all of Plaintiffs' claims on Daeschner's motions for summary judgment. If there are no issues for a jury, it is not error for the district court to dismiss the Plaintiffs' claims pursuant to a summary judgment motion, thereby implicitly denying their demand and motion for a jury trial.

Our reversal of the district court's grant of summary judgment on Plaintiffs' First Amendment claims does not change this result. After our opinion today, Plaintiffs are left with their equitable claims for declaratory and injunctive relief based on a theory of First Amendment retaliation. Because we have affirmed the district court's denial of

36   *Leary et al. v. Daeschner*                    No. 01-6118

Plaintiffs' motion for leave to amend, the complaint cannot be altered to include any claims other than those equitable claims[8] currently at issue. Because Plaintiffs requested only injunctive and declaratory relief for the violation of their First Amendment rights, we must consider these claims equitable in nature, and thus the remaining decisions in this case rest exclusively with the court rather than a jury. *See generally Ross*, 396 U.S. at 538 n.10; *Hildebrand*, 607 F.2d at 708; 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1260, at 380-81 (2d ed. 1990) ("[I]f [plaintiff] asserts an equitable claim and requests relief in the form of specific performance or an injunction, the action will be considered equitable in nature and neither party has a right to a jury trial.").

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of Defendant's motion for summary judgment as to Plaintiffs' First Amendment claims and **REMAND** to the district court for further proceedings. We **AFFIRM** the district court's denial of Plaintiffs' motion for leave to amend and conclude that the district court did not err when it failed to grant Plaintiffs' motion for a jury trial.

---

**28** While it is true that declaratory relief can be legal rather than equitable, "[s]eeking declaratory relief does not entitle one to a jury trial where the right to a jury trial does not otherwise exist." *Golden*, 73 F.3d at 662.

## DISSENT

ALICE M. BATCHELDER, Circuit Judge, dissenting. I respectfully dissent. Although I agree with the majority opinion with respect to its holdings regarding the motion for leave to amend and the motion for jury trial, I dissent because I find no evidence in this record that Appellants were transferred because they exercised their First Amendment rights. Neither do I find any basis upon which Superintendent Daeschner could be held liable, even if the Appellants could demonstrate that their transfers were retaliatory. I would therefore AFFIRM the district court's grant of summary judgment.

### I.

### The "Evidence" Upon Which the Majority Bases its Holding is Not Evidence

The majority holds that the Appellants have provided evidence sufficient to create a genuine issue of fact regarding the reason for their transfers. The evidence to which the majority points as "most promising" includes Ms. Howard's testimony that, as the majority quotes it, "Leary was 'probably [transferred] because of [her speaking out on school-related issues] and some other things,'" J.A. at 296 (Howard Test.)," a statement about which the majority opinion notes, "Howard later retracted this testimony, stating that Leary was transferred because she failed to 'embrace change.' J.A. at 297 (Howard Test.)." Both this quotation and the pronouncement that it was retracted mischaracterize the Howard's testimony. The testimony to which the majority opinion cites reads in full as follows:

Q. Well, was there anything else? I mean, Ms. Leary alleged she was a vocal person. Is she?

A. Yes, she is.
Q. And she has alleged and said that she speaks out.
A. Yes. Yells out. She speaks out.
Q. Yells out, speaks out, whatever. And that she is one of the more ringleaders or prominent people who have positions on issues such as this?
A. Yes.
Q. That's true?
A. Yes.
Q. And she's alleging here that it's because of this that she's being transferred?
A. It's probably because of that and some other things.
Q. Well –
A. Which says that she's unwilling to embrace change.
Q. Well, you said she was unwilling to embrace the collaborative model. Is she also being transferred because she's just a vocal persona and yells out?
A. No, I wouldn't think so. We also had a DI program, a Direct Instruction reading program, I mentioned when I first begun the testimony.
Q. Uh-huh.
A. And there was some teachers who participated in that there were some who didn't and wouldn't. She was one of those, also.
Q. One of those who?
A. Would not embrace that change.
Q. Okay. Well, you said that she was properly characterizing herself as one of the more prominent ringleaders or agitators for something including discipline or whatever at the school. Was that the reason she was recommended or at least signed off by you as being appropriate for transfer as not a team player?
A. Yes.
Q. Because she wasn't one of the leaders?
A. No, because she wouldn't embrace the changes in our school.

No. 01-6118                                    *Leary et al. v. Daescher*  39

J.A. 296-97. Ms. Howard did not state that Leary was transferred because of her speaking out; Howard merely confirmed that *this is what Leary alleged.* Ms. Howard's own testimony was that Leary was transferred because "she's unwilling to embrace change." J.A. at 297. Ms. Howard simply did not make the statement that the majority points to as "most promising," to be charitable, the majority opinion cobbles together parts of a statement taken out of context. I find the majority's "most promising" support altogether wanting.

If other evidence supported the majority opinion, I could perhaps agree with its holding. But it does not. Instead, the majority cites "testimony from fellow teachers expressing opinions that Appellants were transferred because they were too vocal." [ Majority Opinion at 19-20]. This opinion testimony is not evidence. It is pure conjecture, unsupported by any personal knowledge or foundation.

For example, one of the peer teachers to whom Appellants point, Ms. Toliafero, responded to the question of why the Appellants were transferred, "I think because they were vocal." J.A. 447. No foundation whatever was laid for this belief. According to Appellants' brief, Ms. Shalda, another of Appellants' colleagues, also surmised that Appellants were transferred because they were outspoken. [The record, however, reflects that Ms. Schalda's testimony (J.A. 431-36) includes no mention of a belief that Appellants were transferred for this reason. Another teacher, Ms. Drescher, testified that Appellants were transferred "because they were outspoken (J.A. 200) and that in her opinion, Appellants were transferred "because they spoke out about the lack of discipline." J.A. 202. When the district court asked Ms. Drescher why she believed that, Ms. Drescher's answer was enigmatic: "[f]or whatever reason would there be." J.A. 203. This pressed further: "[s]o done through a process of elimination?" J.A. 203. Ms. Drescher answered, "I have taught with them all. If they have 30 years of good teaching evaluations, that

40  *Leary et al. v. Daescher*                              No. 01-6118

should stand for itself." J.A. 203. Bald assertions, unsupported by any personal knowledge or facts, but rather reached by process of elimination, are not evidence.

Appellants' own assertions as to why they were transferred likewise lack any basis in fact. The majority opinion admits that both Leary and Williams were "baffled" by their transfers. To support its holding that the Appellants have nonetheless presented evidence of retaliatory motivation, the majority opinion declares that: "Leary testified that she had no idea why she was transferred, so her 'best guess is being too vocal,' J.A. at 338-39 (Leary Test.)" [Majority Opinion at 20] and Williams "seemed baffled by her transfer and testified that '[t]he only conclusion I could come to is that I was too vocal.' J.A. at 460 (Williams Test.)." [Majority Opinion at 20]. The Appellants' guesses are just that; they are not evidence. Therefore, because there is not even a scintilla of evidence upon which the jury could find in Appellants' favor, I cannot join in the majority's opinion.

II.

*Appellants Established No Connection Between Their
Speech and Defendant Daeschner's Actions*

As the majority rightly recognizes, supervisory liability is only appropriate in § 1983 actions when "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy,* 729 F.2d at 421. In the prior published opinion in this case, a panel of this court suggested that merely "showing that [Daeschner] did not know the Appellants personally" cannot shield him from liability. *Leary,* 228 F.3d at 740. And it opined that Daeschner, failing to perform his job properly, acquiescing in constitutional violations, or encouraging subordinates to transfer "particularly vocal" teachers could sustain a trier of fact's conclusion that Daeschner is liable for constitutional violations. *See id.* In short, if evidence were proffered that Daeschner acquiesced or encouraged Appellants' transfer due

No. 01-6118    *Leary et al. v. Daeschner*    41

to their outspoken criticisms, then a trier of fact might find him liable for constitutional violations.

No such evidence, however, appears anywhere in the record. Instead, it is clear from the record that the decision to transfer Appellants, and commensurate knowledge of their proclivity for expressive conduct, rested solely on Dr. Merriweather, Howard, and Bowlds. Moreover, Daeschner specifically testified that he had "never had any contact with any of the Appellants until subsequent to the filing of this action," (J.A. 231) and he "was not aware that these individuals had ever complained about anything." J.A. 231. The majority opinion twists this evidence into a basis for finding supervisory liability, suggesting that it might support a jury's finding that Daeschner is liable for failure to do his job or for relying on recommendations of his employees. But neither of these constitutes encouragement or knowing acquiescence.

By holding supervisors potentially liable for all the actions of those they supervise, even where the uncontroverted evidence establishes no personal knowledge of a connection between the adverse employment action and exercise of free speech, and no basis for a finding that the supervisor knew or should have known that the employees on whom he relied were not reliable, the majority extends *Monell* liability far beyond rational application. Indeed, the majority opinion extends far beyond its logical bounds this court's own language from our prior opinion in this very case: "Daeschner might be liable if the Appellants can show that he encouraged his subordinates to transfer teachers who were particularly vocal in speaking out against school policy through his mandate to transfer those teachers who were not 'team players.'" *Leary*, 228 F.3d at 740. The record contains no evidence that Daeschner did so, and, in fact, it is hard to imagine a case where a supervisor could be shown to have less connection to the alleged constitutional violation. The lengths to which the majority opinion suggests that supervisors must to go in order to protect themselves from

42    *Leary et al. v. Daeschner*    No. 01-6118

liability would effectively preclude the delegation of authority to subordinates at all, a result far afield from that required by any prior decision of this circuit or the Supreme Court.

Because there is no evidence to support the conclusion that Appellants' exercise of free speech was a substantial factor in their transfer, and, even if there were, there is no evidence to support a finding that Daeschner encouraged or acquiesced in the alleged constitutional violations, I respectfully dissent.